UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | *Filed Electronically* |
| | ) | |
| v. | ) | No. 3:08-cr-21-KSF |
| | ) | |
| LEONARD LAWSON, | ) | |
| CHARLES WILLIAM "BILL" NIGHBERT, and | ) | |
| BRIAN RUSSELL BILLINGS, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' POST-*ENRIGHT* HEARING RESPONSE BRIEF
ON INADMISSIBILITY OF ALLEGED CO-CONSPIRATOR
STATEMENTS UNDER FED. R. EVID. 801(d)(2)(E)**

Steven S. Reed
Kent Wicker
REED WICKER PLLC
2100 Waterfront Plaza
321 West Main Street
Louisville, Kentucky 40202
Telephone: (502) 572-2500
E-mail: kent@reedwicker.com

Counsel for Brian Billings

Howard O. Mann
Graham Trimble
Aaron Howard
LAW OFFICES OF HOWARD O. MANN, P.S.C.
104 North Kentucky Avenue
P.O. Drawer 1344
Corbin, Kentucky 40702
Telephone: (606) 528-0616
Email: hmannlaw@bellsouth.net

Counsel for Charles William Nighbert

Larry A. Mackey
Stanley C. Fickle
Jason Barclay
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204-3535
Telephone: (317) 236-1313
E-mail: lmackey@btlaw.com

J. Guthrie True
JOHNSON TRUE GUARNIERI, LLP
326 West Main Street
Frankfort, Kentucky 40601
Telephone: (502) 875-6000
E-mail: gtrue@jtgattorneys.com

Counsel for Leonard Lawson

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................................................1

ARGUMENT ..........................................................................................................................5

I.      This Court Sits As A Fact-Finder In Determining The Admissibility Of Evidence Under Rule 801(d)(2)(E), And Considers The Weight Of Evidence And Witness Credibility In Deciding Whether The Government Has Proven Each Of The Necessary Foundation Facts By A Preponderance Of The Evidence ....................................................................5

II.      The Court Should Find No Proof By A Preponderance Of The Evidence That A Conspiracy Existed ....................................................7

        A.      The Government Has Not Proven A Bribery/Conversion Conspiracy ................................................................................7

               1.      Rummage's Fundamental Story Is Inherently Not Credible ....................................................................................8

               2.      Rummage's Testimony Is Uncorroborated, Contradicted By His Own Statements, And Inconsistent With Physical Evidence ....................................................................14

        B.      The Government Has Not Proven A Conspiracy To Obstruct Justice.......23

        C.      The Government Has Not Proven Nighbert's Position With UMG Was Part Of Any Conspiracy ..........................................28

III.     At A Minimum, The Government Has Not Proven That Billings Was A Member Of A Conspiracy..................................................................30

        A.      The Government Has Failed To Prove By A Preponderance Of The Evidence That Billings Had Actual Knowledge And Joined In A Criminal Enterprise ..............................................30

               1.      Billings Did Not Join A Bribery Conspiracy.................................32

               2.      Billings Did Not Join A Conspiracy To Obstruct Justice..............................................................................37

B.    The Government Has Failed To Prove By A Preponderance Of The Evidence That Billings Had Actual Knowledge And Joined In The Conspiracy Charged In the Second Superseding Indictment ..................................................................46

VI.    Billings' Statements Are Also Inadmissible Against Lawson And Nighbert Under Rule 801(d)(2)(E) – And Vice Versa – Because The Government Has Not Shown That The Alleged Conspiracy Extended Beyond December 2007 ..................................................................49

A.    Under The Evidence And The Controlling Legal Rules, The Alleged Conspiracy Terminated By December 2007 ..............................50

B.    The Government's Theories For Avoiding Termination Of The Conspiracy As Of December 2007 Fail Under The Evidence And The Controlling Law ..........................................................53

1.    The Government's First Termination Avoidance Theory – That Lawson Continued To Receive Payments Under The Road Contracts – Fails Because It Did Not Show That Any Portions Of Those Payments Are Proceeds Of The Alleged Conspiracy, That There Was Any Agreement To Divide Those Payments, And That The Continuation Of The Payments Is The Product Of Continuing Conspiratorial Activity...................................................54

2.    The Government's Second Termination Avoidance Theory – That Nighbert Received Payments From UMG During 2008 – Fails Because It Did Not Show That Nighbert's Employment By UMG Resulted From A Decision Made By Lawson ...........................................58

3.    The Government's Third Termination Avoidance Theory – That Concealment By Means Of An Agreed "Cover Story" Was Part Of The Original Conspiratorial Agreement – Fails Because Rummage's New "Cover Story" Testimony Is Not Credible And Even If Believed Would Not Show Obstruction Was Part Of The Original Alleged Conspiracy Within The Meaning Of *Grunewald* ...........................63

C.    Because The Alleged Conspiracy Terminated By December 2007, Statements By Lawson After That Time Are Also Not Admissible Against Nighbert And Such Statements By Nighbert Are Also Not Admissible Against Lawson Under Rule 801(d)(2)(E)........................................................................69

V.  Several Statements Designated By The Government Are Inadmissible Under Rule 801(d)(2)(E) Because They Were Not Shown To Be "In Furtherance Of" The Alleged Conspiracy Under Any Theory ............................ 71

    A.  Pre-formation Statements .......................................................... 71

    B.  Additional Designated Statements Not Shown To Be "In Furtherance Of" The Alleged Conspiracy .................................................. 72

CONCLUSION ............................................................................................................ 75

## INTRODUCTION AND SUMMARY

For three days, the Government outlined its case against Leonard Lawson, Charles William Nighbert, and Brian Billings in great detail. It presented the testimony of its star witness, James Rummage, who, armed with a "sky's the limit" deal and a "willingness, even a propensity to lie," was forced to concede that the Government's assertions about the so-called "bribery conspiracy" were false. It presented the testimony of its case agent, Clay Mason, who, too busy leaking his search warrant affidavit to the press, was forced to reveal that he had not even bothered to interview attorney David Guarnieri, the centerpiece of its "obstruction conspiracy."

The story the Government presented, however, was so unlikely, and so unsupported by competent evidence, that it could not be taken as anything but fiction. It began with the premise that a Cabinet Secretary and a successful road contractor would pick out Rummage, who they barely knew, to be their partner in crime. They would use him to seek engineer's estimates, although other estimates with the same information were publicly available. They would obtain the engineer's estimates they did not need, for projects on which they knew Lawson would be the sole bidder and win by default. Then, despite all these efforts, they would not even use the estimates to prepare their bids.

Perhaps aware of the implausible nature of the story it wanted to tell, the Government ultimately set out to prove this unlikely crime by creating a new one. It launched a plan to "pucker [the] ass" of the defendants by "ramming at them" the fiction that Rummage wanted help creating a false story and paying for his attorney. When Lawson denied the allegations Rummage made against him, the Government called it "speaking in code." When he and Billings refused to pay for Rummage's attorney, the Government called it a ruse to steer him to an attorney Lawson had already bought and paid for. When that attorney, Guarnieri, revealed at

the hearing that the Government's accusations were entirely false, the Government had no response.

Nor has the Government demonstrated any conscience for what it has done to Brian Billings, collateral damage in its war against Lawson and Nighbert. Despite proclaiming in two indictments, briefs and oral argument to this Court that Billings had no involvement or even knowledge of any bribery, it has charged him with it anyway. The Government did so because it became convinced that the only way to evade Judge Reeves' severance ruling was to charge Billings with a crime it knows he did not commit.

This brief is divided into five parts. Section I summarizes the legal framework for evaluating the evidence at an *Enright* hearing to determine whether out-of-court statements are admissible under Federal Rule of Evidence 801(d)(2)(E). It is the Government's burden to prove by a preponderance of evidence, for each statement, that a conspiracy existed, that the defendant against whom the statement is offered was a member of that conspiracy, and that the statement was made during the course of and in furtherance of that conspiracy. On all of these issues, the Court evaluates witness credibility, weighs evidence and sits as the sole factfinder.

In Section II, the defendants explain why the Government's proof of a conspiracy falls far short of the mark. Its story rests, entirely and without exception, on the testimony of Rummage. On each and every important issue, his testimony is contradicted by other statements he has given, the testimony of other Government witnesses, or documentary evidence. On every significant allegation Rummage makes, there is a complete absence of corroborating evidence, under circumstances in which it would have been easy to acquire that evidence had his story been truthful. Yet cross-examination, the "greatest engine for the discovery of truth," revealed

that the foundational theories supporting the Government's case have been defective from the start. There is no evidence to support the Government's accusation that Lawson's bid pattern reveals the use of inside information. There is no evidence to support the Government's accusation that Lawson orchestrated UMG hiring Nighbert to pay him for illegal conduct. There is no evidence to support the Government's accusation that Lawson and Billings attempted to steer Rummage to Guarnieri because he would help them obstruct justice. The Court should find the Government has not met its initial burden to prove a conspiracy and rule that no out-of-court statements by any defendant is admissible against any other defendant under Rule 801(d)(2)(E).

Section III explains the Government's failure to prove that Billings was a member of any conspiracy with Lawson, Nighbert, and Rummage, and certainly not the one charged in the Second Superseding Indictment. Rummage admitted, to the Government's consternation, that Billings knew nothing about his alleged obtaining of estimates or receiving bribes. He also admitted that Billings never, in any way instructed him to lie, change his story, or cut off his contacts with the Government.

In Section IV, the defendants explain the second reason why Billings' statements are not admissible against Lawson and Nighbert, and theirs are not admissible against him. Even if the Government's factual accusations were completely true, they would prove only a conspiracy which terminated in December 2007, before the point the Government even claims Billings became a member. By December 2007, Rummage had obtained all the estimates, received all the payments, and both he and Nighbert had left positions where they could obtain any estimates in the future. The Government's efforts to extend the life of the conspiracy to avoid Judge Reeves' severance ruling fails for a lack of legal basis, and for a lack of proof.

The Government must show more than a conspiracy for the statements to be admissible, however, and Section V, finally, addresses why some of the statements it seeks to introduce would not have been made "in furtherance" of the supposed conspiracy.

Like Ahab and his whale, the Government's quest to convict Lawson and Nighbert has caused it to forget what justice is all about. It matters little to the Government that it may damage Billings, or Guarnieri, or its own reputation for integrity. When winning becomes the only goal, everyone suffers. The Court sits as the sole factfinder on the issues the *Enright* hearing presents. The Court now has the opportunity, for the first time, to take a measure of the Government's evidence, to put it to the test of proving its accusations. Because the Government has fallen short, the Court should exclude the hearsay statements the Government seeks to admit.

Defendants are filing concurrently with this Brief a joint motion to sever the trial of defendant Billings from the trial of defendants Lawson and Nighbert. For the reasons addressed in detail in this Brief, the Court should, at a minimum, rule that the Lawson and Nighbert statements are not admissible against Billings under Rule 801(d)(2)(E), and conversely that Billings statements are not admissible against Lawson and Nighbert. In that circumstance, severance is imperative to protect defendants' rights to a fair trial, as explained in the Memorandum in support of the severance motion.

In its Brief on the *Enright* hearing and Rule 801(d)(2)(E) issues, the Government gratuitously asserts that "many" of the same statements are alternatively admissible as "verbal acts." Plaintiff's Brief on Admissibility of Statements of Co-Conspirators (Doc. 493) at 1, 33-35 (hereafter cited as "Gov. Br."). The Government does not identify which statements it claims are included in this category, however, and more importantly, it does not explain how the

unidentified statements allegedly qualify as verbal acts under the legal standard it advocates. Admissibility of statements as "verbal acts" was not the issue before the Court at the *Enright* hearing, and and is therefore not addressed in this Brief. The "verbal act" issues are, however, significant for the severance motion, and accordingly are addressed in that supporting Memorandum. As shown there, (1) the statements do not qualify as verbal acts under the law or the Government's own argument; and (2) to the extent any of the statements did qualify as verbal acts (which the Court need not decide at this point), the same basic difficulties involving limiting instructions and jury confusion that require severance would remain.

## ARGUMENT

**I.     This Court Sits As A Fact-Finder In Determining The Admissibility Of Evidence Under Rule 801(d)(2)(E), And Considers The Weight Of Evidence And Witness Credibility In Deciding Whether The Government Has Proven Each Of The Necessary Foundation Facts By A Preponderance Of The Evidence.**

As the proponent of the admissibility of out-of-court hearing statements under Fed R. Evid. 801(d)(2)(E), the Government has the burden to prove each of several foundation facts: (1) that the alleged conspiracy existed; (2) that the defendant against whom the evidence is offered was a member of that alleged conspiracy; and (3) that the declarant's out-of-court statement was made during the course and in furtherance of that alleged conspiracy. *U.S. v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007) (*quoting U.S. v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998)). As part of the third, "during the course and in furtherance of" element, the Government must establish that the declarant was a member of the alleged conspiracy at the time he or she made the statement. *See Conrad*, 507 F.3d at 430 ("out-of-court statements made *after* the conclusion of the conspiracy are not made 'in furtherance of the conspiracy,' and are thus not admissible under the co-conspirator exception") (Court's emphasis).

- 5 -

To establish that a statement is admissible under Rule 801(d)(2)(E), the Government must prove *each* of these foundation facts by a *preponderance* of the evidence. *Conrad*, 507 F.3d at 429 (quoting *Maliszewski*); *U.S. v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979)).

Determining whether the Government has met this burden of proof "is the sole province of the trial judge." *Vinson*, 606 F.2d at 152. Accordingly, in making that determination, this Court "'exercise[s] judicial fact-finding responsibilities which . . . require [it] to evaluate both the *credibility* and the *weight* of the evidence.'" *James R. Snyder Co.  v. Assoc. Gen. Contractors*, 677 F.2d 1111, 1116-17 (6th Cir. 1982) (emphasis added) (*quoting U.S. v. Enright*, 579 F.2d 980, 985 (6th Cir. 1978)).

As the Rule provides, "[t]he contents of the [out-of-court statement] shall be considered but are not alone sufficient to establish" the necessary foundation facts. Fed. R. Evid. 801(d)(2). Under the Sixth Circuit's case law, such "out-of-court statements are presumptively unreliable," and this presumption must "be rebutted by appropriate and sufficient independent evidence." *U.S. v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994). Accordingly:

> Admissibility of the hearsay . . . hinges on whether some sufficiently corroborating evidence exists which overcomes the suspected unreliability of out-of-court statements. *United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988).

*Id. Accord Conrad*, 507 F.3d at 429; *U.S. v. Warman*, 2009 U.S. App. LEXIS 18560, at *25-26 (6th Cir. Aug. 18, 2009). The *Silverman* court held that:

- Evidence that "is completely consistent with a conclusion that [the defendant] was unaware of the conspiracy" is not sufficient independent evidence to establish that the defendant was a member of the conspiracy for purposes of admissibility of out-of-court statements under the co-conspirator exception to the hearsay rule.

- "Evidence that a defendant merely associated with a member of a conspiracy" is also not sufficient independent evidence.

- Other out-of-court statements are also not sufficient independent evidence; "[o]ne presumptively unreliable statement cannot be invoked to corroborate another, particularly when each was allegedly uttered by the same declarant."

861 F.2d at 579.

## II.   The Court Should Find No Proof By A Preponderance Of The Evidence That A Conspiracy Existed.

### A.   The Government Has Not Proven A Bribery/Conversion Conspiracy.

The Government's proof at the hearing consisted almost entirely of testimony by Rummage or about Rummage. Rummage's testimony should be rejected because it is simply not credible. On all important issues, his testimony was virtually unsupported by documentary evidence or the testimony of other witnesses. In many instances, that testimony is flatly contradicted by the factual record. This lack of objective support, coupled with Rummage's contradictory statements, his history of making false statements for his own benefit, his incentive to lie, and the logical improbability of much of his testimony, make his story hard to swallow. Because Rummage's testimony is not credible, the Court should find that the Government's proof of an underlying conspiracy does not meet its burden under the preponderance of the evidence standard. Consequently, the Court should rule, no out-of-court statements by any defendant are admissible against any other defendant under Rule 801(d)(2)(E).

### 1.    Rummage's Fundamental Story Is Inherently Not Credible.

The Government wants the Court to accept that in June, 2006, out of the blue and without warning, Rummage – who at the time was a mid-level manager in the Kentucky Transportation Cabinet (Rummage, I-7)[1] – was called into a meeting with the Secretary of Transportation and one of the state's largest highway contractors and primed to be a full-fledged member of a criminal conspiracy to defraud the state of hundreds of millions of dollars.

From the very outset this story falls apart. First, Rummage testified that in this initial meeting where this criminal conspiracy was allegedly hatched, a third party non-participant, the Commissioner of Highways Marc Williams was present. (Rummage, I-14). Yet Williams, who seemingly would be the ideal witness for the Government to corroborate Rummage's story as an eyewitness to the genesis of this criminal conspiracy, was not called as a witness, nor did the Government submit an affidavit or other evidence from Williams. Equally importantly, the Government has not even purported to answer the obvious question why Nighbert and Lawson would embark on a criminal conspiracy in the presence of Williams. The absence of both Williams and the Government's answer suggests this meeting never happened and certainly did not happen as Jim Rummage described.

Furthermore, Rummage could never explain why Nighbert or Lawson would choose him as a member of any conspiracy. He testified that in 2006, he had no special relationship with Secretary Nighbert, he was not a "favored" employee in the Cabinet, (Rummage, II-47, 49) and there were others, including Williams and Nighbert himself, who had equal access to the engineer's estimates. (Rummage, II-48). Rummage claimed not even to know that Nighbert is a

---

[1] References to the hearing transcript (Docs. 480, 483, 484, 485, 486, 487) contain the name of the witness, the transcript volume number, I through VI, and the page number.

Republican. (Rummage, III-64). However, it was well-known to the world, according to Rummage, that he was a life-long Democrat, who had contributed to Governor Fletcher's opponent and appeared on the infamous "hit list," a merit personnel hiring investigation out of which Nighbert found himself indicted on misdemeanor political discrimination charges (Rummage, III-65, 66). The Government and Rummage never explained why Republican Nighbert, one of Governor Fletcher's appointees and closest advisors, and Lawson, one of the Governor's supporters, would choose Democrat Rummage as their chief collaborator to launch a massive criminal conspiracy. As far as Rummage knew, he was "just one of several thousand employees at the Cabinet," and he simply had no idea why Secretary Nighbert would choose him to retrieve engineer's estimates. (Rummage, II-49). Although Rummage "knew of" Mr. Lawson, he did not know him very well. (Rummage, III-96).

The Government offered little to explain why the defendants – or anyone else – would go to any effort to obtain an engineer's estimate for illicit reasons. Rummage testified that as deputy State Highway Engineer, he often chaired the Awards Committee (Rummage, II-28), the body responsible for recommending the approval of all state highway contracts and the amount of those contracts. Rummage was a full voting member of that Committee, was responsible for picking which projects would be approved for bid, authorizing change orders, and recommending changes in the size and scope of projects. (Rummage, II 28-31). Yet never once did Leonard Lawson ever pay or ask Rummage to use his position on the Committee to vote to award a project to him, to change an estimate before the project award, to approve the bids above 7 percent over the estimate, or to approve a change order. (Rummage, II-30-33). This naturally raises the question what was so special about engineer's estimates. For one, Lawson did not even need these estimates to win these projects. On every single one of the "suspect" contracts,

Lawson was the sole bidder. He had no competition. (Def. Ex. 67). There was no risk that he was going to lose any of these projects to a competing contractor.

Rummage testified that the Transportation Cabinet performs a variety of preliminary estimates for projects at various stages in a project's development except for the engineer's estimate, *and every single one of those estimates is open and available to contractors who ask for them.* (Rummage, III-72). For instance, the Cabinet first performs estimates to place a project in the Six-Year Plan, the master planning document prepared for the Legislature. Later, the Cabinet performs a right-of-way estimate, then a utility estimate, to determine the cost of those essential items. (Rummage, III-71). As a project moves closer to development, each district will do its own estimate of each of its projects. (Rummage, III-72). The final estimate at the district level is called a "field estimate," and unlike the engineer's estimate, would be prepared by an engineer who had actually viewed the project. (Rummage, III-74, II-39). Like all the other preliminary estimates, field estimates are not confidential, and Rummage testified he has given out field estimates to contractors, and he would do so whenever asked. (Rummage, II-40).[2]

Even if a contractor had an engineer's estimate before the letting, it would do him little good. Rummage testified that engineer's estimates can change right before the bid is opened, or even *after* the bids are opened and before the contract is awarded. (Rummage, II-25, 30). When there is only one bidder, the sole bidder nearly always receives the contract, even if its bid is significantly higher than the estimate. Even if a bid is rejected, the project will nearly always be scheduled for letting again in the next month. At the second letting, the contractor will always

---

[2] Kentucky statutes in fact require dissemination of KTC estimates to public legislative bodies. (Def. Exs. 77, 78, 79).

have the engineer's estimate, since they are released at the first letting for the project and published on the Cabinet's website. (Rummage, II-35).

On the other hand, the *Enright* record demonstrated that the Secretary of the Transportation Cabinet would have a substantial legitimate reason to ask for engineer's estimates prior to bids. Highway construction projects in the planning stages are significantly under-funded, Rummage admitted, perhaps by hundreds of millions of dollars. (Rummage, III-73). Projects are often pulled from lettings for lack of funding. (Rummage, III-90, 91). Ensuring that the right projects are funded, and making that decision with the most accurate and up-to-date information possible, is an important duty for the Transportation Secretary. In fact, under Section 40-16 of the State Engineer's Manual, a document Rummage acknowledged never having read before this case, the Secretary is charged and authorized to

> make decisions and commitments regarding the Department's program and to make the best available use of available funds to assist in the decision-making process. The estimated cost of proposed projects should be as up-to-date and accurate as possible. Changes in costs or scope of the defined project must be recognized and decisions made as early as possible in the process.

(Rummage, III-77). The years 2006 and 2007 were especially busy times at the Transportation Cabinet, and the Cabinet set records in each of those years for the volume of construction projects let, over $1 billion in each year. (Rummage, IV-19, 20). Rummage and Mason both agreed that the Secretary is permitted to see engineer's estimates as part of his duties to manage these huge spending challenges. (Rummage, III-76). He also admitted Nighbert never told him to keep secret his requests to Griffith or the other estimators, Deborah Rhody, or Donnie Miracle. (Rummage, II-53, III-84). Never once did any of these individuals ever report Rummage's requests for estimates to the Office of Inspector General or state and federal law enforcement

authorities. The Government never demonstrated what was unusual about the state's highest transportation official asking for the estimated costs of a highway project for budget purposes.[3]

Finally, the Government offered no proof Lawson or anyone working for him actually *used* any of the estimates Rummage says he delivered. In fact, on this critical point, the actual record of Lawson's bids squarely impeaches Rummage's testimony. Rummage admitted that there was nothing about the Lawson actual bids that looked unusual. He even claimed that he provided Lawson an estimate on a project known as the "Rock Crusher Curve" project in Carter County, but conceded that Lawson won with a bid almost 20% *over* the estimate. (Rummage, II-63; III-12). If Lawson had been attempting to hit a target of 107% of the engineer's estimate, as the Government suggests, he missed the mark by a wide margin on the Rock Crusher Curve job. Rummage's own testimony destroys the prosecution's motive theory.[4]

Other bids, such as the one submitted by Central Rock, were actually *under* the estimate. (Def. Ex. 4A). Lawson's companies left millions of dollars on the table, a peculiar move if he actually had the estimates before the letting and his motive for having the estimates was to make as much money as possible. (*Id.*)

Indeed, Rummage's testimony here makes little sense. Lawson did not even own Central Rock at the time Rummage claims he provided him an estimate for the $50 million project

---

[3] Indeed, the Government has previously acknowledged and admitted, in filings with the Court, that "Secretary Nighbert had the right to handle, possess and discuss engineer's estimates. In fact, the secrecy and confidentiality given to the engineer's estimates appears to be more of a time honored policy than a specific rule or regulation." (Doc. 141 p. 4).

[4] That is why this project is missing from the Government's list of "suspect" contracts. The Government wants to conceal this project from the Court, despite Rummage's claim that he definitely provided this estimate to Lawson, because it is highly inconsistent with the Government's theory of this case. The Government's failure to disclose is disingenuous.

Central Rock won. (Rummage, II-64, 65). None of the estimates Lawson allegedly obtained were for the Allen Company, a construction company Lawson did own and one of the most active bidders. (Rummage, II-67). Nor does Rummage provide any explanation for why Lawson would only use him to obtain a handful of estimates when throughout the 2006-2007 period, Lawson companies bid on "scores and scores" of other projects worth far more money to Lawson's companies. (Rummage, II-67).

Even a cursory review of Lawson's bidding on projects during 2006 and 2007 undermines the Government's conspiracy allegations. The Government began its case on the theory that Lawson sought to use information from Rummage to maximize his profits on sole bid projects; to get as close as possible to 7% over the engineer's estimate, as Agent Mason testified, "so as not to leave money on the table." (Mason, VI-17). The evidence at the hearing showed, however, that Lawson left over $1.7 million on the table on the bids the Government alleges Rummage obtained estimates for. (Mason, VI-17). Agent Mason testified he could not "estimate or guess" why Lawson would do such a thing if he had the estimates. (Mason, VI-18).

In addition, Lawson won projects at 10% over the engineer's estimate without Rummage's help during this same time period. (Mason, VI-6). He also lost multi-million dollar projects during the same time period, even though, according to the Government, he could have used Rummage to win them. (Mason, VI-6, 7). Agent Mason could not explain the logical inconsistency:

> Mr. True:    Why would you reckon it would be that a fellow who has got a plant inside the Cabinet that he's groomed, that he's paying -- and he's working it up, according to Mr. Rummage's testimony, he didn't have to use the middleman over here. He can just call and go direct to the supplier of the estimates. But yet, he's losing all these contracts?

Agent Mason: I can't answer that. (Mason, VI-9).

Rummage was also forced to admit that nothing in the Lawson bids looked unusual or out of place. The amounts of the bids did not show any sign of knowing the estimates. (Rummage, II-36). Agent Mason agreed with Rummage that "the percentage above or below 7 percent on the Lawson-related bids is not indicative of leaking of the estimates." (Mason, VI-18). Rummage was compelled to concede, as was Agent Mason, that he had no evidence that the estimates he allegedly obtained were ever in fact used in a bid submitted by Lawson. (Rummage, II-36, 37). Neither Rummage, nor any other witness for the Government, sought to explain this glaring omission – why the defendants would conspire to obtain estimates if they did not want to use them in the bids.

> ### 2.     Rummage's Testimony Is Uncorroborated, Contradicted By His Own Statements, And Inconsistent With Physical Evidence.

Rummage has told a variety of different versions of his story. He told the Transportation Cabinet's Office of Inspector General in January 2008 that he had obtained estimates only for Secretary Nighbert, and only for funding purposes. (Rummage, III-92). He gave the same information to the FBI in February, 2008. (Rummage, III-93). Rummage told the truth when he said he couldn't remember how many times he had lied. (Rummage, III-80). If his current story is true, he also lied to Ryan Griffith and the other estimators from whom he obtained engineer's estimates, and to the Internal Revenue Service by filing false tax returns. (Rummage, IV-12). He also lied to at least one of numerous attorneys he consulted prior to meeting with the OIG (Rummage, III-8).  Rummage is, at the least, an admitted and repeated liar. (Mason, VI-60, 122). The Court must examine his testimony with great caution and care.

Even after shifting to his current tale, Rummage has given very different versions on very important parts, even adding new meetings and conversations on the eve of the *Enright* hearing that he never told the FBI in at least ten prior meetings. For example, Rummage first told Agent Mason that the only time he was ever together with Nighbert or Lawson was on an unspecified date at Lawson's office (Def. Ex. 13) entirely contrary to his later claim that Lawson attended a meeting at the Cabinet with he and Nighbert.   Rummage testified at the hearing that he was "either lying or mistaken" in the original statement to Mason. (Rummage, III-21). Further, Rummage told the Grand Jury in April 2008 that he had heard about the OIG investigation from the investigator's email he received from Chuck Hines. (Def. Ex. 18, pg. 25, lns 11-16). The prosecution introduced the email dated January 23, 2008 (Gov. Ex. 21). He testified at the hearing, however, that he had learned about it much earlier; a new and sudden recall guided by the prosecution, from a conversation with Steve Waddell, a Transportation Cabinet official. (Rummage, III-40).

Other important parts of his story have also emerged suspiciously late in Rummage's memory. Although Rummage had given ten prior statements, to the OIG, the FBI, the Grand Jury, and to defense counsel, many of Rummage's allegations were disclosed for the first time in the Government's pre-hearing written disclosure, only ten days before the hearing. (Def. Ex. 1). Rummage first claimed at the hearing that Lawson threatened to have him fired if he did not apply to be State Highway Engineer. He admitted, however, that he never said such a thing to the FBI, the grand jury, or the prosecutors until the Government's *Enright* designations shortly before the hearing. (Rummage, III-33, 34). Even more significant, Rummage had never told the Government or defense, over the course of more than eighteen months of inquiries, that he had ever had the meeting with Brian Billings at a Chinese restaurant in Mt. Sterling in January, 2008

– a meeting that dramatically advances in time (and more than doubles in total time) his friend Billings' supposed involvement in this matter. Nor did he tell anyone that he met with Nighbert not once, but twice, in a Lexington Denny's parking lot. (Rummage, III-36, 37). These "newly-recalled" events had taken place just weeks prior to Rummage's multiple statements to the Government in the spring of 2008. Yet now, *twenty months later* and only days before he was set to testify in the *Enright* hearing, these new facts miraculously emerged. Of course, these new events Rummage belatedly remembered fit nicely with the Government's evolving theory of the case that has now been created in the Second Superseding Indictment to evade Judge Reeve's severance order.

Rummage's testimony is largely unsupported by his otherwise ubiquitous tape recordings or documentary proof. Rummage admitted there was no person who could corroborate his testimony that he delivered estimates to Lawson or received money from him. (Rummage, II-70, 71). He never told anyone, not even his wife, about the money he claims to have received. (Rummage, II-72). He never listed the money on his tax returns until after the indictments were returned. (Rummage, IV-4, 5). Although Rummage recorded two conversations with Nighbert in the fall of 2006, he made no recordings of any meetings with Lawson to deliver estimates, or of any conversations with Nighbert about which estimates to request, or of any Nighbert instructions on what to do with the estimates. (Rummage, III-34, 35). There are no recordings of Rummage receiving money from Lawson, even though if he had recorded the alleged December, 2006 exchange, he would have hard proof that Lawson said "buy something nice for your family." (Rummage, III-35, 36). Rummage never taped Nighbert or Lawson telling him to lie to the Inspector General or anyone else. Rummage did not tape his alleged meeting or meetings with Nighbert at Denny's restaurant. (Rummage, IV-11).

The two tapes Rummage did make of Nighbert in the fall of 2006 do not show a conspiracy between anyone, and they in fact contradict his in-court testimony. In the first tape, made in August 2006, Rummage falsely tells Nighbert that he found an anonymous note on his computer suggesting someone thought he was improperly obtaining estimates. Rather than express concern that his crime had been detected, Nighbert merely tells Rummage "You've done nothing wrong," and continues to discuss other work matters. (Rummage, III-86). There is no excitement, anxiety, or fear in Nighbert's voice. There is no indication that Nighbert had previously asked Rummage to commit a crime or was worried about detection.

In the second tape recording, made in September 2006, Rummage and Nighbert discuss an upcoming project on the Cumberland Parkway, including the amount of milling to be applied. (Rummage, III-22). Although Nighbert and Rummage talk about an "estimate," Rummage admitted it was the non-confidential field estimate, since the engineer's estimate would not be completed for another month on that job. (Rummage, III-24).

Rummage's attempt to convince the Court that Lawson was in the room during this September 2006 discussion is unbelievable on its face. Lawson never speaks in the conversation, even though Nighbert and Rummage are discussing road construction and Pike County, two subjects on which Lawson is uncommonly well-informed. (Rummage, III-20). Lawson's name is never mentioned in the discussion. Although Rummage claims he turned on his tape recorder before entering Nighbert's office, neither Nighbert nor Rummage ever greets Lawson upon entering or says good-bye to him upon leaving. (Rummage, III-21). Rummage, who testified that he was making this recording to protect himself, does not bring Lawson into the conversation. (Rummage, III-18).

The tapes Rummage made of conversations with Lawson do not support his story either. Those recordings fall into two categories: those made without FBI coaching and those made after such coaching. In the first category is the recording that Rummage made from a Lexington payphone on March 7, 2008, the day following his decision to change his story and five days before he first met the FBI. Rummage had no trouble using his own cell phone device to record his phone call to Lawson on March 7th. Without a Government designed script or "ram it at him" instructions from the FBI, the call on March 7th produced the most natural back and forth between the two men. *At no point did Rummage say or indicate that he had given estimates to Lawson, or that Lawson had paid him money for estimates*. Indeed, at one point in the call Rummage essentially agrees that no such crime had been committed:

> Lawson:    ". . . [E]verything you talked to 'em was true . . . *you wouldn't give me a goddamn thing . . . .*
>
> Rummage:    *Yeah.*
>
> Lawson:    I don't think anything could come out.
>
> Rummage:    Yeah.
>
> Lawson:    How can it? I mean they can drop something out there but it can't come out I mean*, there ain't no story there*.
>
> Rummage:    Um, huh.

(Def. Ex. 12(c), pg. 2, lns 12-22) (emphasis added).

The phone call between the two men on March 7th was a perfect opportunity for Rummage to openly confront Lawson's denials of wrongdoing but Rummage never did so. Instead, Rummage's natural – *i.e.*, uncoached by the Government – reaction was to agree with Lawson's statements.

The prosecution's consistent approach with all of the Rummage/Lawson recordings, beginning with the egregiously misleading "quotations" in the first indictment, included only for the media's benefit, that Judge Reeves ordered the Government to delete has been to ignore any innocent exchange and distort the rest.[5] The Government's *Enright* brief is only the most recent instance. For example:

- The Government egregiously misrepresents the conversation between Rummage and Lawson in the afternoon on March 12, attempting to use as evidence of Lawson's alleged guilt that he, "[r]ather than hanging up in the face of Rummage's allegations … responded by making several statements intended to dissuade Rummage from saying anything to law enforcement other than the previously agreed to cover story," such as talking about where Rummage could have obtained cash and advising him to get an attorney. (Gov. Br. 19). The Government's attempts to characterize Lawson's advice that Rummage get an attorney and suggestion that Rummage talk to Jon Woodall as being designed to keep Rummage from cooperating are not only wholly unsupported by the record, but also affirmatively refuted by David Guarnieri's testimony.

- Although the Government suggests Lawson not hanging up meant he thereby was agreeing to the allegations, the conversation in its entirety in fact shows Lawson affirmatively refuting Rummage's allegations every time. After Rummage opens the conversation by telling Lawson that the FBI believes Lawson gave him money because Rummage was not taking money out of the bank, Lawson responds, "I,

---

[5] *See* Defendants' Joint Motion to Strike Paragraphs 5, 6, 7 and 13 of Count 6 of the Indictment as Prejudicial Surplusage and supporting Memoranda (Doc. 87, 180), granted by Order of January 6, 2009 (Doc. 205).

you know, I never did give ya any money. You ain't got nothing' to hide." (Gov. Ex. 24b p. 2 lns. 7-8). Later in the conversation Lawson tells Rummage that "they can't indict you for something that you ain't done. You done what your boss said to do," (Gov. Ex. 24b p. 7 lns. 1-2) and that "you didn't give me anything, Jim, that's where – that's where you got to have the lawyer." (Gov. Ex. 24b p. 7 lns. 9-10). Rummage continues to insist that the FBI is suspicious about him not withdrawing cash and Lawson again says, "you know, Jim, I have to say I've never given you anything in my life. I don't care what the FBI or anybody else says. And, you never gave me no direct information, and, for them to accuse you of this, you need a lawyer." (Gov. Ex. 24b p. 8 lns. 15-18). It defies everyone's logic, except the prosecution's, that denying involvement is somehow evidence of guilt – whereas hanging up would have been evidence of innocence!

- The Government also twists out-of-context portions of the conversation to attempt to make Lawson look guilty for making "several suggestions to Rummage about explanations for the money." (Gov. Br. 20). Yet Lawson initially simply tells Rummage that "you need to get you a lawyer." (Gov. Ex. 24b p. 2 lns. 30). It is only after government-coached Rummage insists, as the Government describes, in an "excited and worrisome tone" that "I need somethin' to come up right now," and "I got to come up with something….Well, I gotta have somethin' here" (Gov. Ex. 24b p. 2 lns. 6, 14) that Lawson responds that maybe Rummage had records that could "jeopardize their record or somethin'. I mean you—you could save it— you coulda been savin' money up for years. Why's to say, it just—they just follow it just like anybody else would. They're just followin' a trend that you've

always had. I mean hell ***I don't know how much money, what you're talkin'*** ***about or anything***, but, uh, they ain't no way that they can do anything with you for this. They're—they're scarin' the hell out of you, is what they're doin.'" (Gov. Ex. 24b p. 3 lns. 18-25; emphasis added). Lawson is responding to Rummage's government-coached panicked pleas for help, not manipulatively feeding Rummage lies to tell the FBI, as the Government implies.

Troublingly, these are only examples of the Government's mischaracterizations of just *one* conversation. The bottom line is that despite Rummage's insistent pleading, coached by the Government, Lawson consistently denies having ever given Rummage any money or having received any engineer's estimates from him. The Government's argument that sometimes Lawson is telling the truth and sometimes speaking in code – that "no, I didn't" really means "yes, I did" – is nonsensical. Judge Reeves has already rejected the allegation that Lawson knew he was being taped by the Government.[6]

The bank records the Government offered do not support Rummage's testimony either. Although Rummage claims he received $20,000 from Lawson in an eighteen month period, and he stopped using ATM machines during that time period, his prior ATM use does not show such a high use of cash during the prior eighteen month period. (Gov. Ex. 15). He can produce no receipts or other documentation showing he spent the money.

---

[6] If, as the Government contends, Lawson's statements were made thinking they were being taped by or for the Government, they would be "testimonial" under *Crawford v. Washington,* 541 U.S. 36 (2004), and inadmissible against Billings and Nighbert. Judge Reeves rejected that argument in his ruling on the motion to sever, although he granted the motion on other grounds. (Doc. 264 at 7; Doc. 336 at 4).

The telephone records give no more support to Rummage's testimony. Certainly, there are telephone calls between Rummage, Lawson, and Nighbert. As professionals in the same industry, one would expect to see ample contact between them. Lawson and Nighbert were also friends, and they spoke often, at times unrelated to the bids at issue in this case. The Government's summary of telephone records show, for example, dozens of lengthy calls between Lawson and Nighbert between January and early March 2007, a time when it does not allege Lawson obtained any engineer's estimates. (Gov. Ex. 45; Mason, VI-57, 58). As Agent Mason testified,

| | |
|---|---|
| Mr. True: | There were no bid lettings, however, between December the 15th of 2006 and March the 23rd of 2007 that Mr. Lawson had any interest in or that you contend are any suspect bids; is that right? |
| Agent Mason: | That's correct. |
| Mr. True: | You don't have any explanation as to why Bill Nighbert and Leonard Lawson would be talking on multiple occasions for 15 and 20 minutes during that period of time, do you? |
| Agent Mason: | No. |
| Mr. True: | There may be very innocent reasons as to why they would talk frequently for those lengthy periods of times, might'n there? |
| Agent Mason: | There may be, yes. |

(Mason, VI-58). The same pattern holds true for the period between March 23, 2007, and September 7, 2007, where the Government also alleges no suspect bids. Lawson and Nighbert continued to speak frequently over that period. (Mason, VI-59, 60-61). The telephone records ultimately show nothing more than Lawson and Nighbert liked to talk to each other. Moreover,

the Government conceded that many of the calls were of extremely "short duration," more indicative of "phone tag" than lengthy conspiratorial discussions.[7] (Mason, VI-116).

Nor do the Ryan Griffith calendars support Rummage's allegations of a conspiracy to provide engineer's estimates to Lawson. They give support to his claim he obtained the estimates, of course, something Rummage admits he had a right to do for Secretary Nighbert. Rummage did not hide these requests, or tell Griffith or the other estimators to keep his requests secret. Moreover, the Griffith calendars conflict with portions of Rummage's testimony. They do not show any entries to support Rummage's claim that he obtained estimates in June 2006 and August 2007. (Gov. Ex. 3 and 4).

Ultimately, the Government's case rests, wholly and completely, on an unlikely story by an admitted and unsupported liar. The Court should not believe it.

**B.    The Government Has Not Proven A Conspiracy To Obstruct Justice.**

Just as the Government has not met its burden to show a conspiracy to bribe Rummage for engineer's estimates, it has not proven a conspiracy to obstruct justice. The Government alleges Lawson, Nighbert, and Billings conspired to obstruct justice by attempting to persuade Rummage to change counsel from Marc Murphy to David Guarnieri. This allegation rests on the Government's belief that Lawson had previously arranged to pay for Guarnieri's work for

---

[7] Courts have frequently noted the very limited probative value of telephone records to establish membership in an alleged conspiracy; not only must an inference be drawn as to the participants on the call but also a second-level inference must be drawn as to the content of the conversation. *See, e.g., U.S. v. Coppin*, 1 Fed. App'x. 283, 292 (6th Cir. 2001); *U.S. v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990); *U.S. v. Galvan*, 693 F.2d 417, 419 (5th Cir. 1982). The Sixth Circuit has followed the U.S. Supreme Court in repeatedly ruling that conspiracy charges "are not to be made out by piling inference on inference." *Direct Sales Co. v. U.S.*, 319 U.S. 703, 711 (1943); *U.S. v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008); *U.S. v. Superior Growers Supply, Inc.*, 982 F.2d 173, 179 (6th Cir. 1992).

Rummage and to control Guarnieri's advice to him. Agent Mason acknowledged at the hearing that he had testified to the Government's theory in the Grand Jury:

| | |
|---|---|
| Mr. True: | See if you remember these questions and answers. Question: "What was the next contact?" Answer: "The next contact occurred about March 20th. There was a phone conversation with Brian Billings." Question: "What was that about?" Answer: "Well, at this point, Billings was coming in to be kind of an intermediary with Jim, because Leonard Lawson was in Florida, so he was coming up to meet with him and trying to advise him to use the attorney that Leonard was pushing for him to use." Question: "And who was that attorney?" Answer: "At this point, it became a fellow from Frankfort named David Guarnieri." Question: "Okay. Is it apparent that he had already made arrangements for representation?" Answer: "Yes." Do you remember being asked those questions and giving those answers? |
| Agent Mason: | Yes. |
| Mr. True: | Were you attempting to infer to the grand jury that the advice that Mr. Guarnieri would give would be influenced by Leonard Lawson in some way? |
| Agent Mason: | That's what we believed at the time. |

(Mason, V-23, 24). The Government's belief was unhindered by facts, however. Mr. Guarnieri testified that the Government never attempted to question him about this representation, and he first learned about it after the indictment in a chance conversation with the prosecutor. (Guarnieri, II-84, 85).

If the Government had bothered to investigate its theory, it would have learned it was baseless. Guarnieri is a highly respected local attorney with extensive experience in federal criminal proceedings. His reputation for integrity is equally strong. Guarnieri testified, without challenge by the Government, that he had never represented Lawson or any of his companies, and never even met him. Lawson had made no "arrangements" for Guarnieri to represent

Rummage. Indeed, he was not originally even recommended by Lawson, but by his fellow attorney friends, Jon Woodall and Jaron Blanford. (Rummage, II-78).

Moreover, Guarnieri testified, unequivocally, that his representation would not have been influenced by Lawson, or by anything other than his client's best interest:

| Mr. True: | David, this is – really, knowing you, I'm almost hesitant to ask this. But based on the evidence that we've heard here today I feel like I need to, so I hope you won't be offended by this. Would you ever, under any circumstances, undertake representation of someone and take direction from some third person in terms of what advice to give them? |
|---|---|
| Mr. Guarnieri: | I wouldn't. Not only is it against my nature, because I feel that I ought to be the one giving advice and not taking advice; but more importantly, I would deem it a breach of our ethical responsibilities. |

(Guarnieri, II-85). Guarnieri made it abundantly clear that he, and he alone, gives legal advice to his clients about strategic legal decisions, including whether to cooperate in an investigation. (*Id.*)

The Government's obstruction conspiracy theory continues to unravel under scrutiny. It has not proven, as it must, an agreement between the defendants to obstruct Rummage's testimony or communications with the Government. The Government has not alleged any act of obstruction by Nighbert after the federal investigation began in February 2008.[8] Nor does the evidence show an agreement between Lawson and Billings. In fact, the evidence shows a

---

[8] Agent Mason admitted that when Nighbert allegedly met with Rummage on Jan. 25, 2008 (the morning of Rummage's OIG interview) that 1) there was no on-going federal grand jury investigation, and 2) he had no direct evidence of "any effort by Mr. Nighbert - after January 25, 2009 to obstruct justice or to prevent anyone from providing information to a federal officer." (Mason, iv-54).

considerable disconnect between them, rather than the unified position one would expect from partners in a criminal endeavor.

For example, Rummage testified that he understood that Lawson had promised to pay for his attorney in the first telephone conversation on March 12. (Rummage, IV-36). When Rummage asks Billings to help him get payment from Lawson on March 20, Billings replies that he does not know if that would be possible. (Def. Ex. 12(R)). Instead, Billings suggests Rummage get advice from an attorney about setting up a legal defense fund, as Governor Fletcher had done some months before. After considerably more prodding by Rummage, Billings finally agrees to ask Lawson if he would help pay for an attorney, and he ultimately responds that the answer is no. (Def. Ex. 12(X)). If the Government's theory were true, however, Billings would have known that Lawson had already agreed to pay for an attorney, two weeks before, and he would not have engaged in this discussion at all.

In addition, Billings never gives the "cover story" the Government alleges Lawson, Nighbert, and Rummage had agreed upon. The Government argues Lawson was reminding Rummage of the "cover story" when he reminded Rummage on March 12 that he (Rummage) had been merely getting the estimates for Nighbert. (Def. Ex. 12(D)). Billings never repeats this story, however. When Rummage tells Billings, for the first time, that Rummage gave engineer's estimates to Lawson, Billings instead talks about the issues within his range of knowledge. Whatever you did, Billings says, we did not have the estimates:

> I never saw any numbers or anything that indicated what we need to or what we should be biddin or anything else. . . . I don't know, I can just . . . I can tell ya, we just didn't have, we would never use any information if … if there was any available out there.

(Def. Ex. 12(M)).

- 26 -

Finally, Billings does not, as Lawson did, suggest that Rummage could assert his Fifth Amendment rights.[9] Although the Government makes much of Billings writing or typing messages to Rummage, the content of the messages never urged anything improper. If Billings had been conspiring with Lawson to influence Rummage's testimony or hinder his cooperation, he certainly did not do anything to suggest he knew those were the conspiracy's goals. Conspirators who do not know of and agree to the goals of a conspiracy are not conspiring.

---

[9] The government concedes that Rummage, like all persons accused of a crime, has a right to the benefit of advice from an independent lawyer. It also concedes that the exercise of a Fifth Amendment privilege does not constitute an obstruction of justice. (Mason, V-24, 25).

### C.    The Government Has Not Proven Nighbert's Position With UMG Was Part Of Any Conspiracy.

The Government has offered no suggestion that Lawson ever rewarded or bribed Nighbert during the 2006-2007 time period when it alleges Rummage and Nighbert were supplying him with engineer's estimates. It charges, however, that Lawson later made disguised payments to Nighbert through a company in which he had an indirect minority interest, Utility Management Group, LLC ("UMG"). The Government alleges that these payments were part of the alleged conspiracy between Lawson, Nighbert, Rummage, and Billings. It also contends the corporate structure was organized to hide Lawson's interest, and the payments to Nighbert were disguised through a fictitious company to hide his receipt of them.

The evidence at the hearing, however, told a different story. UMG is a company that contracts with local governments to manage their public utility services. The company began by operating the water companies for Mountain Water District and the City of Pikeville. Its business plan was to expand the company to include the water and waste disposal companies operated by local governments across the state. (Mason, VI-35, 36). Its chief executive officer is Greg May, who formerly worked for large international water companies.

The Government was forced to admit that UMG was organized by Lawson and other businessmen in 2004, two years before the Government alleges the conspiracy began and even a year before Nighbert became Secretary of Transportation. (Mason, VI-42). Agent Mason conceded the obvious:

Mr. True:        You''ll agree with me that UMG was not established as a mechanism to pay Bill Nighbert?

Agent Mason:     No, I don't think it would have been.

(Mason, VI-43). The Government also conceded that there was nothing unusual about the manner in which the corporate entity was structured. (Mason, VI-45). It offered no rebuttal to the opinion of Dean Allen Vestal, former Dean of the University of Kentucky College of Law who found the creation of the business structure to be lawful and customary. (*See* Def. Ex. 54).

The Government had to admit there were good reasons for UMG to hire Nighbert. Nighbert had been Mayor of Williamsburg, Chairman of the Cumberland Valley Area Development District, President of the Kentucky League of Cities, Deputy Commissioner of GOLD (Governor's Office of Local Development), and Secretary of Transportation. He was well known by Mayors and County Judges throughout the state, and he would have been able to draw upon those contacts to help the company acquire new local government customers. (Mason, VI-38, 39).

The Government's allegations that Nighbert tried to use a fictitious company to hide his connection to UMG also folds upon review. Nighbert was a member, along with his brother, in a company called "Double Buck, LLC." (Def. Ex. 76). The company was publicly registered with the Kentucky Secretary of State, and Nighbert's interest was listed in the filing. Although the checks from UMG to Nighbert were made out to "Two Buck, LLC," rather than Double Buck, LLC, it is equally likely Nighbert merely misstated the name of the company. Nor did Nighbert try to hide his ownership of the car that came with his consulting arrangement. When it could not be registered under "Two Buck," since that was the wrong company name, he asked the dealership to register the car *in his own name*. As the Court noted, "his name is spread all over these exhibits." (Court, IV-65).

Nor do the checks from UMG to Nighbert prove any conspiracy to reward him for illicit services to Lawson. Nighbert took a job working for Senator David Williams on transportation issues during the legislative session, which ended in April. Although he received three checks from UMG, he did not deposit any of them. (Mason, VI-42). The Government would now argue that his decision not to deposit the checks was because he learned about the investigation and became afraid to do so. The facts do not support this allegation, either. Nighbert received his first check on January 9, 2008, well before anyone learned about a Government investigation. A more likely conclusion is that Nighbert did not deposit the checks because he had not yet started earning them.

Finally, the hearing revealed that neither Rummage nor Billings knew anything about UMG. Rummage first learned about it by reading the newspaper. (Mason, VI-47). The Government has no evidence Rummage or Billings ever knew of the consulting arrangement between UMG and Nighbert, the plan to use his services, or the financial arrangements. (Mason, VI-47, 48). While not all members of a conspiracy need to know every detail, the Government proclaims that the UMG allegations are a "major component" of the conspiracy it has charged (Mason, VI-129), a component all conspirators would presumably need to understand.

In summary, the Government has not met its burden of proving a conspiracy existed. The Court should exclude all statements offered under Fed. R. Evid. 801(d)(2)(E).

**III.    At A Minimum, The Government Has Not Proven That Billings Was A Member Of A Conspiracy.**

     **A.    The Government Has Failed To Prove By A Preponderance Of The Evidence That Billings Had Actual Knowledge And Joined In A Criminal Enterprise.**

Even if the Court finds that the Government has somehow met its burden to prove a conspiracy existed, it has failed to prove that Defendant Billings knew of any criminal conduct, joined any criminal conduct, or was a member of any conspiracy at all. Therefore, it may not admit any of Billings statements against Defendants Nighbert and Lawson under Rule 801(d)(2)(E), nor may the Government use Nighbert's or Lawson's statements against Billings under Rule 801(d)(2)(E).[10] A brief examination of the law of conspiracy in this Circuit, and its application to the facts here, make this point clear.

"[T]he federal crime of conspiracy requires proof of specific intent, actual or implied, to violate federal law. . . . Generally, that degree of criminal intent necessary under the substantive count must be proved to sustain a conviction for conspiracy, . . . but as to any circumstances attendant to the crime, the government must prove a mental state no less than knowledge." *U.S. v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001) (citations omitted). In particular, "one who has no knowledge of the object of a conspiracy cannot be a conspirator, for the intent to participate is lacking. . . . Moreover, evidence of knowledge must be clear and not equivocal." *Stanley v. U.S.*, 245 F.2d 427, 430 (6th Cir. 1957) (citing *Direct Sales Co. v. U.S.*, 319 U.S. 703 (1943)).

"[T]o establish the intent, the evidence of knowledge must be clear, not equivocal[,] . . . because charges of conspiracy are not to be made out by piling inference upon inference . . . ."

---

[10] The Defendants additionally request a ruling that if Billings' statements are admitted at a joint trial as party-opponent admissions against Billings, pursuant to Federal Rule of Evidence 801(d)(2)(A), that the jury be given a limiting instruction that those statements may not be considered for any purpose against Lawson or Nighbert. *See* Fed. R. Evid. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly"). Likewise, if Lawson's and Nighbert's statements are admitted under either Rule 801(d)(2)(A) or 801(d)(2)(E) at a joint trial, Billings is requesting a limiting instruction at the time of their admission that the jury may not consider those statements for any purpose against him.

*Direct Sales*, 319 U.S. at 711. *Accord, U.S. v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008); *U.S. v. Superior Growers Supply, Inc.*, 982 F.2d 173,179 (6th Cir. 1992). Evidence that "might well arouse suspicion and support a speculative conclusion of . . . guilt" is insufficient to prove knowledge of and participation in a conspiracy. *U.S. v. Barnes*, 383 F.2d 287, 293 (6th Cir. 1967) (*quoting U.S. v. Dunn*, 299 F.2d 548, 554-55 (6th Cir. 1962)). As the Sixth Circuit recently reiterated:

> Conjecture and surmise regarding what a defendant may have intended or known is insufficient to support a [conspiracy] conviction. The government is required to present evidence of the defendant's intent, knowledge and agreement to join a conspiracy. Absent such evidence the government's case will not succeed merely because there is something "fishy" about the defendants' conduct.

*Warman*, 2009 U.S. App. LEXIS 18560, at *14 (6th Cir. Aug. 18, 2009) (*quoting U.S. v. Coppin*, 1 Fed. App'x 289, 291 (6th Cir. 2001)).

The Government has fallen far short of its burden to prove Billings knowingly joined in a conspiracy. It failed to present sufficient evidence, and at times its evidence affirmatively disproved, that Billings had knowledge of *any* criminal conduct. As a result, the Government failed to prove that Billings knowingly joined *any* conspiracy, let alone the broad and multi-phase conspiracy that has been charged in Count 1 of the Second Superseding Indictment.

## 1.    Billings Did Not Join A Bribery Conspiracy.

First, the proof at the *Enright* hearing established that Billings knew nothing about Rummage's alleged delivery of engineer's estimates to Lawson before the letting of those projects. This proof comes not from evidence presented by the Defendants, but rather out of the mouth of Rummage, the Government's star witness, who testified unequivocally, "I have *no evidence* that Brian [Billings] knew that I was providing Mr. Lawson . . . [any] estimates." (Rummage, IV-21) (emphasis added). In fact, Rummage expressly testified that Billings was

"not one of [his] partners" in the alleged "criminal partnership in 2006 and 2007." (Rummage, IV-21) Rummage acknowledged that Billings first learned about these alleged estimates from Rummage himself during a March 18, 2008 recorded call that Rummage initiated at the FBI's direction. (Rummage, IV-29). That disclosure came a full two months *after* the Government now alleges Billings became a full member of the conspiracy. *See* Government's Brief at 3.

In fact, the Government now concedes that Billings had no part in any improper activity during the 2006-2007 time period. (*See* Gov. Br. at 3 (asserting that Billings "joined the conspiracy" "around late January, 2008"). It had no choice. Rummage testified that the conspiracy began in July, 2006 when he was asked to obtain and deliver engineers' estimates in private meetings with Nighbert and Lawson. When asked about Billing's involvement in those meetings, Rummage said: Billings "was not in any meetings with [Rummage], Mr. Lawson, or Mr. Nighbert where estimates were discussed." (Rummage IV-21). Rummage testified that he was asked by Lawson in multiple subsequent phone calls to obtain estimates. Yet Rummage confirmed Billings was "not on any phone calls when [he and Lawson] talked about getting estimates before the letting." (Rummage, IV-21).

Other testimony at the hearing also confirms that Billings had no knowledge that any estimates were passed by Rummage to Lawson. Certainly, there is no evidence in the record that Billings, or anyone else, ever used any of those estimates in preparing bids for Lawson. Rummage testified on multiple occasions that he had no reason to believe the bids were prepared with the benefit of inside information. (Rummage, II-36). ("I don't recall thinking they were unusual bids. Yes, I looked at them").

The Government's only argument that Billings ever knew Rummage allegedly passed estimates to Lawson – before Rummage told him – comes from distorting the evidence from the *Enright* hearing. The Government disingenuously argues in its Brief that "it is reasonable to conclude from the circumstances that Lawson had told Billings which projects were in question." (Gov. Br. at 25). That conclusion is mere speculation based on an incomplete reading of a statement made by Billings to Rummage during their March 18, 2008 recorded conversation.

The Government omitted the exact language to which it refers, but the following is the full transcript of the precise segment of the March 18 recording that the Government cited as the basis for its "reasonable" conclusion:

> Rummage:   Well, I mean look Bri – Brian, shoot I don't, uh, you know, I – I – I gave Leonard some, uh, estimates on projects before the bid and, you know, look if – if – if this stuff comes out, uh, it's, uh, I don't – Has – has he said anything to you about this?

> Billings:   No, and in – in everything I saw, that I, you know, we – I never saw any numbers or anything that indicated what we needed to or what we should be biddin' or anything else. We, you know, we – I went through my normal process and you know as with any company, you gotta – you've got, you know, the owners or whatnot get involved and look at number, you know, our number before you submit it or –

(Gov. Ex. 90b p. 2 lns. 5-15). The Government concludes from that passage, and the subsequent discussion by Billings that references "these projects," that Lawson must have told Billings which "projects" were "in question" and disingenuously interprets Billings reference to "projects" to only mean the suspect bids. Yet the Government's contention is *directly refuted* by three important aspects of its *own* evidence.

First, in this very segment, Rummage directly asks Billings if Lawson ever told him about receiving estimates from Rummage. Billings response is equally direct when he tells Rummage "no." Second, later in this conversation, Billings says, "you know, you can look at our

– our percentages that we got on these jobs and we were, most of the time, we were eight, nine, or greater percentage over [the engineer's estimate]." Yet for the projects charged in the Second Superseding Indictment, the Government's own *Enright* exhibit (Gov. Ex. 12) indicates that Lawson's "suspect" bids were between 3% and 7% above the engineer's estimates. In fact, of the seven Lawson bids that the Government claims are fraudulent, *only one* exceeds 8%, at 8.13%, and none exceed 9%. It is the Government's theory, as stated by Agent Mason, that it was Lawson's motive to obtain these estimates so that he could get as close as possible but be below the 7% mark. (Mason, V-6.) Billings' reference to bids that were above the 7% mark and exceeded 8% and 9% further demonstrates his lack of involvement in and knowledge of the underlying conduct. It certainly suggests he had no knowledge of or involvement in trying to get *below* the 7% guideline. Billings tells Rummage "if there was information there, we – it wasn't bein' used, I can tell you that." *See* (Def. Ex. 12(M) at 4).

Third, what makes the Government's "reasonable" conclusion so incredulous is that its own witness, Rummage, testified that he disagreed with the conclusion the Government is now asserting in its Brief. Rummage was asked whether he believed Billings when he said he had never seen any of the estimates provided to Lawson. Rummage said "I didn't know if he did or didn't [see any estimates]," (Rummage, IV-30), but he acknowledged, "I have *no evidence* that Brian [Billings] knew that I was providing Mr. Lawson . . . [any] estimates," (Rummage, IV-21 lns. 8-9, emphasis added). Rummage never told "Billings the projects on which [he was] getting engineer's estimates and providing to Mr. Lawson," (Rummage, II-6), and "there is nothing I can point to in those bids and say 'this is – seems out of line'", (Rummage, II-6). The Court should base its ruling on the evidence, rather than on the Government's "spin doctor" tactics.

Nor did the Government present any proof that Billings knew, at any time, about the allegation that Lawson had made or arranged for payments to Rummage or Nighbert. Rummage testified that he received cash payments from Lawson in four in-person meetings, but "[Billings] was not at any occasion when [Rummage] received cash from Mr. Lawson." (Rummage, IV-21). Rummage testified that there is nothing in any of the statements made by Billings to Rummage during the investigation that "suggest that [Billings had] *any knowledge of* payments from Mr. Lawson to [Rummage]." (Rummage, IV-29) (emphasis added). Likewise, the Government's chief investigator, Agent Mason, testified at the hearing there is no evidence that Billings had any knowledge of any payments by Lawson or UMG to Nighbert. Mason said he did not "have any evidence that [led him] to believe that Billings [even] knew about the relationship between Bill Nighbert and UMG." (Rummage, V-48).

The threadbare nature of the Government's proof here – to put it charitably – should come as no surprise. To the contrary, it is completely consistent with the theory of this case that the Government embraced so decidedly for over nine months in two separate predecessor indictments. Neither of those indictments alleged that Billings had any involvement in the alleged bribery scheme. In fact, even ten days before the Second Superseding Indictment was returned, the Government told Judge Reeves that Billings had no involvement in or knowledge of the alleged bribery events. Doc. 413 (Tr. of 5/26/09 hearing) at 24 ("[Billings is] not in the first conspiracy. . . he's not charged in 1 through 5 so there's no danger of prejudice there. The jury has no option of convicting him on 1 through 5").

The Government's theory changed days later, not because it received new evidence, but because Judge Reeves denied its motion to reconsider his order severing the case into two trials. *See* Docs. 336 & 396. On this point there is no dispute. For one thing, the Government has told

the Court explicitly that the only purpose for drop kicking Billings into a single, much larger conspiracy (and exposing him to a significantly longer sentence) in the new indictment was to reverse Judge Reeves' severance order. *See* Doc. 433 ("[T]he Court erroneously severed what logically and legally should be one trial. . . [The Government wanted] to improve [its] chances of a conviction . . . [and] to make admissible evidence which had been excluded in the first trial"). Second, Mason's testimony on this point before the grand jury that returned the Second Superseding Indictment is astounding – not in what is said – but in what is missing. There is not a single attempt to explain why Billings should be added to a conspiracy that includes the bribery and conversion charges in the Second Superseding Indictment. Mason acknowledged the total absence of any evidence that Lawson had relayed estimates to Billings in his *Enright* testimony. (Mason, VI-39). In fact, the Government knew better. Rummage was asked if he told the Government "that [he] had no evidence to prove that Brian Billings knew you were giving estimates to Mr. Lawson." Rummage responded, "I believe so." (Rummage, IV-38).

Whether the Government's actions were proper or ethical is perhaps for another day. The important point here is that the Government's goal of circumventing the Court's prior rulings by charging a single conspiracy should be held to have failed. Simply alleging that Billings was part of the cash-for-estimates agreement is not enough for *Enright* standards. The Government has not proven by a scintilla of evidence, much less a preponderance, that Billings was involved in a conspiracy to commit bribery and convert engineer's estimates.

### 2.    Billings Did Not Join A Conspiracy To Obstruct Justice.

The closest the Government comes to seriously suggesting Billings had any knowledge of *any* of the objectives of the alleged conspiracy is asserting that Billings joined the pre-existing conspiracy in late January 2008 by meeting with Rummage in a parking lot at a Chinese

restaurant in Mt. Sterling, Kentucky with "an intent to continue with this obstructive conduct." (Gov. Br. at 3). The Government defines "this obstructive conduct" as "the defendants' attempts to control Rummage to thwart the investigation." (*Id.*). Even if there were evidence Billings became involved in an effort to stop Rummage from talking to investigators, that would not relieve the Government of its obligation to prove by a preponderance of the evidence that Billings had knowledge of the *essential nature* of the main conspiratorial plan – namely that Rummage was exchanging estimates for cash – in order to meet its burden to prove Billings was a member of the Count 1 conspiracy. *See* Part IIB, *infra*.

Equally important, like so many of the Government's assertions, this contention is not supported but rather contradicted by the *Enright* record. None of Billings' statements indicate he was trying to control Rummage or thwart an ongoing investigation. For that matter, none of Billings' statements constitute an obstruction of justice.

For starters, the Mt. Sterling meeting, which the Government now argues was Billings' official entry into the conspiracy in late January or February, 2008, was *never mentioned by Rummage in ten prior statements given to the FBI, the U.S. Attorney's Office, the grand jury, and/or defense attorneys over a twenty month period.* This includes multiple statements Rummage or his attorney gave to the FBI and the grand jury on March 7, March 11, March 12, March 19, April 4, and April 16, 2008, which would have been a little over a month to two months after the Mt. Sterling meeting that Rummage now claims occurred. (Rummage, IV-26, 27-29). Rummage also recorded conversations with Billings, which have now been played to the Court, that took place on March 13, March 18, March 19, March 20, March 24, and March 25, 2008, and not a single conversation makes any reference to a prior meeting between the two in a Mt. Sterling parking lot. (Def. Ex. 12(I-K, M-U, W, X). The first time Rummage recounted this

meeting to the Government was while preparing for his August 6-7, 2009 *Enright* testimony, a fact that both Rummage and Agent Mason acknowledge. (Rummage, IV-27; Mason, VI-123).

Furthermore, Rummage only claims that Billings wrote notes to him at this newly-recalled Mt. Sterling meeting saying "[Rummage] hadn't done anything wrong," "Mr. Lawson . . . was wanting to know what was going on," and "continue kind of keeping [Lawson] informed of what was happening with the investigation." (Rummage, I-57). The remainder of the Government's evidence concerning Billings is:

- On March 7, 2008, Rummage claimed he had another in-person meeting where Billings passed him notes that read, "Leonard needed to know what was going on," and "I needed to call Leonard." Billings also gave Rummage Lawson's phone number, but did not participate in that phone call or inquire about what occurred in that call. (Rummage, I-61, 62).

- On March 18, Rummage called Billings at the FBI's request, and in this conversation, as previously discussed, Billings told Rummage he had no knowledge of Lawson obtaining estimates and did not believe any estimates were ever used to prepare a bid for one of Lawson's companies. (Def. Ex. 12M-2-5).

- On March 19, at another in-person meeting, Rummage claims Billings passed him notes that asked "do I have an attorney yet," "once I got an attorney, I need to let him know so the attorneys can talk," and "do you have anything big you need to talk about?" (Rummage, II-8, 9).

- On March 20, at another FBI staged meeting between Rummage and Billings, Billings allegedly wrote notes, "asking [Rummage] if I have talked to an attorney yet," "telling me I can start a legal defense fund," and giving the name of an attorney, "Guarnieri." (Rummage, II-10, 11).

- On March 24, in a phone call Rummage made to Billings at the FBI's direction, Rummage asked Billings "Do you have something that might help me out," and Billings responded, "Yeah, yeah, I do." Rummage testified he believed this meant Billings had money to give him for an attorney. (Rummage, II-13, 15).

- On March 24, during a second FBI-directed phone call, Rummage asked Billings "And have you got something? Okay, you got something for me, though, man? That's the main thing I want to know – know. It will calm me down that way." Billings responded, "Absolutely." Rummage testified

he thought this meant Billings had money to give him for an attorney. (Rummage, II-15, 16).

- On March 25, at another FBI staged meeting where the FBI expected Billings to bring Rummage cash and were ready to arrest him, (Rummage IV-37), Billings told Rummage "Leonard told me to tell you specifically that as far as this attorney's concerned he can't give you any money." Rummage then testified that Billings typed on his cell phone messages that said, "don't talk out loud," "David Guarnieri," "if you agree to switch attorneys nod your head," and "if I switch attorneys costs will be taken care of." (Def. Ex. 12(X); Rummage, II-18, 19).

Even assuming all of these statements attributed to Billings occurred, not a single one constitutes obstruction of justice or indicates Billings is trying to control Rummage or thwart an investigation. Much less is there any statement that indicates Billings knowingly agreed with Lawson and/or Nighbert[11] to obstruct justice by urging Rummage to lie to or not to talk to the FBI or the grand jury.

In fact, Rummage himself does not believe Billings' statements constitute obstruction of justice or proof of a conspiracy. Rummage testified that "in none of these recordings [Billings] ever tells [me] to lie to the FBI." (Rummage, IV-28). Billings never told Rummage "to assert [his] Fifth Amendment rights or to stop talking to the FBI." (Rummage, IV-29). Billings never told Rummage that "you've got to take the lawyer that Jon Woodall recommended." (Rummage, IV-31). Rummage did not think that Billings' advice that "he ought to hire a lawyer" constituted an obstruction of justice. (Rummage, IV-32). Rummage testified that all the notes Billings allegedly wrote "*never* said, 'Jim, you need to lie to the FBI,'" or "'you got to lie to the grand jury,'" or "'you got to take the Fifth Amendment,'" or even "'don't talk to the government.'" (Rummage, IV-35). Rummage agreed that "nothing in those notes or in anything [Billings] said

---

[11] For all of the undercover recordings made in March 2008, Nighbert's name is virtually never mentioned.

to him obstructed [his] relationship with the Government in this case." (Rummage, IV-35).

Agent Mason acknowledged under oath that the exercise of one's Fifth Amendment rights does

not constitute obstruction of justice (Mason, V-24):

> Q:    And is it your testimony as you sit here today under oath that the exercise
>       of one's Fifth Amendment privilege under the Constitution constitutes an
>       obstruction of justice?
> A:    No.

The Government has also conceded that recommending a lawyer for another person, and even

paying for the lawyer, does not in itself constitute obstruction of justice. (*See* Gov. Response to

Motion to Dismiss [Doc. 143], p. 12) ("Paying for someone's attorney, standing alone, clearly is

not obstructive conduct").

What is most offensive, perhaps, is the suggestion by the Government that because

Billings wrote the name of "David Guarnieri" twice on a note to Rummage, and suggested once

that Rummage switch attorneys, that Billings was obstructing justice.

In fact, *Mason never bothered to interview Guarnieri* to find out if there was in fact an

arrangement for him to represent Rummage, be paid by Lawson, or instruct Rummage to assert

the Fifth Amendment. If Mason had, he would have heard the same testimony that Guarnieri

gave at the *Enright* hearing. Guarnieri testified that he was never contacted by Jon Woodall,

Jaron Blandford, Leonard Lawson, Bill Nighbert, or anyone associated with any of those

individuals to represent either Jim Rummage or "an unnamed potential client for whom someone

else would be paying the fee." (Guarnieri, II-83). It was not until November or December, 2008,

after all three defendants had been indicted that Guarnieri first learned about his involvement

*from AUSA Taylor*, not Woodall, Blandford, or Lawson, that he "was the attorney to whom Mr.

Rummage was attempting to be referred." (Guarnieri, II-85). Guarnieri made clear to Taylor then

"that was the first I had ever heard of it, of me being at all involved or having any connection whatsoever to this case that's in court here today, the Leonard Lawson case." (Guarnieri, II-85).

Woodall and Blandford never asked Guarnieri to give anybody, including Rummage, the advice to take the Fifth Amendment. (*Id*.). In fact, Guarnieri was emphatic when asked whether he would ever take direction from a third party about how to best represent a client, saying, "I wouldn't. Not only is it against my nature, because I feel that I ought to be the one giving advice and not taking advice; but more importantly, I would deem it a breach of our ethical responsibilities." (Guarnieri, II-86). The fact the Government accused Guarnieri of such an ethical violation without even attempting to interview him is itself a breach of professional responsibility. Guarnieri also made clear he was never part of any arrangement to obstruct justice and he would never be a part of such an arrangement. (Guarnieri, II-87). *The Government has NO contrary evidence.*

As it relates to Billings then, if Billings wrote Guarnieri's name on a note to Rummage, the Government has not established by a preponderance of the evidence that such an act by Billings was an effort to prevent Rummage from talking to the Government or proof Billings was a member of any conspiracy. To the contrary, the Government presented *no such evidence* and the uncontradicted evidence – Guarnieri's testimony – affirmatively *disproves* it. All the Government showed, just as Rummage himself testified, was nothing more than a recommendation for a lawyer – a recommendation, it may be added, that the FBI was encouraging Rummage to seek from both Billings and Lawson. There is no evidence, let alone evidence by a preponderance, that Billings was part of any attempt to obstruct justice by paying Guarnieri to represent Rummage or by any other means.

Courts in this Circuit have not hesitated to reject on such a weak expanse of proof charges that a defendant was a member of even a proven conspiracy. In *James R. Snyder Co.*, the Sixth Circuit upheld the District Court's ruling that statements by union officials were inadmissible under Rule 801(d)(2)(E) "because the plaintiffs had not proven the existence of a conspiracy by a preponderance of the evidence, as required under [*Enright*]." 677 F.2d at 1115-16. Specifically, "the district judge concluded that while there may have been proof of a conspiracy or agreement among the union people themselves," the plaintiffs had not shown by a preponderance of the evidence that there was an "agreement or conspiracy between the unions and [defendant employers]." *Id*. at 1121 & n.13.[12] Even where "[t]he government may have proved that there was a conspiracy, . . . the government must still present sufficient evidence to show that this particular defendant knew of the objective of the conspiracy and agreed to join it." *Coppin*, 1 Fed. App'x at 292. Comparison between the facts here and those presented in other cases further illustrate that the Government has not shown that "this particular defendant" – Billings – "knew of the object of the [alleged] conspiracy and agreed to join it."

For example, *U.S. v. Franklin*, 608 F.2d 241 (6th Cir. 1979), involved a conspiracy conviction for misapplication of bank funds. The defendant not only had referred the ineligible borrowers to the bank officer who misapplied banks funds by lending to them, but also told the borrowers that they would have to give the officer a "present." *Id*. at 242. The Sixth Circuit nevertheless reversed the conviction because the Government had not presented evidence that the defendant had actual knowledge of the borrowers' financial condition or of "the various

---

[12] In *James R. Snyder Co.*, a civil antitrust case, the Sixth Circuit explained that the standards for admissibility under *Enright* and Rule 801(d)(2)(E) are the same for both criminal and civil cases. 677 F.2d at 1117.

procedures implemented by [the bank officer] to secure the loan." *Id*. at 245. Reiterating that "the law of conspiracy . . . requires agreement as to the 'object' of the conspiracy, which means that the 'essential nature of the plan' must be shown," the Court said there was no sufficient evidence of an agreement between the defendant and the bank officer "to misapply [bank] funds . . . with an intent to injure or defraud the bank." *Id*. at 246. At least in *Franklin* there was more than sufficient evidence that the defendant knew something very shady was going on (telling the borrowers as he referred them to the bank officer to apply for a loan that a bribe would be necessary). Here, there is not even that type of evidence as to Billings.

Similarly, the Sixth Circuit has not hesitated to reverse conspiracy convictions based on close connections between defendants, common associates, or other suspicious circumstances. In *Coppin,* the Court reversed the defendant's conspiracy conviction, despite evidence that he had been present when payments for drug deals were taking place, that he had frequent telephone contact with the other defendants, and that he was present when the arrests of the conspirators took place. The Court stressed that "[t]he government is required to present evidence of the defendant's intent, knowledge of and agreement to join a conspiracy. Absent such evidence, the government's case will not succeed merely because there is something 'fishy' about the defendant's conduct." *Coppin*, 1 Fed. App'x at 291-292.

The essence of a conspiracy is an agreement, after all, and the proof of a conspiracy fails if the Government cannot prove the agreement. In *U.S. v. Gibbs,* 182 F.3d 408 (6th Cir. 1999), for example, the Court of Appeals reversed the conviction of lower-level drug dealers because the Government had not proved they knowingly joined a conspiracy to exclude rivals from their neighborhood. *Id.* at 421-422. Likewise, in *Barnes*, 383 F.2d at 293, the Court of Appeals reversed conspiracy convictions under the Travel Act because the Government did not show the

partners in a nightclub knew another partner was using interstate facilities to promote gambling. "Whatever suspicions or speculations might be indulged that the Uptown Club was in fact part of 'the syndicate,' the destruction of which was part of the Congressional purpose in enacting the Federal Travel Act, and that Carney and Washer knew of and conspired in the illegal doings of Barnes, such suspicions, speculation and surmise are not sufficient to sustain their conviction." *Id.*

The proof in each of those cases – in which the defendants' conspiracy convictions were reversed – was far stronger than the proof against Billings here. The evidence here better reflects a different scenario, one the Government rejects because it is not criminal. Billings had been friends with Rummage for years, working with him at the Transportation Cabinet and looking to him as a mentor. (Rummage, IV-23). He wanted to help his friend, and he encouraged him to hire an attorney, even recommending an attorney, David Guarnieri, widely reputed to be capable, experienced, and highly principled. What Billings did not know was that Rummage was only *pretending* to need help finding and hiring an attorney. Although Billings did not know what Rummage was doing, nothing that Billings did in response violated the law. At a minimum, evidence that "is completely consistent with a conclusion that [the defendant] was unaware of the conspiracy" is not sufficient independent evidence to establish the defendant was a member for purposes of Rule 801(d)(2)(E). *Silverman*, 861 F.2d at 579; *see* Part I, *supra*.

For all of these reasons, the Court should therefore find that Billings has not joined any conspiracy, and statements made by him cannot be admitted under Fed. R. Evid. 801(d)(2)(E). As set forth in more detail below, however, the Government's burden is even higher and more specific, and it unquestionably has not been met.

**B.     The Government Has Failed To Prove By A Preponderance Of The Evidence That Billings Had Actual Knowledge And Joined In The Conspiracy Charged In the Second Superseding Indictment.**

The preponderance of the evidence at the *Enright* hearing also did not establish what the Government must prove – that Billings had *actual knowledge of the nature and scope of the conspiracy as it is alleged in the Second Superseding Indictment, and that he knowingly joined in it.* It is of course true, as the Sixth Circuit has said, that to be a member of a conspiracy, it is not necessary that the defendant "know every other member," *Swafford*, 512 F.3d at 841; or "be aware of all facets of the conspiracy," *U.S. v. Virta*, 1994 U.S. App. LEXIS 1327, at \*19 (6th Cir. Jan. 21, 1994); or "be an active participant in every phase of the conspiracy." *U.S. v. Mayweather*, 1995 U.S. App. LEXIS 15395, at \*12 (6th Cir. June 16, 1995). At the same time, however, it *is* necessary that the defendant "be *aware* of the *general nature and scope* of the conspiracy and *knowingly* join in the *overall scheme*." *Virta*, 1994 U.S. App. LEXIS 1327, at \*19 (emphasis added) (internal quotation marks and citation omitted). *See also, e.g., Warman*, 2009 U.S. App. LEXIS 18560, at \*14 (must be a "party to the general conspiratorial agreement") (internal quotation marks and citation omitted); *Swafford*, 512 F.3d at 841 ("agreed to participate in what he knew to be a collective venture directed toward a common goal").

Although this requirement is stated in various ways, it ultimately traces to the U.S. Supreme Court's ruling in *Blumenthal v. U.S.*, 332 U.S. 539 (1947), that the defendant must know of and agree to the "essential nature of the plan" before he may be convicted of conspiracy. *See U.S. v. Stanley*, 1986 U.S. App. LEXIS 19333, at \*18 (6th Cir. April 2, 1986) (quoting *Blumenthal*, 332 U.S. at 557); *Franklin*, 608 F.2d at 246 (same). In *Blumenthal*, which continues to be the controlling authority on this point, the Supreme Court distinguished its decision in *Kotteakos v. U.S.*, 328 U.S. 750 (1946), holding that the defendants could be found to be co-

conspirators only because they knew of the conspiracy's "essential features and broad scope, though not of its exact limits, and [agreed to its] common single goal." 332 U.S. at 558; *see also id.* at 559 ("knew of and joined in the overriding scheme").

As the Government states in its Brief, the Second Superseding Indictment charges a conspiracy having as its objectives: (1) to "provide Lawson with confidential KTC engineer's estimates"; (2) to "compensate Nighbert and Rummage for their assistance"; (3) to "groom and corruptly compromise Rummage as an inside KTC source of future confidential information"; and (4) to "conceal the compensation and misappropriations" and "obstruct state and federal investigations." (Gov. Br. at 2; Doc. 415 at 4-5). The evidence at the hearing showed otherwise.

When Rummage was asked at the *Enright* hearing to describe the objectives of the conspiracy he joined, he cited only one objective, namely to "deliver[] an engineer's estimate prior to bid to Mr. Lawson." (Rummage, IV-60). When pressed to elaborate, Rummage agreed that "the goal of this enterprise, this agreement, was to deliver the estimates to Mr. Lawson before the letting." (Rummage, IV-60). It is not surprising then that in its Brief, the Government cites to nothing more than the naked allegations in the Second Superseding Indictment itself for support that the conspiratorial agreement was broader in scope than the alleged exchange of estimates for cash. The *Enright* record, including the testimony of Rummage – the only *Enright* witness who was a party to and should have knowledge of the terms of the actual conspiratorial agreement – offers no support for the Government's assertion that any of the alleged co-conspirators, and certainly not Billings, knowingly adopted or agreed to the other objectives alleged in the Second Superseding Indictment.

Even more important, the *complete absence* of evidence that Billings had knowledge even of the alleged estimates or bribes themselves, much less agreed to join a conspiracy with those objectives, is detailed in Part IIIA1, *supra*. Again, *actual knowledge* of the objectives of an alleged conspiracy is required, *Searan*, 259 F.3d at 441, and must be shown by "clear, not equivocal" evidence, *Direct Sales*, 319 U.S. at 711. "Suspicion," "speculation" and "surmise" will not do. *Barnes*, 383 F.2d at 293.

Consequently, Billings cannot be found to be a member of the conspiracy charged in the Second Superseding Indictment when he did not join or even know about its essential objectives – *i.e.*, to bribe Rummage for estimates. The other two objectives, to "groom" Rummage to accept more bribes in the future (as to which there also is no evidence of knowledge and agreement by Billings), and to conceal and obstruct investigation of the alleged bribery in the past, stand secondary to the original bribery allegations. Thus, when the Supreme Court and Sixth Circuit rule that a person cannot knowingly join a conspiracy unless that person has knowledge of the *essential* nature of the conspiracy, they mean, for purposes of this case as it is now charged, that Billings cannot be held to be a conspirator unless he understood and agreed to join a conspiracy involving the alleged engineer's estimates and bribery.

Because the Government has not carried its burden on that point, the Court should hold that Billings is not a member of the charged conspiracy. Because Billings never joined such a conspiracy, his statements cannot be said to be in furtherance of that conspiracy and they may not be admitted against Lawson or Nighbert. Likewise, any statements by Lawson or Nighbert that might satisfy the standard for admissibility under Rule 801(d)(2)(E) as between the two of them may not be admitted against Billings, who *patently* was not a member of the conspiracy the Government has now charged in the Second Superseding Indictment.

IV.    **Billings' Statements Are Also Inadmissible Against Lawson And Nighbert Under Rule 801(d)(2)(E) – And Vice Versa – Because The Government Has Not Shown That The Alleged Conspiracy Extended Beyond December 2007.**

According to the Government's argument (with Rummage's newly remembered Mt. Sterling meeting), Billings "joined the [alleged] conspiracy" only in "late January, 2008." (Gov. Br. at 3). However, the preponderance of the evidence and controlling legal principles show that the conspiracy now alleged in the Second Superseding Indictment had already terminated by December 2007. For this reason as well, Billings' statements – all of which are claimed to have occurred during 2008 – are not in furtherance of the alleged conspiracy and therefore not admissible against Nighbert and Lawson under Rule 801(d)(2)(E). For the same reason, Billings was not a member of the alleged conspiracy and hence Lawson's and Nighbert's statements are not admissible against him under that Rule.

The Second Superseding Indictment now alleges a single conspiracy that had four objectives: (1) to unlawfully provide Lawson with confidential KTC engineers estimates for prospective road contracts, which he could use in formulating bids, (2) to compensate Nighbert and Rummage for their assistance, (3) to "groom" Rummage as an inside source of future confidential information, (4) and to conceal the compensation and misappropriations, and obstruct justice. Doc. 415 at 4-5 (¶ 3). As shown below, however, the preponderance of evidence – indeed, the uncontradicted evidence – presented at the *Enright* hearing establishes that the first three alleged objectives, save for the "Nighbert compensation" component, were either completed or defeated by December 2007. (Rummage, III-27, 28). Controlling Supreme Court precedent holds that the fourth alleged objective – concealment and obstruction – does not

continue the duration of a conspiracy after the main objectives are either accomplished or defeated. *Grunewald v. U.S.*, 353 U.S. 391 (1957); *Krulewitch v. U.S.*, 336 U.S. 440 (1949).[13]

The Government advances three theories to avoid the conclusion that the alleged conspiracy terminated on December 27, 2007:  (a) that the duration of the conspiracy continued until the date of indictment because Lawson continued to receive payments on road contracts, (b) that UMG, a company in which Lawson held an indirect interest, made payments to Nighbert during 2008, and (c) that the alleged concealment and/or obstruction were part of the original conspiratorial agreement.  However, each of these avoidance theories fails under the Government's evidentiary showing and the controlling law.

### A.    Under The Evidence And The Controlling Legal Rules, The Alleged Conspiracy Terminated By December 2007.

The evidence is uncontroverted that Rummage left his relevant state employment August 31, 2007. (Mason, VI-50).  Although he later returned to the KTC, he was then, by his own design, not in a position to gain access to engineer's estimates. (Rummage, III-28).  It is also undisputed that Nighbert left the KTC on December 10, 2007. (Mason, VI-50).  Accordingly, as of the latter date, it was impossible for the conspiracy to have continued with respect to the first alleged objective of the conspiracy – *i.e.*, Nighbert and Rummage providing engineer's estimates to Lawson.  With respect to the second, compensation objective of the conspiracy, there is no evidence (and the Government does not claim) that Rummage was paid any money after he left the relevant KTC position September 1, 2007, or that he was owed any money for previous

---

[13] The Government tells this Court that *Grunewald*, 353 U.S. at 399-405, stands for the proposition that "part of conspiracy to defraud government inextricably contained the acts or concealment." (Gov. Br. at 3-4). In fact, the precise holding of *Grunewald* at the cited pages is that the "acts of concealment" *did not* extend the duration of the conspiracy. *See* Part IVA, *infra*.

services rendered. Moreover, by putting himself in a position where he no longer had access to engineer's estimates Rummage necessarily ended the alleged objective of his being compensated for providing them to Lawson. *See* Subpart IV(B)(2) of this Response, *infra*.

The third alleged objective of the conspiracy – "grooming" Rummage for the State Highway Engineer position –was defeated in December, 2007, when Gilbert Newman was appointed to that position, also in December, 2007. (Mason, VI-4).

Accordingly, the alleged conspiracy terminated by December 2007. *See, e.g., Grunewald*, 353 U.S. at 399-400 (conspiracy ends when main criminal objectives have succeeded or failed); *Krulewitch*, 336 U.S. at 442-43 (same); *U.S. v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993) ("a conspiracy has ended when its objectives have been achieved or have been rendered impossible").[14]

The fourth alleged objective of the conspiracy – concealment and obstruction – does not extend the duration of a conspiracy after the accomplishment or defeat of the conspiracy's main criminal objectives. This point is conclusively established by two key U.S. Supreme Court precedents.

In *Krulewitch*, involved the admissibility of a statement by a co-conspirator made to conceal the conspiracy after its "objectives either had failed or had been achieved." 336 U.S. at 442. The Government argued the statement was admissible on the theory that a conspiracy

_____

[14] A continuing conspiracy of indefinite duration is deemed to continue until the occurrence of a "specific terminating event." *U.S. v. Gardiner*, 463 F.3d 445, 463 (6th Cir. 2006). The events described above are "specific terminating events" – Rummage leaving the relevant KTC position, Nighbert leaving the KTC, and Newman's appointment as State Highway Engineer – as to the first three objectives.

always involves an express or implied agreement among the conspirators "to conceal facts in order to prevent detection, conviction and punishment," and therefore co-conspirator statements made in furtherance of this "subsidiary phase of the conspiracy" should be admissible like those in furtherance of the "central criminal objectives." *Id*. at 443. In rejecting this argument, the Supreme Court said "[t]here are many logical and practical reasons" not to have a co-conspirator hearsay exception at all, and emphasized that the strict limitation on this exception to inadmissibility of hearsay – *i.e.*, "that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged" – was "scrupulously observed by federal courts." *Id*. at 443-44. Accordingly, the Court refused the Government's invitation to create "a further breach of the general rule against the admission of hearsay evidence." *Id*. at 444.

In *Grunewald*, the conspirators in a tax fraud conspiracy engaged in extensive efforts to obstruct justice and defeat a Government investigation "after the main criminal purpose of the [tax fraud] conspiracy was accomplished." 353 U.S. at 398. The Supreme Court listed as "examples" of those efforts "[getting] rid of certain [government] records," persuading one witness "to lie to the grand jury," and attempting to persuade another witness "not to talk to the grand jury." *Id*. at 403.[15] Based on that evidence, the Government argued that under the "actual" agreement among the conspirators, the scope of the conspiracy included its concealment "as a subsidiary element." *Id*. at 398, 401. The Court rejected this argument as another attempt to

---

[15] The indictment in *Grunewald* alleged that "[i]t was part of the [tax fraud] conspiracy that the defendants and co-conspirators would make continuing efforts to avoid detection and prosecution . . . through the use of any means whatsoever, including but not limited to, bribery, improper influence and corruption of government employees, the giving of false testimony, [etc.]." 353 U.S. at 394 n.3 (Court's brackets in original). One of the tax fraud conspirators in *Grunewald* was also convicted of obstruction of justice under 18 U.S.C. § 1503. 353 U.S. at 393.

broaden conspiracy law, because the Government had not shown "that concealment of the crime after its commission was part of the *initial* agreement among the conspirators." *Id*. at 402 (emphasis added). (As discussed in Subpart IV B3, *infra*, concealment and obstruction are seemed to be part of the "initial agreement" in this sense only where they are in furtherance of (and necessary to) the successful completion of the conspiracy's main objective(s)).[16]

*Krulewitch* and *Grunewald* remain the law. The drafters of Rule 801(d)(2)(E) rejected "wider admissibility of statements of co-conspirators," stating that the Rule's "during the course and in furtherance of" limitation on admissibility adhered to the existing law and Supreme Court precedent. Fed. R. Evid. 801, Advisory Committee Notes, 1972 Proposed Rules (citing *Krulewitch* and *Wong Sun v. U.S.*, 371 U.S. 471 (1963). In the latter case, the Supreme Court again affirmed its "consistent[] refusal to broaden [the] very narrow [co-conspirator] exception to the hearsay rule . . . ." 371 U.S. at 490. Likewise, the governing Sixth Circuit precedent holds that *Krulewitch* and *Grunewald* are controlling precedents under Rule 801(d)(2)(E). *U.S. v. Howard*, 770 F.2d 57, 59-60 (6th Cir. 1985) (*en banc*); *see also U.S. v. Marks*, 585 F.2d 164, 170 (6th Cir. 1978).

### B. The Government's Theories For Avoiding Termination Of The Conspiracy As Of December 2007 Fail Under The Evidence And The Controlling Law.

---

[16] The issue in *Grunewald* involved the running of the statute of limitations for conspiracy. However, the Court was deciding a doctrinal limit on conspiracy law that included limitation of the co-conspirator exception to the inadmissibility of hearsay, as shown by *Grunewald's* reliance on *Krulewitch* as the controlling precedent and its rejection of the Government's argument as "for all practical purposes wip[ing] out the statute of limitations in conspiracy cases, *as well as extend[ing] indefinitely the time within which hearsay declarations will bind co-conspirators*." 353 U.S. at 402 (emphasis added). Accordingly, the Supreme Court and other courts have always considered *Grunewald* a controlling precedent on the permissible scope of the co-conspirator exception to the hearsay rule. *See, e.g., Dutton v. Evans*, 400 U.S. 74, 82 (1970) (plurality opinion); *Howard*, 770 F.2d at 59-60 (*en banc*).

The Government argues in its brief three theories why the alleged conspiracy continued into 2008. None is correct.

1.    **The Government's First Termination Avoidance Theory – That Lawson Continued To Receive Payments Under The Road Contracts – Fails Because It Did Not Show That Any Portions Of Those Payments Are Proceeds Of The Alleged Conspiracy, That There Was Any Agreement To Divide Those Payments, And That The Continuation Of The Payments Is The Product Of Continuing Conspiratorial Activity.**

The Government's first theory that the alleged conspiracy continued after December, 2007 is that Lawson's companies were still receiving payments on road contracts for which Lawson allegedly had received engineer's estimates. (Gov. Br. at 3, 4-5). In support of this argument, the Government relies on cases in which the duration of the conspiracy was held to extend to the conspirators' subsequent receipt and division of the proceeds of the conspiratorial activity. *See id*. The Government's cases do not support its position here for two reasons.

*First*, the Government has not shown by a preponderance of the evidence that the road contract payments actually contained any allegedly unlawfully-obtained proceeds, or that there was any agreement among the alleged conspirators to divide them. As discussed in Part IIA1, *supra*, the Government did not show, or even attempt to show, at the hearing that any estimates Lawson allegedly received were used to increase any bids or contract prices. Moreover, all of the evidence on the topic indicated the opposite – the estimates were not used in preparing Lawson company bids. *See id*. For this reason alone, the Government cites to support its continuing-payments theory actually support Lawson's position. (*See* Gov. Br. at 2-5 (citing *U.S. v. Hamilton*, 689 F.2d 1262 (6th Cir. 1982); *U.S. v. Dynalectric*, 859 F.2d 1559 (11th Cir. 1988); *U.S. v. Girard*, 744 F.2d 1170 (5th Cir. 1984); *U.S. v. Helmich*, 704 F.2d 547 (11th Cir. 1983); *U.S. v. Walker*, 653 F.2d 1343 (9th Cir. 1981))). Each of these cases involved proceeds resulting

from the illegal conduct and an express agreement to divide or share the proceeds that was used to extend the conspiracy's duration.

In *Dynalectric*, a restraint of trade and antitrust conspiracy, the court looked to the defendants' joint venture agreement, which provided for distribution of continued payments. 859 F.2d at 1564-65. There, the joint venture agreement was proof that payment and distribution of the ill-gotten funds were part of the agreement between the conspirators. Similarly, in *Hamilton*, the evidence made clear that the conspirators agreed not only to illegally deal in explosives, but to collect the proceeds and divvy up money amongst the conspirators. 689 F.2d at 1269. Here, the Government presented no evidence that any part of the continuing road contract payments constituted proceeds resulting from the alleged illegal conduct, much less that there was any agreement to divide them.

The Government's assertion that the Fifth Circuit's *Girard* decision is "directly on point" is baffling. (Gov. Br. at 5). There, payments to the original conspirators were not made until after Girard Plumbing had received payment from the Housing Authority under Girard's ill-gotten contract. *Girard*, 744 F.2d at 1172. As the Fifth Circuit observed, the terms of the agreement were explicit; each conspirator was to receive "a set payoff on specified dates[.]" *Id.* at 1173. In other words, upon payment by the Housing Authority, Girard would pay his co-conspirators pursuant to their agreement. *Id*. This is why the final payment to Girard could rationally be used to extend the conspiracy's duration—the conspiratorial agreement spoke directly to the issue of dividing up payments, thus a clear connection was established. *See id.*[17]

---

[17] *Helmich* is so factually and legally dissimilar that it has no application here. Helmich pleaded guilty to conspiring to transmit defense information for remuneration, and the specific

*(Footnote Continued To Next Page)*

In this case, the Government can point to no such evidence. There is no evidence, much less a preponderance of evidence, that there was an agreement to collect or divvy up payments on Lawson's contracts. The Government's bald argument cannot serve to extend the conspiracy's duration and should not influence the court's evidentiary decisions.

*Second*, the Government failed to show by a preponderance of the evidence, or by any evidence at all, that the continuing road contract payments were the product of concerted or conspiratorial activity. Here again, the Government's theory runs afoul of controlling Supreme Court precedent. In *Fiswick v. U.S.*, 329 U.S. 211 (1946), the Supreme Court held that, "[t]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one. Continuity of action to produce the unlawful result, or . . . continuous cooperation of the conspirators to keep it up, is necessary." *Id*. at 216 (internal quotation marks omitted). Thus, "[a] conspiracy does not continue indefinitely simply because the fruits of the conspiratorial objective continue into the future." *U.S. v. Colon-Munoz*, 192 F.3d 210, 228 (1st Cir. 1999) (citing *Fiswick*, 329 U.S. at 216 and *U.S. v. Doherty*, 867 F.2d 47, 61 (1st Cir. 1989)). Instead, to extend the length of the conspiracy, the continuing conduct alleged must involve continued conspiratorial cooperation, rather than "unilateral activity." *Doherty*, 867 F.2d at 62.

In *Doherty*, the Government argued that continued salary payments to police officers who received promotions as part of a RICO conspiracy extended the duration of the conspiracy. The

---

*(Footnote Continued From Previous Page)*

count to which he pleaded guilty included the allegation that the payoff was part of the conspiratorial agreement. 704 F.2d at 548-49. The payoff, which took place years after the information was transmitted, was used to extend the duration of the conspiracy, and Helmich claimed on appeal that the payoff was outside the statute of limitations. The court held that, because the payoff was clearly part of the agreement, and because Helmich had stipulated to it by pleading guilty to the conspiracy count that described the payoff in two separate paragraphs, he could not later claim that the payoff could not be used to extend the conspiracy's duration. *Id.*

court held, however, that where "the payoff [of a conspiracy] merely consists of . . . ordinary, typically noncriminal, unilateral actions, . . . *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues." *Id.* at 61. Similarly, in *Colon-Munoz*, a loan fraud conspiracy, the Government argued that repayments of the fraudulent loans extended the length of the conspiracy. 192 F.3d at 228-29. Because the repayments were Colon's acts alone, and were not part of the concerted efforts of the conspirators, the court declined to extend the duration of the conspiracy, observing that "Colon's repayment of his [bank] loan is analogous to the continued receipt of increased salary as the result of the fraudulently obtained promotions at issue in *Doherty*." *Id.* at 228.

The continued road contract payments relied upon by the Government are just the sort of unilateral, non-conspiratorial acts contemplated by *Fiswick*. It simply cannot be said that Lawson's continued receipt of payments on the contracts involved or required concerted or conspiratorial action. Therefore, these payments cannot be used as events that extend the duration of the conspiracy.

Once again, the Government's authority actually weakens its position. It cites *Walker*, 653 F.2d at 1347 where the court determined that the division of profits among the conspirators involved "continuing cooperation" without which "the scheme would have fallen apart." The same simply cannot be said of Lawson receiving payments on the contracts. The continued payments received by Lawson's company did not involve continued cooperation of the alleged conspirators, and nothing about the alleged scheme would have "fallen apart" without the payments. Indeed, with Nighbert gone from the Cabinet and Rummage working outside

Frankfort in a District Office, it would have been difficult, if not impossible, for there to be any ongoing coordination of activity concerning the road contract payments.

In *U.S. v. Smith*, a prosecution for conspiracy to collect a usurious loan, the Second Circuit found that continued payments of the loan proceeds did involve concerted activity because, when one conspirator claimed to have been shortchanged, the remaining conspirators contacted the collector and agreed to meet to "straighten the matter out." 464 F.2d 1129, 1136 (2d Cir. 1972). The court held that "[t]here was 'continuity of action' here sufficient to indicate that the conspiracy was continuous." *Id.* (quoting *Fiswick*, 329 U.S. at 216). In this case, there is no such continuity of action with reference to the continuing payments to Lawson's company. Hence, for this reason as well, the Government cannot avoid termination of the conspiracy as of December 2007 based on the continued payments under the road contracts.

> **2.    The Government's Second Termination Avoidance Theory – That Nighbert Received Payments From UMG During 2008 – Fails Because It Did Not Show That Nighbert's Employment By UMG Resulted From A Decision Made By Lawson.**

The Government's second theory for avoiding termination of the conspiracy in December, 2007 is that Nighbert received payments from UMG during 2008. (Gov. Br. at 3). The Second Superseding Indictment alleges that while Rummage got cash, Nighbert got his financial reward through the UMG job, and portrays Lawson as the chief architect of the UMG payments.[18] This would be a more compelling story if there were proof to support it. Instead, after three days of *Enright* testimony and scores of exhibits, the Government failed to prove that

---

[18] "LAWSON *caused* to be transmitted to NIGHBERT $36,000 for the purchase of an automobile, *disguised* as part of an employment contract with a utility management company"; "LAWSON *caused* to be transmitted to NIGHBERT $10,417 as purported salary *on the fake consulting contract*." Doc. 415, Count 1, ¶¶ 18, 27 (emphasis added). Oddly, the Indictment failed to expressly allege either the January 9, 2008 or the March 11, 2008 checks to Two Bucks.

Lawson was responsible for UMG's decision to hire Nighbert. Without that nexus, none of the 2008 events between Nighbert and UMG can serve to extend the conspiracy beyond December 2007.

The prosecution has worked particularly aggressively to link Lawson and Nighbert financially. When CPA Archie Marr "hemmed and hawed" (Mason, IV-67) during questioning in early June 2008, FBI Special Agent Clay Mason returned the favor by later executing simultaneous search warrants at Marr's Corbin accounting firm offices and UMG's Pikeville business offices. The prosecution did so even though, in the meantime, UMG had hired respected Louisville counsel Michael Mazzoli who had made production of records in response to a grand jury subpoena. (Mason, IV-68-70; V-34-35). In fact, it was the very documents which UMG openly produced to the Government that Mason used to fashion the supporting affidavit for the search warrants. While a search of Nighbert's bank account had revealed Nighbert's purchase of the Toyota with funds from UMG, the account showed no other deposits from UMG. This was the case because, as the *Enright* hearing made abundantly clear, the three checks written by Marr's accounting firm on January 9, 2008, February 9, 2008 and March 11, 2008 to Two Bucks LLC had never been negotiated. (Mason, VI-95; Gov. Ex. 65). Apparently convinced that Marr had purposefully concealed the uncashed checks from him during his questioning in June, Mason drafted a 12-page affidavit and convinced a federal magistrate to issue daytime search warrants at the two business locations. Mason did so with the sworn assertion that UMG, through its counsel, had produced phony documents to the grand jury, namely the consulting agreement between Nighbert and UMG: "Also provided was an employment "agreement" . . . which is *of*

*questionable authenticity.*" Mason Affidavit, Def. Ex. 70, paragraph 10 (emphasis added).[19] Corbin area newspapers carried the story that the FBI had raided Marr's CPA offices, this quickly became old news when a few weeks later Mason's entire affidavit was made public by the prosecution and immediately became front page news. (See Doc. 85). Following the search warrants at their respective offices, Marr and May each retained counsel, and both were advised by the prosecution that they were "targets". Although named targets, they were called to the federal grand jury where they exercised their Fifth Amendment rights, an event that the prosecution first publicized during redirect examination of Mason at the *Enright* hearing (Mason, VI-135) and later published in its brief.[20] (Gov. Br., 33).

To secure search warrants, the FBI once alleged that Nighbert's UMG agreement was manufactured evidence[21], yet today its lawyers feature the same document as proof that Nighbert entered into the arrangement at a time when he was "still Transportation Secretary."[22] (Gov. Br., 32). But even an occasional flip-flop could be ignored if the prosecution were more honest about the evidence they don't have. The prosecution simply has not proven that Lawson "caused" the

---

[19] The "agreement" described in Mason's search warrant affidavit was introduced by the US during the *Enright* hearing (Gov. Ex. 63). The government's own exhibit impeaches Mason's affidavit when he represented to the Magistrate Judge that there was no date on the agreement. *See* Mason Affidavit, Def. Ex. 70, paragraph 10. Mason conceded at the hearing that his "back-dating" theory turned out to be incorrect and the consulting agreement was prepared months before there ever was an investigation. (Mason, VI-109).

[20] These public disclosures violate Federal Rule of Criminal Procedure 6; a practice that has unfortunately marked this prosecution from the pre-indictment period.

[21] Mason acknowledged during cross examination by Nighbert's counsel at the *Enright* hearing that he believed the agreement was fake and had been manufactured as part of a "cover story." (Mason, VI-109)

[22] The Government points to the agreement as among the files "seized" by the FBI (Gov. Br. at 32) but fail to mention that the agreement had been produced by UMG counsel before the raids.

UMG payments to be made to Nighbert. The prosecution is primed to argue that UMG's payments to Nighbert represent his "reward" for directing Rummage to deliver engineer's estimates. But those floodgates cannot open until the prosecution has first proven by preponderance that Lawson was responsible for those payments. Three facts stand squarely in the prosecution's path.

First, the *Enright* record established that UMG is a legitimate company serving Eastern Kentucky communities, not a sham. Even without the testimony of either May or Marr, the origin of UMG became known through the course of the hearing. Lawson helped his friend May start his own utility management company. In 2004 Lawson turned to Marr, his company accountant, to help May get started and a few years later the company was servicing contracts for Pikeville and Pike County. (Mason V, 34-36).

Second, the UMG family of LLCs is legitimate and the fact that Lawson has any measure of direct or indirect financial interest does not prove that he "caused" UMG to hire Nighbert. Dean Allan Vestal, who reviewed the same UMG documents offered by the prosecution, concluded that there was nothing illegal or unusual about the way the three UMG LLCs were created or structured and indeed it was " . . done in ways that comported with the Kentucky limited liability company structure and *common business practice*." Def. Ex. 54 (emphasis added). Contrary to suggestions of "disguise." Dean Vestal concluded as well that the LLC internal documents and tax filings ". . . provides a clear picture of the direct and indirect participation of Leonard Lawson in the three LLCs." (*Id.*)

Rather than give legitimacy and due credit to these customary business documents or to Dean Vestal's opinion, the prosecution turns to an innocuous word choice in email traffic as

proof positive that the UMG job was of Lawson's making. Both during the hearing and now in its brief, the Government latched onto a single email from Archie Marr to Chuck Herman, the CFO of ATS Construction, a Lawson company, dated April 11, 2007. With tax day fast approaching, it would stand to reason that the outside managing partner for the company's accounting firm might have cause to email his client's CFO. In the email, Marr asked Herman to ". . . give the Boss a copy [of the UMG financial statements] for his review." (Gov. Ex. 74 (emphasis added)) Nonetheless, those two words used in April 2007, so says the prosecution, prove that it was Lawson and no one else who "caused" UMG to hire Nighbert seven months later. The other interpretation is the whole and innocent truth: *Lawson was Chuck Herman's boss.*

Third, it made perfect business sense for UMG to seek out and secure Nighbert's services once his KTC term ended given Nighbert's experience and network of contacts. *See* Part IIC, *supra* (documenting this point with hearing evidence).

Ultimately, however, the legitimacy of the UMG business model, its lawful structure and operations, and the bona fides of the Nighbert hire are not the only evidence that the United States has failed to meet its burden as to UMG matter. The testimony of the FBI case agent is proof positive:

> Q:    Do you have any idea as you sit here today who's – who first came up with the notion of UMG employing Bill Nighbert after he left the office of Transportation Secretary?
>
> A:    No, I don't personally.

(Mason, V-36).

On this record, the prosecution failed to prove by a preponderance that Lawson "caused" UMG to hire and pay Nighbert. Simply put, neither "[c]onjecture and surmise," *Coppin*, 1 Fed. App'x at 291, nor "suspicion and . . . speculat[ion]", *Barnes*, 383 F.2d at 293, will suffice. Accordingly, the Government may not use Nighbert's relationship with UMG to carry the alleged conspiracy forward into 2008.

>   **3.      The Government's Third Termination Avoidance Theory – That Concealment By Means Of An Agreed "Cover Story" Was Part Of The Original Conspiratorial Agreement – Fails Because Rummage's New "Cover Story" Testimony Is Not Credible And Even If Believed Would Not Show Obstruction Was Part Of The Original Alleged Conspiracy Within The Meaning Of** *Grunewald*.

The third theory the Government asserts to avoid termination of the conspiracy as of December, 2007, is that "[s]tatements which constitute efforts to conceal earlier criminal conduct are considered in furtherance of a conspiracy" where they were "part of the original understanding and agreement." (Gov. Br. at 3 (citing *Grunewald*, 353 U.S. at 399-405)). The Government then argues that "the indictment alleges, and the evidence introduced at the hearing supports, that from the beginning Nighbert, Lawson, and Rummage agreed that they would conceal their conduct with a cover story." (*Id*. at 4). The evidence claimed to support this argument is Rummage's testimony that "he believed [certain] statements between himself and Nighbert and in the presence of Lawson formed their agreement that they would stick to [an agreed] cover story if anyone ever asked about Rummage obtaining the engineer's estimates prior to letting." (*Id*. at 13).[23]

------

[23] In full text, Rummage's testimony as to this supposed "agreement" – the key portion of which is his affirmative response to a carefully framed leading question – was as follows:

>   Q.      Then on page three, line 19 and 20, Secretary Nighbert says, "But the bottom line is, is when hell freezes over, they'll never hear it from us."

*(Footnote Continued To Next Page)*

A complete evaluation of this evidence again necessitates retracing the history of this case. When the Government moved for reconsideration of Judge Reeves' severance order based on an Eighth Circuit case, the central issue was the meaning of the Supreme Court's *Krulewitch* and *Grunewald* decisions. (*Se*e Doc. 367 at 5-12). Judge Reeves' denial of reconsideration of severance was based squarely on *Grunewald*:

> Contrary to the United States' contentions, evidence of a "cover-up" conspiracy is not categorically evidence of consciousness of guilt on the part of the conspirators allegedly involved in the underlying conspiracy. *See Grunewald v. United States*, 353 U.S. 391 (1957) ("We cannot accede to the proposition that the duration of a conspiracy can be indefinitely lengthened merely because . . . the conspirators take steps to bury their traces . . . after the central criminal purpose has been accomplished.").
>
> Cover-up measures, in words or actions, may only connote guilt as to the underlying conspiracy if the measures somehow further the aims of that

---

*(Footnote Continued From Previous Page)*

> What did you believe was Secretary Nighbert's purpose for making this statement in front of Mr. Lawson?

A.    That he was not going to admit to any illegitimate purpose for asking for the estimate, that he was going to stick to the pretext he had given me, that, you know, he was looking at the money, how much this would cost and looking at it for funding purposes, that, you know, he was not going to reveal any other reason and that I shouldn't reveal any other reason.

Q.    And then at line 21, you say, "That's absolutely right." What was your intent in making that statement to them or your purpose in making that statement to them?

A.    That I was agreeing to go along with that pretext.

Q.    Okay. So based on this conversation, was it your belief at that time that you, Secretary Nighbert, and Mr. Lawson had agreed that should anyone ask in the future about these estimates and why they were being obtained, that all three of you would tell the cover story that you spoke of, that they were for budgeting purposes and that they were never given to Mr. Lawson; is that correct?

A.    Yes.

(Rummage, I-35). This testimony was Rummage's characterization of statements made in the recorded September 2006 conversation between Rummage and Nighbert (of which Rummage claims Lawson was a silent observer). *See id*. at 32-35; Gov. Ex. 19b.

underlying conspiracy. In other words, actions or statements cannot be attributed to a conspiracy unless they are committed or made in furtherance of that conspiracy. As the Supreme Court has stated:

> By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

(Doc. 396 at 2 (*quoting Grunewald*, 353 U.S. at 405)).

In response to Judge Reeves' discussion of *Grunewald*, the Government's Second Superseding Indictment – confessedly brought for the purpose of undoing Judge Reeves' severance order – alleged for the first time a conspiratorial objective "to conceal the compensation and misappropriations." (Doc. 415 at 5). This allegation that an agreement to cover up was part of the original conspiracy obviously is intended to bring the alleged cover up within what the Government believes is an exception to *Grunewald*'s general holding. Not coincidently, that allegation links the alleged bribery/conversion conspiracy to the previously alleged obstruction conspiracy, creating a single grand and overarching alleged conspiracy. (*See id.*).

This new "concealment objective" allegation was added in the Second Superseding Indictment notwithstanding the fact that no evidence concerning the supposed concealment agreement, much less any new evidence, was presented to the grand jury. Rummage never testified to the grand jury at any time about this supposed "cover story" agreement. (Def. Ex. 18). Nor is any Rummage statement about this recorded in the FBI 302s, OIG interview notes, or AUSA interview notes. (Def. Exs. 13, 14(G), 14(C), 15-21, 74).

Given this history, the Court should reject as not credible Rummage's testimony about this purported "cover story" agreement – actually, his "yes" answer to the Government's question whether he "believed" the statements constituted such an agreement. (Rummage, I-35). This is another instance of Rummage trimming his testimony to fit the Government's evolving theory of the case.

Furthermore, Rummage's "yes" answer to the Government's leading question whether he believed a three-party agreement had been formed concerning the cover story in turn depends on his testimony that Lawson was a silent presence during Rummage's recorded September, 2006 conversation with Nighbert. (Rummage, I-27, Def. Ex. 12(B)). As previously discussed, Lawson never speaks and his name is never mentioned in the recorded conversation. (Gov. Ex. 19B). Although Rummage turned his tape recorder on before entering Nighbert's office, Rummage doesn't greet Lawson upon entering the office and doesn't say goodbye to him upon leaving and Lawson never uttered a word on his own initiative. (Rummage, II-18). Although Rummage says he was making the recording to protect himself, he doesn't bring Lawson into the conversation (or even mention Lawson's name) to capture Lawson's supposed presence on the recording. (Rummage, II-21). Rummage's testimony concerning the purported "cover story" agreement should be found not credible for this additional reason as well.

Even if it were believed, however, Rummage's testimony concerning this supposed "cover story" agreement would *not* extend the duration of the conspiracy. That is so for two reasons.

*First*, after the Supreme Court rejected the Government's argument in *Krulewitch* that the duration of a conspiracy should be extended based on an "implied" agreement among the

conspirators to cover it up, *Grunewald* rejected the Government's attempt to reach the same result by inferring an "actual" cover-up agreement from the facts concerning the later obstruction and other cover-up activities, after the main purpose of the conspiracy had been accomplished. 353 U.S. at 402-05. Rummage's testimony here amounts to no more than that. The Government is attempting to infer an actual agreement to create a specific cover-up story and maintain it indefinitely in the future based upon Rummage's "belief" that this is what was meant by (1) his and Nighbert's statements that do not directly say any such thing, and (2) the complete silence of the allegedly present Lawson. The Supreme Court's analysis and emphatic holding in *Grunewald* is not to be evaded based upon such verbal gymnastics. *See id.* at 402, 403 ("on the facts of this case the distinction between 'actual' and 'implied' conspiracies to conceal, as urged upon us by the Government, is no more than a verbal tour de force. . . . In effect, the differentiation pressed upon us by the Government is one of words rather than of substance"); *see also U.S. v. Steele*, 685 F.2d 793, 803 (3d Cir. 1982) ("According to the teachings of *Grunewald*, neither circumstantial evidence permitting an inference of an agreement to conceal, *nor direct evidence that the conspirators implicitly agreed to conceal*, will satisfy the prosecution's burden of production") (emphasis added).

*Second*, the Government is reading *Grunewald* to say that where the original conspiracy includes an agreement to cover up the conspiracy, the duration of the conspiracy lasts indefinitely. The Government appears to base its interpretation on language in the opinion concerning the absence of "proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." 353 U.S. at 402; *see also id.* at 404 ("There is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-

protection, traces of the crime after its commission"). However, other portions of *Grunewald* show that these comments on the absence of evidence in that case do not define the line between cover-up activities that are deemed to be part of the initial conspiracy (and hence extend its duration) and those that are not. Rather, and as Judge Reeves said in the order quoted above, cover-up activities are part of the initial conspiracy only where they are in furtherance of the *main* purposes of the conspiracy (as opposed to merely serving to avoid apprehension after those main objectives have been accomplished or defeated).

Specifically, and as quoted by Judge Reeves, the Supreme Court said "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." 353 U.S. at 405 (emphasis in original) (quoted in Doc. 396 at 2). The Supreme Court then reinforced this "vital distinction" in its discussion of hypotheticals:

> Kidnappers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal; in both cases, the successful accomplishment of the crime necessitates concealment.

*Id.* By comparison, the Court said:

> [C]onspiring kidnappers who cover their traces after the main conspiracy is finally ended – *i.e.*, after they have abandoned the kidnapped person and then take care to escape detection . . . [are committing] acts of covering up by themselves indicate nothing more than that the conspirators do not wish to be apprehended – a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord.

*Id.* at 405-06 n.18.[24]

Defendants and Judge Reeves are not alone in interpreting *Grunewald* this way. In its controlling *en banc* decision in *Howard*, the Sixth Circuit held:

> [A]n agreement to conceal a completed crime does not extend the life of a conspiracy.

770 F.2d at 60 (citing *Grunewald* and *Krulewitch*).[25]

In sum, the Government's "agreement to cover-up story" theory to extend the duration of the conspiracy fails because Rummage's testimony is not credible; because even if taken at face value that testimony would show only an implied agreement, which is insufficient to extend the duration of a conspiracy under *Grunewald*; and because cover-up activities after the main criminal objectives are accomplished or defeated are also insufficient under *Grunewald* to extend a conspiracy's duration.

**C.    Because The Alleged Conspiracy Terminated By December 2007, Statements By Lawson After That Time Are Also Not Admissible Against Nighbert And Such Statements By Nighbert Are Also Not Admissible Against Lawson Under Rule 801(d)(2)(E).**

As previously stated, the Government does not even contend Billings joined the alleged conspiracy before January 2008. It is uncontroverted that by December 2007, Nighbert was gone

---

[24] The Government's contrary theory – that a conspiratorial agreement to cover up purely to avoid apprehension, if part of the conspirators' initial agreement, indefinitely extends the duration of the conspiracy – also clashes with the Court's condemnation of "Government theor[ies] that would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators." 353 U.S. at 402.

[25] The *en banc* Sixth Circuit also explained in *Howard* that even when committed during the initial conspiracy, cover-up activities are "in furtherance of" that conspiracy only "where a main objective has not been attained or abandoned and concealment *is essential to success* of that objective." 770 F.2d at 61 (emphasis added).

from the KTC, Rummage had left his position at the KTC with access to engineer's estimates, and Gilbert Newman had been appointed as the new State Highway Engineer. Because the Government has not proven by a preponderance of the evidence any facts that would continue the alleged conspiracy after December 2007, Billings could not have been a member of it. For this reason (as well as those stated in Part III, *supra*), Billings statements are not admissible against Nighbert under Rule 801(d)(2)(E); and Lawson and Nighbert statements are not admissible against Billings under that Rule.

In addition, because the Government has not proven by a preponderance of evidence any fact showing the alleged conspiracy continued after December 2007, Lawson's statements after that time are also not admissible against Nighbert under Rule 801(d)(2)(E). Likewise, Nighbert's statements after December 2007 are not admissible against Lawson under that Rule. Again, "out-of-court statements made *after* the conclusion of the conspiracy are not made 'in furtherance of the conspiracy,' and are thus not admissible under the co-conspirator exception." *Conrad*, 507 F.3d at 430 (emphasis in original).

V.    **Several Statements Designated By The Government Are Inadmissible Under Rule 801(d)(2)(E) Because They Were Not Shown To Be "In Furtherance Of" The Alleged Conspiracy Under Any Theory.**

Entirely apart from the issues addressed above, a number of statements the Government designated are inadmissible as co-conspirator statements because the Government did not purport to show, much less prove by a preponderance of evidence, that they were "in furtherance of" the alleged conspiracy.

A.    **Pre-Formation Statements.**

The Second Superseding Indictment alleges that the conspiracy between the three defendants began in or about June 2006. (*See* Doc. 415 at 3). The Government then designates statements for admission pursuant to Rule 801(d)(2)(E) that were made in June, 2006, alleging that "Nighbert requested Rummage. . . to obtain engineer estimates on a particular project because he suspected that they had been leaked." (Def. Ex. 1 at 3 (¶ 1)). The Government also designates statements "sometime around July, 2006," that Nighbert "again asked Rummage to get an estimate on a particular project." (*Id*. (¶ 2)). Presumably the Government will also seek to elicit out-of-court statements Rummage made to others asking for the estimates the Government claims were requested by Nighbert in these two designations.

Yet at the *Enright* hearing, Rummage testified that the conspiracy did not begin until after these conversations occurred. These were allegedly the first two requests for estimates by Nighbert, and Rummage testified conclusively that "there was nothing about the first two requests from Mr. Nighbert that led [him] to think that [he] had joined a criminal enterprise." (Rummage, II-60). Rummage was asked, "when by date, then, did you form the intent. . . to join, knowingly join, a conspiracy?" Rummage responded, "[w]hen I was requested to take the estimate to Mr. Lawson." (Rummage, II-60). According to the Government's own designations,

- 71 -

that event did not take place until "later in the summer of '06," long after the first two conversations had occurred. (Id. (¶ 3)). The Government, for its part, has no evidence that Nighbert did anything with the first two estimates Rummage obtained or that Lawson ever received either of those estimates. (Mason, VI-14). There is not even evidence in Ryan Griffith's calendar to verify that Rummage ever received copies of these engineer's estimates. *See id.*

Statements made *outside* the period of the conspiracy, including those made before the criminal agreement was formed, are not admissible under Rule 801(d)(2)(E), which requires that the statement be made "during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *see also Warman*, 2009 U.S. App. LEXIS 18560 at *17 ("'in furtherance' requirement" is "interpreted strictly"); *U.S. v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003) (enforcing "strict requirements of Rule 801"). The Government should, therefore, be precluded from admitting any out-of-court statements made prior to the start of the alleged conspiracy, including those specifically identified in Paragraphs 1 and 2 of the Government's Designations (Def. Ex. 1 at 3 (¶¶ 1-2)) made by Nighbert, Rummage, or any other witness, against Lawson or Billings and a jury should be so instructed. *See* Fed. R. Evid. 105.

### B.    Additional Designated Statements Not Shown To Be "In Furtherance Of" The Alleged Conspiracy.

As noted, Rule 801(d)(2)(E) only permits the admission of otherwise inadmissible hearsay statements by a co-conspirator that are "in furtherance of the conspiracy." *See* Fed. R. Evid. 801. Courts have not read the "in furtherance of" requirement out of Rule 801(d)(2)(E). To the contrary, the Sixth Circuit considers it a "strict" threshold requirement for the admissibility of co-conspirator hearsay. *See U.S. v. Foster*, 711 F.2d 871, 880 (6th Cir. 1983). Only statements that "promote the objectives of the conspiracy" are considered to meet the "in furtherance of"

requirements. *See Conrad*, 507 F.3d, at 430. The Sixth Circuit has found that "casual conversation about past events" are not in furtherance of the conspiracy. *See Darwich*, 337 F.3d at 658. Unless the declarant "is seeking to induce [the listener] to deal with the conspirators or in any other way to cooperate or assist in achieving the conspirators' common objective, *the declaration is inadmissible.*" *Foster*, 711 F.2d at 880 (internal citations omitted) (emphasis added).

There are several statements in the Government's designations, without any additional support from the *Enright* record, that simply do not come close to meeting those standards. For example, the Government asserts that "Lawson made numerous comments about Nighbert having been over to his house." (Def. Ex. 1 at 5 (¶ 11)). There is no explanation in the designations or in the *Enright* record, however, that explains how these statements are even remotely connected to the alleged conspiracy, let alone how they "promote the objectives of the conspiracy." After all Rummage acknowledged that "it was obvious that – to me that [Nighbert and Lawson] were . . . close friends." (Rummage, I-41). In Rummage's *Enright* testimony, he was not asked and never offered an explanation as to how these visits were related to the exchange of estimates for cash. (Rummage, I-41).

The Government designated a statement by Lawson to Rummage that "the secretary was over the other night and brought me that information you gave him." (Def. Ex. 1 at 5 (¶ 12)). Yet Rummage never testified that Lawson made this statement, and even if he had, the Government never specifies that the "information" Lawson was referring to was an engineer's estimate, or even anything improper or impermissible for Lawson to have. (Rummage, I-40, 41-42). Rummage acknowledged that there are Cabinet documents, including field estimates, that are

perfectly legitimate to release to contractors prior to a bid, (Rummage, II-40),[26] and engineer's estimates are also available to the public after a bid. (Rummage, II-27). This statement also constitutes exactly the type of "casual conversation about past events" that the Sixth Circuit ruled in *Darwich* does not meet the "in furtherance of" standard and is not admissible under Rule 801(d)(2)(E).

Similarly, the Government seeks to admit a statement by Lawson "that Secretary Nighbert's wife and son would be coming over to swim" at Lawson's house as a co-conspirator statement. (Rummage, I-41); (Def. Ex. 1 at 5 (¶ 13)). This statement is irrelevant and should be excluded in its entirety. The Government does not even attempt to explain how this statement was made "to induce" the listener to "assist in achieving the conspirators' common objectives" to satisfy the "in furtherance of" requirement. After all this statement was not even made to Rummage – Rummage allegedly overheard Lawson making it to an unknown person on the phone. See *id.*. Nor does the Government ever attempt to meet its burden to place this statement in the period of the conspiracy.

The same is true of the Government's designation that "Lawson told Rummage that Nighbert flew to Lawson's house in Florida and then they flew on Lawson's plane to a conference." (Def. Ex. 1 at 5 (¶ 14)). The Government never seeks to identify that this statement was made during the course of the conspiracy or that it had anything to do with the release of estimates. The Government never alleges, in its three prior indictments, multiple pleadings, or its leaked-FBI affidavit, that Lawson made this statement or that it was somehow a form of

---

[26] Rummage released these field estimates on two occasions to Bill Cress, an employee of Hinkle Contracting, which is owned by Henry Hinkle, the wealthy Kentucky contractor who secured a promotion for Rummage in the Fletcher administration. (Rummage, II-42).

remuneration to Nighbert. More fundamentally, the Government never attempts to prove this flight ever occurred even though they seek to have this statement now admitted for the truth of the matter asserted. This statement is of recent origin and completely fabricated by Rummage. It does not appear in any of Rummage's *ten* prior statements to the Government.

Finally, the Government seeks to admit statements made to third parties, who are wholly unrelated to the conspiracy, under Rule 801(d)(2)(E). Yet statements the Government designated that were made to Brian Collins, Vince Gabbard, Becky Harrelson, Tim Hill, and Joe Prather do not meet the "in furtherance of" legal standard. (Def. Ex. 1 at 9-11). None of these designated statements were intended, as the Sixth Circuit said was essential in its *Foster* decision, to "induce the listeners," in this case, Collins, Gabbard, Harrelson, Hill, and Prather, to assist in the objectives of the conspiracy, namely to release estimates to Lawson, compensate Rummage or Nighbert, or obstruct the investigation. Every one of these statements was made *after* Nighbert had left state Government and Rummage had withdrawn from the conspiracy.

The Defendants seek a ruling that none of the statements designated in paragraphs 11-14 or attributed to witnesses, Brian Collins, Vince Gabbard, Becky Harrelson, Tim Hill, and Joe Prather, may be admitted as co-conspirator statements pursuant to Rule 801(d)(2)(E) because the Government has failed both in its designations and at the *Enright* hearing, to prove that any of these alleged statements were made in furtherance of the conspiracy.

## CONCLUSION

For the reasons stated in Part II, the Court should find that the Government did not prove the alleged conspiracy by a preponderance of the evidence, and therefore rule that no out-of-court statements in this matter are admissible against any defendant under Rule 801(d)(2)(E).

In the alternative, for the reasons stated in Part III (the Government did not show by a preponderance of the evidence that Billings was a member of the alleged conspiracy) and in Part IV (the Government did not show by a preponderance of the evidence that the alleged conspiracy continued after December, 2007), the Court should find that Billings' statements are not admissible against Lawson and Nighbert under Rule 801(d)(2)(E), and correspondingly that Lawson and Nighbert's statements are not admissible against Billings. For the same reasons stated in Part IV, the Court should further find that Lawson's statements after December 2007 are not admissible against Nighbert, and Nighbert's statements after December 2007 are not admissible against Lawson, under Rule 801(d)(2)(E).

In addition, for the reasons stated in Part V (the Government has not shown by a preponderance of the evidence that statements were in furtherance of the alleged conspiracy), the Court should find that the statements in Government designation paragraphs 1-2, 11-14 (Def. Ex. 1 at 3, 5) and in "Other Statements" designation paragraphs 2, 4, 6-8 (*id*. at 9-10) are inadmissible against any defendant under Rule 801(d)(2)(E).

Respectfully submitted,

/s/ Kent Wicker
Steven S. Reed
Kent Wicker
REED WICKER PLLC
2100 Waterfront Plaza
321 West Main Street
Louisville, Kentucky 40202
Telephone: (502) 572-2500
E-mail: kent@reedwicker.com

Counsel for Brian Billings

/s/ Howard O. Mann
Howard O. Mann
Graham Trimble
Aaron Howard
LAW OFFICES OF HOWARD O. MANN, P.S.C.
104 North Kentucky Avenue
P.O. Drawer 1344
Corbin, Kentucky 40702
Telephone: (606) 528-0616
Email: hmannlaw@bellsouth.net

Counsel for Charles William Nighbert

/s/ Larry A. Mackey
Larry A. Mackey
Stanley C. Fickle
Jason Barclay
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204-3535
Telephone: (317) 231-7000
E-mail: lmackey@btlaw.com

/s/ J. Guthrie True
J. Guthrie True
JOHNSON TRUE GUARNIERI, LLP
326 West Main Street
Frankfort, Kentucky 40601
Telephone: (502) 875-6000
E-mail: gtrue@jtgattorneys.com

Counsel for Leonard Lawson

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this 17th

day of September, 2009, pursuant to the Court's electronic filing service:

> Kenneth Taylor
> Kevin Dicken
> Assistant United States Attorney
> United States Attorney's Office
> 260 West Vine Street, Suite 300
> Lexington, KY 40507

/s/ Larry A. Mackey
Larry A. Mackey

INDS02 SCF 1069427v1