UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | *Electronically Filed* |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:08-cr-21-KSF |
| | ) | |
| LEONARD LAWSON, | ) | |
| CHARLES WILLIAM "BILL" NIGHBERT, and | ) | |
| BRIAN RUSSELL BILLINGS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO SEVER**

The Defendants Lawson, Billings, and Nighbert have jointly moved the Court to sever Defendant Billings pursuant to Federal Criminal Rule of Procedure 14(a) into a separate trial and file this memorandum of law in support of severance.

**Background and Introduction**

While the Defendants previously sought [Doc. 117] and were granted severance of counts by Judge Reeves prior to his recusal [Doc. 336][1], they now seek severance of defendants rather than counts. This change is prompted by the Government's filing of the Second Superseding Indictment [Doc. 415], which not only supplanted two previous indictments, but also effectively overruled Judge Reeves' prior severance order by prosecutorial fiat. The prosecution's game day substitution of charges, while slick, nonetheless leads to the same call on the field – there must be a severance to preserve a fair trial for all three Defendants. Granted, the newest indictment spoiled Judge Reeves' ruling that there should be a severance of counts. But the

---

[1] However, Judge Reeves' prior severance order did effectively result in the severance of Defendants also since Billings was not a party to the first trial on Counts 1-5 of the (First) Superseding Indictment.

*Enright* hearing fully established severance is still required; only this time, severance of defendants.

Severance is required when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *See Zafiro v. U.S.*, 506 U.S. 534, 539 (1993). Judge Reeves ruled that when "the evidence against one defendant cannot be compartmentalized and the jury is likely to consider it to the prejudice of a defendant against whom it is not properly directed, then severance is warranted." *See* Opinion Memorandum and Order (Reeves, J.) [Doc. 336]. On two prior occasions – first in an order granting the Defendants' Joint Motion to Sever [Doc. 117] and second in an order denying the Government's Motion to Reconsider [Doc. 346] that prior order granting severance [Doc. 396] – Judge Reeves found that Rule 14 severance was necessary in this case. *See* Doc. 336 ("Here, there is a serious risk that a jury would be unable to compartmentalize the recorded conversations").

The Government has acknowledged that the sole reason it obtained a Second Superseding Indictment was to bypass Judge Reeves' prior severance orders and other adverse evidentiary rulings by rejoining all three defendants in a single trial that alleges the three defendants committed a single conspiracy together. *See* Doc. 433 ("[T]he Court erroneously severed what logically and legally should be one trial. . . [The Government wanted] to improve [its] chances of a conviction . . . [and] to make admissible evidence which had been excluded in the first trial"). The two earlier indictments [Doc. 1 & 246] alleged two separate conspiracies during two different time periods; a conspiracy to violate 18 U.S.C. § 666 and a conspiracy to obstruct justice and tamper with a witness. At no point during the nine months prior to the Second Superseding Indictment – including at a hearing held ten *days* before its filing – did the

Government ever allege that Defendant Billings had any involvement in or knowledge of the alleged bribery events underlying the § 666 conspiracy. *See* Tr. of May 26, 2009 Hearing [Doc. 413] at 24 ("[Billings is] not in the first conspiracy. . . he's not charged in 1 through 5 so there's no danger of prejudice there. The jury has no option of convicting him on 1 through 5").

Indeed as officers of the Court, in open court, Government prosecutors explicitly assured Judge Reeves that Billings was not involved in the § 666 conspiracy. And, as officers of the Court, Government prosecutors twice obtained indictments unequivocally alleging the existence of two separate conspiracies. The Government's cynical attempt to avoid Judge Reeves' prior severance order by suddenly declaring that there is only one conspiracy should not be rewarded by denying all three Defendants a fair trial.

For that matter, Judge Reeves' orders granting severance were not grounded on how many conspiracies were alleged in the first two indictments. Whether one or multiple conspiracies are charged, Rule 14 severance is necessary when a jury cannot "properly compartmentalize the evidence as it relates to the appropriate defendants." *See U.S. v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987); *U.S. v. Fernandez*, 892 F.2d 976, 990 (11th Cir. 1989) ("[T]he case against Fernandez and Recarey had a 'substantial and injurious effect' on the jury's determination of Del Ray's guilt. . .we *reverse* Del Ray's conviction and remand with directions to *sever* his case for a new trial") (emphasis added). In fact, if there is – as Judge Reeves found – "a serious risk of substantial prejudice" [Doc. 336] to the defendants caused by evidence admitted in a joint trial, the Defendants' Sixth Amendment constitutional rights would be violated. *See U.S. v. Wirsing*, 719 F.2d 859, 866 (6th Cir. 1983) ("Since we find *substantial prejudice* in this case from the joint trial. . .we conclude that the defendant was denied his Sixth Amendment right to a fair trial") (emphasis added).

Equally important, the number of conspiracies charged does not resolve the question of whether Billings' statements are admissible against Nighbert or Lawson and vice versa. Those issues must be resolved by the Court pursuant to *U.S. v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978). Judge Reeves did not believe that Billings' statements would ever be admissible against Nighbert under any evidentiary theory, and his orders granting and reaffirming severance were clearly influenced by this belief.

On August 6, 7, and 10, 2009, the Court conducted a pre-trial *Enright* evidentiary hearing to evaluate the admissibility of co-conspirator hearsay statements. The Government failed at that hearing to meet its burden to prove by a preponderance of the evidence that Billings was a member of any conspiracy, including the specific conspiracy charged in Count 1 of the Second Superseding Indictment, or that the alleged Count 1 conspiracy continued past December 10, 2007 at the latest.[2] *See* Defendants' Post-*Enright* Hearing Response Brief On Inadmissibility Of Alleged Co-Conspirator Statements Under Fed. R. Evid.801(d)(2)(E), filed concurrently herewith, at Parts III-IV [Doc. 497] (hereinafter "Defendants' Response Brief"). In light of those failures, none of Billings' out-of-court statements should be used against Lawson or Nighbert at a joint trial, and likewise, none of Lawson's or Nighbert's statements should be admitted against Billings during that trial. *See id.* at 497.

The evidentiary patchwork the *Enright* record creates at a joint trial – where a jury should be instructed to compartmentalize statements made by Billings and only consider them for the truth of the matter asserted against him and not consider them for any purpose against Nighbert or Lawson, and at the same time, consider Nighbert's and Lawson's statements against each of them respectively, but not against Billings at all – presents precisely the same confusing,

---

[2] Any one of these arguments is by itself a basis for excluding Billings' statements against Nighbert or Lawson or excluding Nighbert's or Lawson's statements against Billings.

convoluted web of jury instructions that Judge Reeves confronted when he twice before granted severance.

The Court should reject the Government's game play. The Second Superseding Indictment is nothing more than the same set of facts re-packaged in a new container to distract the Court.[3] No amount of new ribbon or wrapping, however colorful, will change the fact the Government has created a trial setting where no jury can reasonably segregate different statements and evidence among the three defendants.[4] The best way to avoid the impending prejudice and the substantial risk of a wrongful conviction to all three defendants from the Government-imposed confusion and chaos of a joint trial is to grant Billings a separate trial of his own.

I.    **There is a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence.**

Federal Rule of Criminal Procedure 14(a) says that "if joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Courts have concluded that if prejudice is likely to result to any co-defendant as a result of the dynamics created by a joint trial, the court, in the exercise of its discretion, should order severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. *See U.S. v. Davidson,* 936 F.2d 856, 861 (6th Cir. 1991) ("Davidson suffered substantial prejudice from the spillover effect of the proof of the unrelated tax charges against his absent co-defendant"). Where

---

[3] A comparison of the evidence and testimony presented to the grand jury prior to the first indictments is virtually identical to the evidence and testimony offered to a different grand jury prior to the latest indictment, except now the Government has alleged one rather than two conspiracies.

[4] One can only conclude from the way the Government went about securing this new indictment and their stated desire to inject Billings back into a trial with Nighbert and Lawson, that they believe the more confusion and disorientation they create, the greater likelihood that a jury will be so utterly blinded by that confusion that they increase their odds of convicting all three defendants.

multiple defendants are charged in the same conspiracy, the potential for a jury to misuse evidence of wrongdoing by a conspirator, which is inadmissible against his co-defendant, is substantial. *See Krulewitch v. U.S.*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring) ("A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, codefendants can be prodded into accusing or contradicting each other, they convict each other"). [5]

The true severity of prejudice is demonstrated in the post-*Enright* brief being concurrently filed by the Defendants and cross-referenced throughout the remainder of this Memorandum. The results from the *Enright* hearing, as outlined in that brief, illustrate the pressing need for severance to protect the Defendants' fair trial rights.

### A.    Nighbert or Lawson statements, whether admitted as party admissions or co-conspirator statements, will substantially prejudice Billings.

The record from the *Enright* hearing demonstrates the wide disparity in evidence between Billings and his two co-defendants, Lawson and Nighbert. In the Government's own Brief, for example, it acknowledges that Billings had no involvement in any of the events alleged in the Second Superseding Indictment prior to "late January 2008" at best. *See* Government's *Enright* Brief at 3 [Doc. 493] (hereinafter "Gov't Br."). In the first two indictments, Billings' name was not even mentioned by the Government until page 9 of each pleading. And at one time, when the Government had a different strategy to minimize the appearance of any prejudice to Billings from a joint trial with all three defendants, the Government consistently trumpeted how little

---

[5] The Sixth Circuit has noted that the Supreme Court's subsequent decision in *Grunewald v. U.S.*, 353 U.S. 391 (1957), adopted Justice Jackson's concurring opinion in *Krulewitch*. *See U.S. v. Minarik*, 875 F.2d 1186, 1192 (6th Cir. 1989).

involvement Billings had in the bribery conspiracy. *See* Tr. of May 26, 2009 Hearing at 24, ln 12 ("Billings [is] not in the first conspiracy"); Doc. 372 (filed May 19, 2009) at 1 n.1 ("[H]ere, Billings was not in the first conspiracy").

The danger for any defendant with such minimal involvement in a lengthy, complex trial is that he risks being convicted, not for his statements and conduct, but rather for the actions of others. *See U.S. v. McAnderson*, 914 F.2d 934, 949 (7th Cir. 1990) ("[T]here is a danger in complex cases that the taint of the larger actors might spill over onto the smaller ones"). This potential "spill-over" effect is exacerbated in this case where the Government failed to prove Billings was a member of any conspiracy, much less the conspiracy charged in Count 1 of the Second Superseding Indictment, Billings is only charged in two of the remaining six counts of the indictment, and if tried jointly with Nighbert and Lawson, Billings may very well be the victim of a puzzled jury unable to properly sort through the very jury instructions that are designed to protect minor players, like Billings.

The Government, for example, now seeks to introduce, at its joint trial, detailed evidence of a bribery scheme covering nineteen months of conduct *before Billings ever became involved*, and six recorded conversations and over fifty unrecorded conversations between Nighbert and Rummage or Lawson and Rummage,[6] none of which involved Billings.

Unlike some cases where a defendant may play some role, albeit at the periphery, in a conspiracy, Rummage acknowledged that not only did Billings have no involvement in the alleged cash-for-estimates scheme, *he had no knowledge it even occurred.* As discussed in the Defendants' Response Brief, Rummage testified that Billings "was not in any meetings with [Rummage], Mr. Lawson, or Mr. Nighbert where estimates were discussed." (Rummage, IV-

---

[6] *See infra* fn. 7.

21)[7].  Rummage confirmed Billings was "not on any phone calls when [he and Lawson] talked about getting estimates before the letting."  (Rummage, IV-21), and "[Billings] was not at any occasion when [Rummage] received cash from Mr. Lawson."  (Rummage, IV-21).  In fact, Rummage testified there was nothing to "suggest that [Billings had] *any knowledge of* payments from Mr. Lawson to [Rummage]."  (Rummage, IV-29) (emphasis added).  FBI Special Agent Clay Mason testified he did not "have any evidence that [led him] to believe that Billings [even] knew about the relationship between Bill Nighbert and UMG."  (Mason, V-48).  When asked about Rummage's arrangement with Lawson for attorney's fees, Rummage said, there was nothing "that suggested that [Billings] knew that [Rummage] already had an arrangement worked out with Mr. Lawson."  (Rummage, IV-36).

If the Court concludes, as the Defendants' have contended in their *Enright* brief, that Billings was never a member of the conspiracy alleged in Count 1 of the Second Superseding Indictment, none of Nighbert's or Lawson's out-of-court statements can be admitted against Billings under the co-conspirator hearsay exception.  Billings then would be entitled to limiting instructions, directing the jury not to consider any of this evidence against him for the truth of the matter asserted.  *See* Fed. R. Evid. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, *shall* restrict the evidence to its proper scope and instruct the jury accordingly") (emphasis added).

However, limiting instructions are not always effective.  In fact, drafters of the Federal Rule of Evidence 105 acknowledged as much when they cautioned courts applying the rule that the language was drafted to "repel any implication that limiting or curative instructions are

---

[7] Citations to the Enright hearing transcripts (Docs. 480, 483, 484, 485, 487) give the name of the witness, the transcript volume number (I through VI), and the page number.

sufficient in all situations." Fed. R. Evid. 105, Advisory Committee Notes (1972).    In fact, the accompanying Notes of the Committee on the Judiciary (1974) specify that, "[t]he Committee adopted this Rule without change on the understanding that it does not affect the authority of a court to order a severance in a multi-defendant case."    Courts, including those in the Sixth Circuit, have followed the Committee's guidance, granting severance when minor defendants, like Billings, are faced with the substantial risk that inadmissible evidence, even with the proper limiting instructions, will "spill-over" and taint the jury's view of that defendant.    *See U.S. v. Lopez*, 915 F. Supp. 891, 901 (E.D. Mich. 1996) (granting severance because "less drastic measures, such as limiting instructions, will not suffice to cure this substantial risk of prejudice" to one defendant from the introduction of admissible evidence against another defendant).

The Sixth Circuit in *U.S. v. Caver*, 470 F.3d 220, 237 (6th Cir. 2006), rejected the argument that the Government's charging of multiple conspiracies in a single indictment caused "the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy."    The Court, however, explained that the reason the argument failed was because "*this was not a case where a defendant with a relatively minor role was forced to endure an extended trial where the bulk of the evidence did not pertain to him.*"    *Id.* (emphasis added).    In this case, Billings is facing a month-long trial if tried jointly with Lawson and Nighbert.    In Rummage's *Enright* testimony alone, Billings was not even mentioned in the first 67 pages of transcripts.

The Eleventh Circuit reached a similar result in a post-trial challenge to the denial of a Rule 14 motion for severance of defendants.    *See Fernandez*, 892 F.2d at 990-991.    In *Fernandez*, like here, the Government charged a single conspiracy, lumping Defendant Del Ray into a conspiracy with Defendants Fernandez and Recarey, even though there was no evidence

that Del Ray had any knowledge or involvement in a separate agreement between Fernandez and Recarey. The Government nonetheless argued that the three "worked to achieve a shared purpose." *Id.* at 987. The Court called this argument "flawed," noting that the Government failed to show that "Del Ray knew that others would employ unlawful means" or that "Del Ray knew of the sums paid to Fernandez; like as not Del Ray was unaware that another party was on the take." *Id.* Despite the lack of evidence tying the three together in a single agreement, rather than charging Del Ray with a second conspiracy and trying him separately, the Government saw an advantage to a joint trial. The Eleventh Circuit concluded that "our major concern under all the circumstances of this case is that the admissible and inadmissible direct evidence against Fernandez and Recarey likely set the stage for the case against Del Ray, with the resulting risk too great that the jurors, 'ready to believe that birds of a feather are flocked together,' *transferred guilt to Del Ray*." *See id.* at 990-991 (citing *Krulewitch*, 336 U.S. at 454) (emphasis added).

The D.C. Circuit has held that the Government's interest in joint trials "must *never* be allowed to eclipse a defendant's right to a fair trial. A joint trial is inappropriate when *the evidence against one defendant is far more damaging than the evidence against the moving party.* In such situations, the jury may not be able to compartmentalize the evidence introduced against each defendant, and the spillover may jeopardize one defendant's right to a fair trial." *See U.S. v. Long*, 905 F.2d 1572, 1581 (D.C. Cir. 1990) (opinion by Thomas, J.) (emphasis added). The presence of far greater amounts of "damaging evidence" against one defendant, Billings, is precisely this case.

The surest way to avoid the danger of the "spill-over" of this and other evidence against Nighbert and Lawson resulting in the wrongful conviction of Billings is to sever Billings out of the case altogether.

**B.    Party admissions by Billings at a joint trial will substantially prejudice Nighbert and Lawson.**

The Government has disclosed at least seventy three (73) unique conversations[8] involving one or more of the Defendants, each of which is composed of dozens of individual statements by each Defendant.  Of those 73 conversations, twenty of them involve Billings.  Some of Billings' communications are lengthy, comprising more than fifty pages of written transcripts and nearly two hours of audio recordings in total.  The Government has argued that all of Billings' statements are admissible against him as party admissions.  Federal Rule of Evidence 801(d)(2)(A) permits the introduction of a "statement offered against a party [that] is the party's own statement" for the truth of the matter asserted.

Those same statements, however, since they were made out-of-court and are being offered for their truth, are also hearsay as to Nighbert and Lawson.  Hearsay statements are "not admissible." *See* Fed. R. Evid. 802.  Therefore, in a joint trial in this case, where statements are introduced that are admissible for one purpose against one party, but are not admissible against one or more other parties, those statements must be accompanied by limiting instructions *at the time the evidence is introduced.  See U.S. v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996) ("[A]fter receiving the evidence, the district court must clearly, simply, and correctly instruct the jury as to the *specific* purpose for which they may consider the evidence") (internal quotation and citation omitted; emphasis added).  *See also Lutwak v. U.S.*, 344 U.S. 604, 618 (1953) ("The court must be careful *at the time of the admission* and by its instructions to make it clear that the evidence is limited as against the declarant only") (emphasis added).

---

[8] This number was derived by counting 44 different conversations detailed in the Second Superseding Indictment, 22 additional conversations identified in the Government's *Enright* designations (Def. Ex. 1), and an additional 7 audio recordings produced to the Defendants during Rule 16 discovery.

The challenge then for a jury becomes apparent.  Just by way of example, the Government has indicated that it intends to introduce a statement made by Billings on March 24 to Rummage.  In response to a question by Rummage asking "do you have something that might help me out," Billings responded "yeah, yeah, I do."  Rummage then intends to testify that Billings' statement meant "that he had money for me [to pay for an attorney]."  (Rummage, II-14,15).  If the Court accepts the Defendants' arguments that this and similar Billings' statements are not admissible as co-conspirator statements, see Doc. 497, then a jury must be instructed that it may consider this statement for its truth against Billings, but may not consider it all against Nighbert or Lawson.   That is a daunting instruction for a jury to comprehend especially since Rummage will also testify that he believed it was Lawson, not Billings, who was going to pay for his attorney.  (Rummage, IV-36).

Nighbert faces similar risks.  After all, Nighbert is not on a single audio recording after September, 2006, including any of the recordings made of Billings.  In fact, Judge Reeves cited in his opinion rejecting reconsideration of the severance order that "the bulk of the tape-recorded evidence the United States seeks to introduce related to the subsequent conspiracy *does not explicitly include Nighbert*."  *See* Doc. 396 (emphasis added).   When Nighbert failed to return Rummage's calls, the FBI provided Rummage with Nighbert's home phone number, and instructed Rummage to "act agitated" and to tell Nighbert that he was at his "last uh, stop sign and . . . if he's got any suggestions to uh, change your direction you're willing to hear them." *See* Def. Ex. 12V at 3-4.   Nighbert never returned any of Rummage's calls, even despite the Government's efforts to "ram it" at Nighbert.  *Id.* at 1.  Yet in a joint trial, a jury may transfer responsibility for Billings' twenty calls to Nighbert, despite the clear instructions from Rule 105 that the use of such inadmissible evidence against Nighbert is prohibited.

When the Court considers that it must give similar limiting instructions for all of the hundreds of Billings' statements that were made,[9] advising a jury that it may not use each of those statements against either Nighbert or Lawson, it is easy to imagine the difficulty a jury will have at the end of a month-long trial determining how and against whom each of these individual statements may be used.  If the jury fails to follow these instructions, certainly in the case of the particular Billings' statement mentioned and given the cumulative effect of all of Billings' statements in 20 different conversations, it will likely result in great and irreparable prejudice to both Nighbert and Lawson.  Since Billings wants to introduce dozens of statements on his own that have not been designated by the Government,[10] the Court's dilemma and the potential for prejudice to Nighbert and Lawson are compounded exponentially.

To illustrate the potential confusion in only one instance, the Government claims that on March 25, 2008, while meeting in the parking lot of the Holiday Inn, Billings told Rummage, "if you use Guarneri, it won't cost you anything."   Since this is a party admission, but not a co-conspirator statement, a jury would be told that it may consider this statement for its truth against Billings, but may not consider it at all in determining whether either Lawson or Nighbert are guilty.  The Government intends to have Rummage then testify that he believed this statement to mean that Lawson, not Billings, would pay for his attorney.  The jury will be instructed that it may consider Rummage's belief for its truth.  The Defendants will call Guarneri to testify that he did not know Rummage, Billings, or Lawson, and certainly had no arrangement to be paid by any of them, which a jury can consider for its truth.  The Government will then argue in closing

---

[9] Each of the 20 Billings-Rummage conversations is comprised of individual statements made by Billings.  *See Williamson v. U.S.*, 512 U.S. 594, 599-600 (1994) (A "statement" is "a single declaration or remark," not "a report or narrative").  Those total over 100 individual statements.

[10] There are large portions of nearly all of Billings' recordings that contain entirely innocuous, and perhaps exculpatory, statements by Billings that the Government does not want to play and Billings does.

that the jury should use this statement ("if you use Guarneri, it won't cost you anthing") as proof that Lawson, Billings, and Nighbert all obstructed the investigation. The Government also intends to argue that it is also proof of Lawson's and Nighbert's "consciousness of guilt" on the bribery allegations, but not Billings. It is not clear how a trained lawyer, let alone a lay jury, would be able to follow these conflicting instructions.

Yet if Billings is severed into a separate trial, this same statement may be admitted against Billings without any limiting instructions. Billings' jury would not have to try to compartmentalize or segregate its treatment of this statement. At Lawson's and Nighbert's trial, no instructions would be necessary, because Billings' statement is simply inadmissible and would not be admitted all. If the three are tried together, the labyrinth of limiting instructions will become so voluminous, complex, and confusing, when offered for all of Billings' out-of-court statements, that no jury can reasonably be asked to keep them all straight.

Courts in the Sixth Circuit, including Judge Reeves in his earlier opinion in this case, faced with this same situation have granted Rule 14 severance rather than run the risk that a defendant might be wrongly convicted on evidence that a jury failed to compartmentalize properly. *See U.S. v. Lawson*, 2009 U.S. Dist. LEXIS 36657 (6th Cir. April 29, 2009) [Doc. 336]; *U.S. v. Lopez*, 915 F. Supp. 891, 901 (E.D. Mich. 1996). In his earlier opinion, Judge Reeves ruled that "[i]f the evidence against one defendant cannot be compartmentalized and the jury is likely to consider it to the prejudice of a defendant against whom it is not properly directed, then severance is warranted." *See Lawson*, 2009 U.S. Dist. LEXIS 36657 at *6; *U.S. v. Meester*, 762 F.2d 867, 883 (11th Cir. 1985) ("Compelling prejudice has been defined . . . as the jury's inability to separately appraise the evidence as to each defendant and render a fair and impartial verdict").

Judge Reeves concluded, just as the results of the *Enright* hearing now demonstrate, that in this case "there is a substantial risk that the jury would be unable to compartmentalize this evidence even if limiting instructions were given." Judge Reeves' ruling was focused at the time solely on the potential prejudice to Nighbert. Now, however, after having the benefit of the *Enright* record, the potential prejudice to Lawson is equally great since it is now clear that Billings' statements are not admissible against either Nighbert or Lawson under the co-conspirator exception to the hearsay rule. [11] *See* Fed. R. Evid. 801(d)(2)(E). Judge Reeves had not decided that issue at the time of his severance rulings,[12] and of course, he severed the case along separate alleged conspiracies (and their corresponding counts), an option the Court no longer has in light of the Government's legal sleight-of-hand, cramming Billings into a combination bribery, conversion, and obstruction conspiracy.

None of the twenty Billings conversations with Rummage involve either Lawson or Nighbert. The fact that severance would effectively preclude the introduction of each of those conversations at a Lawson-Nighbert only trial is one of the most compelling reasons to grant severance. Lawson and Nighbert should not be exposed to the risk of wrongful conviction because a confused jury inadvertently considers Billings' statements against these two men, when those statements are otherwise entirely inadmissible.

## II.    The Government's misuse of the "verbal acts" doctrine only proves the need for severance, it does not eliminate it.

It should not be surprising that the Government, while attempting an end-run around Judge Reeves' prior severance order, would also try to out-run the restrictions of the hearsay

---

[11] There may undoubtedly be instructions limiting certain evidence as between Lawson and Nighbert if they are tried together. Those instructions, however, will be far fewer in number and will not require an instruction for every statement – which is required for all of Billings' statements. The potential for prejudice to Lawson and Nighbert is greatly reduced and the likelihood of wrongful conviction is less.

[12] As Judge Reeves said expressly at the time, "any ruling on the admissibility of evidence will be made explicitly, pursuant to an appropriate motion made by the parties." *See* Doc. 336 at fn. 1, p. 3.

rule.  Or more precisely, knowing that it would lose the *Enright* hearing and be unable to prove by a preponderance of the evidence that Billings was a member of the alleged conspiracy, the Government now apparently claims that Billings' statements should be admitted as "verbal acts," a form of non-hearsay, never admitted for the truth of the matter asserted. *See Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) ("Verbal acts . . . are not hearsay because they are not assertions and not adduced to prove the truth of the matter").  The Government's argument fails on its most basic level; it misstates, misapplies, and misapprehends the "verbal acts" doctrine.

Equally important, even if the Government gets its wish, this theory of admissibility does not obviate the need for severance.  In fact, verbal acts may never be admitted for the truth of the matter asserted, and therefore, even if Billings' statements constituted "verbal acts," they would all have to be accompanied by limiting instructions if used in a joint trial against Nighbert and Lawson.  These are the same instructions that Judge Reeves said would cause confusion and prevent a jury from being able to compartmentalize and segregate evidence among the three defendants.  The Government has again proven the pressing need for severance, not reduced it.

A.    **None of the Billings' statements are "verbal acts" of independent legal significance.**

Verbal acts, as their name describes, are statements that rise to the level of an act because the fact that the words are spoken has *independent legal significance*.  *See* Advisory Committee note to Fed. R. Evid. 801(c) ("exclude[d] from hearsay [is] the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights"); *see also Preferred Prop., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 (6th Cir. 2002) ("The verbal acts doctrine applies where legal consequences flow from the fact that words were said, *e.g.*, the words of offer and acceptance which create a contract").  The only way Billings' statements designated by the

Government as "verbal acts" can fit this definition is if the statements themselves constitute the crime of obstruction of justice – which, as a matter of law, they do not.   In fact, on this point, the Government is impeached by its own witness, Rummage, who testified, "nothing in those notes or in anything [Billings] said to him obstructed [his] relationship with the Government in this case."  (Rummage, IV-35).

The Court does not need to read any further than the Government's own Brief to know that to qualify as verbal acts of independent legal significance, the words themselves must constitute real crimes, such as threats or solicitation.  *See, e.g., U.S. v. Brewer*, 2009 WL 1747843 (6th Cir. June 18, 2009) (instructions to pave certain driveways for votes were verbal acts); *Pizano v. Davis*, 2006 WL 4975357 (E.D. Mich, March 8, 2006) (threats are verbal acts); *U.S. v. Burke*, 495 F.2d 1226 (5th Cir. 1974) (same); *U.S. v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (asking if witness knew anyone who could kill someone was solicitation and therefore a verbal act); *U.S. v. Hamilton*, 689 F.2d 1262, 1279 n. 4 (6th Cir. 1982) (ordering explosives to be used in carrying out conspiracy were verbal acts).

The Government provides good examples of the types of statements that have been admitted as verbal acts by other courts: "put the money in the bag"; "don't say a word or I'll kill you";  "I have a gun, now do what I say"; and "I want some drugs."  *See* Gov't Br. at 3.

Yet the Government also demonstrates just how truly insincere it is now being by trying to manipulate the verbal acts doctrine in order to shoehorn Billings' statements into a joint trial against Nighbert and Lawson.   In its designations, for example, it characterizes Lawson's statements that "Nighbert's wife and kids were coming over to go swimming" and "the secretary was over the other night and brought me that information you gave him" as verbal acts.  (Def. Ex. 1 at 5).  The Government also characterizes Billings' written statement to Rummage simply

listing the name "David Guarneri" as a verbal act. (Def. Ex. 1 at 8). These statements are a far cry from "don't say a word or I will kill you." The Government makes no effort to explain what the *independent* legal significance is of these statements or the dozens of others it has wrongly designated as "verbal acts." The standard for the Government appears to be nothing more than, if the Government thinks it will lose its argument that a designation is a co-conspirator statement, then it has designated that same statement as a verbal act also.

On that account, none of Billings' other statements designated by the Government meet the definition of "verbal acts" or constitute acts of obstruction. Here again, Rummage testified that "in none of these recordings [Billings] ever tells [me] to lie to the FBI." (Rummage, IV-28). Billings never told Rummage "to assert [his] Fifth Amendment rights or to stop talking to the FBI." (Rummage, IV-29). Billings never told Rummage that "you've got to take the lawyer that Jon Woodall recommended." (Rummage, IV-31). Rummage did not think that Billings' advice that "he ought to hire a lawyer" constituted an obstruction of justice. (Rummage, IV-32). Rummage testified that all the notes Billings allegedly wrote "*never* said, 'Jim, you need to lie to the FBI,'" or "'you got to lie to the grand jury,'" or "'you got to take the Fifth Amendment,'"[13] or even "'don't talk to the government." (Rummage, IV-35).

The Government asserts that simply writing the name "David Guarneri" is a verbal act. (Def. Ex. 1 at 8). The Government's theory is that David Guarnieri was under the control of Lawson and would do whatever was in Lawson's best interest, not Rummage's, and advise Rummage not to cooperate with the investigation. (Mason, VI-23). Yet Guarnieri testified at the

---

[13] Even Agent Mason acknowledged under oath that the exercise of one's Fifth Amendment rights does not constitute obstruction of justice, (Mason, VI-24, lns. 22-25):

Q:    And is it your testimony as you sit here today under oath that the exercise of one's Fifth Amendment privilege under the Constitution constitutes an obstruction of justice?

A:    No.

*Enright* hearing that he had never been contacted by Lawson, Nighbert, Jon Woodall, Jaron Blanford or anyone else connected to the case and had never been asked to represent Jim Rummage, or, indeed any "unnamed potential client for whom someone else would be paying the fee." (Guarnieri, II-83). He certainly had no arrangement to do Lawson's bidding by taking money from Lawson to represent Rummage and instruct Rummage to take the Fifth Amendment to stop the investigation. (Guarnieri, II-87). Moreover, Guarnieri never even would have considered consenting to such an arrangement, testifying at the *Enright* hearing that "I wouldn't. Not only is it against my nature, because I feel that I ought to be the one giving advice and not taking advice; but more importantly, I would deem it a breach of our ethical responsibilities." (Guarnieri, II-86).

FBI Case Agent Mason also acknowledged that he did not have "any evidence" that Billings had any involvement in or knowledge of the UMG aspect of the allegations or any involvement in the meetings and communications that allegedly took place prior to Rummage's meeting with the Office of Inspector General. (Mason, VI-129). Without even knowledge of these events, it is difficult to understand how any of Billings' statements could constitute acts of obstruction, a fact Rummage himself acknowledged at the *Enright* hearing. (Rummage, IV-35).

**B.    The Government is improperly seeking to use Billings' statements as substantive evidence of guilt against Nighbert and Lawson on the bribery charges.**

The Government contends that Billings' statements are admissible as verbal acts to prove consciousness of guilt by *all three co-defendants* on the underlying bribery charges. In fact, Billings' statements, offered as evidence of substantive guilt against Nighbert and Lawson on the bribery charges, would be inadmissible hearsay under *Lyle v. Kohler*, 720 F.2d 426 (6th Cir. 1983), where the Court ruled that statements by a co-defendant cannot be admitted against a non-declarant as substantive evidence of the non-declarant's guilt.

On this one point, the parties agree: *Lyle* should control the Court's decision. The Government's Brief on the *Enright* hearing issues cites this same case for the proposition that "[a]ttempts by a defendant to obstruct justice are admissible to show consciousness of guilt on the underlying conduct." Gvt. Br. at 35. In fact, the Sixth Circuit expressly held exactly the opposite, that statements suggesting consciousness of guilt of one co-defendant *cannot be used as substantive evidence of guilt against another co-defendant*.[14] *See Lyle*, 720 F.2d at 434.

In *Lyle*, Lyle's co-defendant on the robbery charge, Kemp, wrote letters seeking to have two friends corroborate his statements to the police and create a false alibi. The Sixth Circuit ruled the letters would be inadmissible hearsay against non-declarant Lyle because the letters were being offered for their truth, to demonstrate that the defendants needed a false alibi and thus were guilty of the underlying crimes. *Id.* at 432-33 (the letters were being used "to have the jury infer the defendants' guilt directly from the substantive message embodied in the letters themselves," and "the inferences they necessarily invite form an integral part of the letters. They were introduced because by inference they assert the proposition of fact that Lyle and Kemp committed the robbery and hence needed an alibi. Accordingly, we conclude that the letters are inadmissible hearsay ...."). The prosecution's attempts to use Billings' statements as substantive evidence against Nighbert and Lawson that they were engaged in a cover-up because they were guilty of the underlying bribery charges is precisely what *Lyle* prohibits. And as in *Lyle*, the statements are inadmissible hearsay against Nighbert and Lawson.

---

[14] Indeed, the Sixth Circuit stated that this would pose a Confrontation Clause problem under *Bruton v. U.S.*, 391 U.S. 123 (1968). *Lyle*, 720 F.2d at 434 (admission of the letters written by Kemp as evidence against Lyle improper because the jury would have had to infer that "the letters' object was to procure fabricated alibi testimony, and that such object evidenced a guilty mind. The close association between Lyle and Kemp ... necessarily invited the jury to extend the inference of Kemp's guilty mind to the substantive guilt of both defendants .... Add[ing] substantial weight, perhaps even critical weight to the Government's case [against Lyle] in a form not subject to cross examination") (quoting *Bruton*, 391 U.S. at 135-36, 127-28).

The Sixth Circuit's *Lyle* decision also points to a more fundamental problem with the Government's logic – which explains why the Government remains so intent on injecting Billings into its bribery case despite the testimony of its own witnesses that Billings had no involvement or knowledge of the alleged bribery events. The Government recognizes that its case on bribery is so extraordinarily weak, that it wants to argue to a jury that Billings' actions constitute obstruction and therefore, prove that Nighbert and Lawson must have committed bribery and conversion. Conversely it also wants to argue to the jury, because Nighbert and Lawson committed bribery and conversion, it must mean that Billings intended to obstruct the investigation into these two men. This circular logic is nothing more than a trial ploy, designed to bolster a weak case, and should be rejected and redeployed to the pages of *Catch-22* where it was undoubtedly inspired. Under no circumstance should the Government be allowed to use anything Billings said to prove that Nighbert and Lawson must be guilty of bribery. Yet another benefit of severance is that it ensures that the Government – and a potentially misled jury – never inject such an idea, even if by chance, into this case.

### C.    The Government is seeking to admit many of the Defendants' statements for their truth.

Verbal acts are not admissible for their truth. Fed. R. Evid, 801(c); *U.S. v. Harris*, 200 Fed. Appx. 472, 487 (6th Cir. 2006) ("the coconspirator exception allows statements to be introduced as proof of the matters asserted, while the verbal-acts doctrine does not"). Yet the Government has designated as "verbal acts" statements by Billings that Lawson needed to talk to Rummage or that Lawson needed to know what was going on – statements that clearly are being admitted for their truth to show that Lawson in fact wanted to talk to Rummage. (Def. Ex. 1 at 8). Statements warning Rummage to be quiet, that "some rooms have ears" likewise impermissibly are being offered for their truth, that Billings believed the room possibly was

bugged.  (Def. Ex. 1 at 8).  *See Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999) (statement that owner would sell her carving for $3 million was inadmissible because it was being offered for its truth that she believed the carving was worth $3 million).  Billings' alleged text on his phone that "If you use Guarnieri, it won't cost you anything," is being offered for its truth – that if Rummage changed attorneys to Guarnieri he would not have to pay.  (Def. Ex. 1 at 9).

The same is true of statements attributed to Nighbert and Lawson.  The Government seeks to offer a statement by Lawson that "the secretary was over the other night and brought me that information you gave him." (Def. Ex. 1 at 5).  Lawson allegedly told Rummage if he didn't apply for the State Highway Engineer job, Lawson "would have Rummage fired."  Nighbert is alleged to have said "that if he was contacted by the OIG, Nighbert wasn't going to meet/talk to OIG."  (Def. Ex. 1 at at 6-7).  All of these statements, including those by Billings, are not significant because they were made – their relevance arises from their *content.  See U.S. v. Harwood*, 998 F.2d 91, 97 (2d Cir. 1993) (Statement by a co-defendant that Harwood was "in the wrong place at the wrong time" when LSD was seized was inadmissible because "the fact that [the codefendant] made the statement … is irrelevant.  What would be relevant is that Harwood was in the wrong place at the wrong time ….").  These statements are being offered for their truth and, by definition, therefore are inadmissible hearsay.

### D.    Limiting instructions will not cure the prejudice to all three defendants

If Billings' statements are admitted as the Government has advocated, they would be admissible against Billings for their truth as party-opponent admissions pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence, and admitted against Lawson and Nighbert as verbal acts, not for the truth of the matter asserted.  Federal Rule of Evidence 105 would still then require the Court to give limiting instructions to the jury at the time each of these Billings

statements are admitted instructing the jury not to use them against Nighbert or Lawson for their truth.  *See U.S. v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992) (limiting instructions not given immediately after objectionable statements "did not neutralize the harm").  It is when a jury must use the same statement for two different purposes that the concerns about the inability to compartmentalize those multiple uses arise.  *See Merriweather*, 78 F.3d at 1079 (jury instructions not curative when they still "left the jury free to consider" evidence for improper purposes).  When a jury cannot properly compartmentalize multiple jury instructions in a lengthy, complex case, the risk of the wrongful conviction of all three defendants is possible and pre-trial severance is necessary.  *See U.S. v. Blakenship*, 382 F.3d 1110, 1124 (11th Cir. 2004) ("Severance must be granted where . . . not even limiting instructions are likely to prevent the jury from considering the evidence against all co-defendants. 'The presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions'") (quoting *U.S. v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994)).

Limiting instructions will also not guard against the prejudice to the three defendants because it will not prevent the jury from improperly using Billings' statements designated as non-hearsay verbal acts as substantive evidence of guilt against Nighbert and Lawson, or vice versa.  Given the number of statements and the various theories under which the statements are offered against each of the Defendants, the jury will be unable to distinguish between the purported purposes for which the statements are offered – i.e., for their truth against Billings and as evidence they were made against Nighbert and Lawson – and the jury undoubtedly (and improperly) will use the statements as substantive evidence of guilt against all the Defendants. *Lyle*, 720 F.2d at 435 ("That the jury had to draw a short chain of inferences in order to link the

letters and Lyle's participation in the crime does not dissuade us from concluding that the letters constituted a substantive portion of the state's evidence against him …. the letters engendered a substantial risk that the jury would consider them in deciding [Lyle's guilt]").

Therefore, the Government's attempt to misuse the "verbal acts" doctrine should be rejected and severance of Billings should still be granted.

### III.    The Government's actions to circumvent Judge Reeves' prior rulings demonstrate the added importance of severance to protect the fair trial rights of the Defendants.

The Sixth Circuit has held that if the Government's actions in bringing a joint trial result in "substantial prejudice" to one or more of the defendants, those actions violate the defendants' Sixth Amendment rights to a fair trial.  *See Wirsing*, 719 F.2d at 865.   In this case, the Government's actions were intentional making them that much more outrageous and objectionable.  After being dealt an adverse ruling by Judge Reeves – one for that matter that was designed to protect the Defendants' Sixth Amendment rights to a fair trial by severing the case into two trials – the Government, with nothing more than a newly drafted indictment and a willing grand jury, re-assembled this case back into a single, joint trial.  Judge Reeves put the Government on notice that "there is a serious risk that a jury would be unable to compartmentalize the recorded conversations" in this case.  Doc. 336 at 4.  Judge Reeves told the Government, not once, but twice, that "due to the complexity" of the issues and "the instructions that would need to be given," "there is a serious risk that the jury would be unable to compartmentalize this evidence."  *Id.*.   Yet the Government, impervious to either the Court's authority or a sincere desire to ensure that those it prosecutes get a fair trial, added more confusion by alleging a single conspiracy on the same set of facts, but with a new, more convoluted theory.

The Government may argue that judicial economy requires the three defendants to be tried together. The Government cannot make such an argument with a straight-face. After all, Judge Reeves had both trials set in June, the first trial on Counts 1 through 5 followed by the second trial, after a one week break, on Counts 6 through 8. This case would have been completed and judicial resources preserved if the Government did not start from scratch with a new indictment simply because it feared losing the two trials that had been scheduled.

More importantly, severance in this case actually makes the case far simpler for two juries to understand and for the Court to administer. Given the lack of evidence against Billings on the bribery counts, which constitute 19 months of testimony, a second trial can be shortened. Nighbert and Lawson participated in none of the recorded Billings-Rummage conversations. Billings participated in none of the Nighbert-Rummage or Lawson-Rummage recordings. Said otherwise, there is little overlap in the evidence that would be presented at two trials. There will also be far less need for limiting instructions, which could lead to confusion in a jury room, extended deliberations, and perhaps even juror deadlock created by the confusion. Such an outcome would most certainly not be in the best interest of judicial economy.

The Court may not grant precisely the same relief that Judge Reeves ordered. Nonetheless the need for some relief still exists in order to prevent a violation of the Defendants' Sixth Amendment rights. The best way to reduce the chance of substantial prejudice to all three defendants, while still preserving some degree of judicial economy, is to sever Billings into a separate trial after Nighbert and Lawson are tried together.

Respectfully submitted,

/s/ Larry A. Mackey
Larry A. Mackey
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 231-7236
Facsimile:  (317) 231-7433
e-mail:  lmackey@btlaw.com

/s/Howard O. Mann
Howard O. Mann
LAW OFFICES OF HOWARD O. MANN,
P.S.C.
P.O. Drawer 1344
Corbin, Kentucky 40702

Attorney for Charles Williams (Bill) Nighbert

/s/ J. Guthrie True
J. Guthrie True
JOHNSON TRUE GUARNIERI
326 West Main Street
Frankfort, KY 40601

Attorneys for Leonard Lawson

/s/ Steven S. Reed
Steven S. Reed
J. Kent Wicker
Reed Wicker PLLC
321 West Main Street, Suite 2100
Louisville, Kentucky 40202

Attorneys for Brian Billings

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this 17th

day of September, 2009, by the Court's electronic filing service to the following:

Kenneth Taylor
Kevin Dicken
Assistant United States Attorney
United States Attorney's Office
260 West Vine Street, Suite 300
Lexington, KY  40507

/s/ Larry A. Mackey
Larry A. Mackey

INDS02 JBARCLAY 1068654v3