UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CRIMINAL ACTION NO. 08-21-KSF

UNITED STATES OF AMERICA                                          PLAINTIFF

v.                                    **OPINION & ORDER**

LEONARD LAWSON,
CHARLES WILLIAM "BILL" NIGHBERT, and
BRIAN RUSSELL BILLINGS                                            DEFENDANT

\* \* \* \* \* \* \* \* \* \*

This matter came before the Court for an evidentiary hearing pursuant to *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978), on August 6, 7, and 10, 2009, to determine the admissibility of certain statements designated by the United States as non-hearsay coconspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence.  At the *Enright* hearing, the Court heard testimony of witnesses and received certain exhibits into evidence.  The parties have filed post-*Enright* hearing briefs outlining their positions on the admissibility of the designated statements under Rule 801(d)(2)(E).

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

Leonard Lawson, Charles William Nighbert and Brian Russell Billings (collectively, "Defendants") were indicted on September 3, 2008.  Lawson and Nighbert were indicted on Counts

---

[1] The United States' proof about the alleged conspiracy consists of testimony by Rummage and Special Agent Clay Mason, telephone, financial and business records and various audio and video recordings.  Unless otherwise noted, the factual background set forth herein is based on the United States' proffer made at the *Enright* hearing and should not be deemed as a finding of fact in any way.

1

1-8 and Billings on Counts 6-8. Judge Danny C. Reeves granted a motion to sever Billings from the

trial of Nighbert and Lawson on April 27, 2009. A Second Superseding Indictment was filed on

June 5, 2009 charging that beginning in June 2006 and continuing until September 2008, Lawson,

Nighbert, Billings and Jim Rummage, an unindicted coconspirator, conspired to illegally obtain

confidential Kentucky Transportation Cabinet ("KTC") engineer's estimates on prospective road

construction projects for Lawson's use in formulating bids, and to compensate Nighbert and

Rummage for their assistance in obtaining the estimates, in violation of 18 U.S.C. § § 666(a) and

317, and conspired to attempt to influence Rummage's testimony before a federal grand jury and to

persuade Rummage not to cooperate with federal law enforcement officials, in violation of 18 U.S.C.

§ § 1503, 1512 and 371. According to the indictment, the conspiracy had the following objectives:

> a) unlawfully provide LAWSON with confidential KTC engineer's estimates for prospective road contracts which he could use in formulating his bid on those projects; b) to compensate NIGHBERT and Rummage for their assistance in so doing; c) to groom and corruptly compromise Rummage as an inside KTC source for future confidential information and improper influence for LAWSON; and d) to conceal the compensation and misappropriations, as well as to obstruct state and federal investigations of their unlawful conduct, including influencing testimony, so as to insure that LAWSON collected road contract funds, that NIGHBERT received his delayed compensation from LAWSON, and that Rummage continued his employment with the KTC.

(DE 415 at 4-5).

Defendants filed a motion to exclude certain conversations recorded by Rummage and the

FBI. The United States argued that they are admissible as coconspirator statements pursuant to

Federal Rule of Evidence 802. The Court ordered a hearing on admissibility of those statements,

which was held on August 6, 7 and 10, 2009. Prior to the hearing, the United States submitted a

Designation of Coconspirator Statements, which is attached hereto, detailing the statements that it

intended to introduce during trial. Following the *Enright* hearing, the parties filed briefs regarding admissibility of the statements.

Contracts on road construction projects are awarded through a competitive bidding process. Projects are advertised for a period of time to allow contractors to propose bids. Plans and proposals explaining the work to be done are available. Bidders submit sealed bids to the KTC before the "letting" where they are opened and announced in a public forum. Prior to the letting, the estimates prepared by the Estimating Department of the KTC and are confidential. These "engineer's estimates" are estimates of the anticipated cost of a project and become public at the letting. After the letting, the Awards Committee makes a recommendation to the Commissioner of Highways on which projects to award contracts and to which companies to award them. (DE 48 at 10,11). If there are multiple bids, the contract is usually awarded to the lowest qualified bidder. When there is only one bidder, that sole contractor bid is compared against the engineer's estimate for that project. The Awards Committee may recommend that a single bid be rejected if it is greater than 7% above the estimate. (DE 483 at 12-13).

In June 2005, Rummage became Deputy State Highway Engineer for the KTC in charge of the "Office of Project Delivery" which included the "Division of Construction Procurement." (DE 483 at 7-8). Rummage often chaired the Awards Committee, the body responsible for recommending approval of all state highway contracts and the amount of those contracts. (DE 480 at 28). While Rummage was in this position, Nighbert was the Secretary of Transportation.

In June 2006, Nighbert asked Rummage to come into his office. Marc Williams, Commissioner of Highways, and Lawson were present. Lawson owns several road contracting and paving companies, including Gaddie Shamrock, ATS and Bizzack, which bid on and received

various government contracts.  Nighbert told Rummage that he had information that an engineer's estimate had been disclosed prior to letting and directed Rummage to get the engineer's estimate on a particular project so that he could compare it to the information that he had been given.  (DE 483 at 14-15).  Rummage got the estimate from Ryan Griffith in the estimating department and gave it to Nighbert.  (DE 483 at 15-16).  Rummage did not believe that obtaining the estimate was illegal. Rummage testified that he had no special relationship with Nighbert at this time and that he was not a "favored" employee in the Transportation Cabinet.  (DE 483 at 47, 49).

Soon after the first request, Nighbert made a second request for Rummage to get an estimate for him.  Rummage complied with the request.  Rummage did not believe that obtaining the second estimate was illegal.  (DE 483 at 15-16).  Then, Nighbert asked Rummage to get a third estimate for him.  When Rummage brought the estimate to Nighbert, Nighbert said "give it to our friend in Lexington" and identified Lawson as the "friend."  (DE 483 at 17-18).  At this point Rummage knew what he was doing was illegal.  (DE 483 at 18).  Nevertheless, Rummage took the estimate to Lawson's office and gave it to him.  A day or so later, Lawson telephoned Rummage and told him that there were errors in the third estimate.  Rummage brought the errors to Griffith's attention and Griffith revised the estimate.  (DE 483 at 20).  Nighbert directed Rummage to take the revised estimate to Lawson.  Rummage telephoned Lawson at Lawson's office and Lawson told him to come by his home, and Rummage took the estimate to Lawson's home.  (DE 483 at 21).  On that occasion, Lawson gave Rummage several frozen fish and $5000 in $100 bills folded and wrapped with a rubber band.  (DE 483 at 23).  Rummage believed that the money was a reward for bringing the estimate and an incentive to continue doing so.  (DE 483 at 24).  From that evening until he retired in August 2007, Rummage was asked by Nighbert and Lawson to get several estimates.  (DE 483

4

at 25).  Each time, he obtained the estimates from Griffith or one of the other estimators, Deborah Rhody or Donnie Miracle.

Griffith recorded notations on his personal calendar showing when Rummage requested estimates.  The calendar was admitted into evidence at the hearing.  (Government Ex. 3-4). Griffith's calendar shows that Rummage requested estimates on July 19, 2006 for Job No. 2006-1038, October 24, 2006 for Job No. 2006-2247, December 14, 2006 for Job No. 2006-2276 and Job No. 2006-2282 and March 20, 2007 for Job No. 2007-2163 and Job No. 2007-1022 (both from Miracle).  All of these contracts were awarded to Lawson-owned companies.  Griffith's calendar also shows estimates obtained July 19, 2006 for Job No. 2006-1037, August 23, 2006 for Job No. 2006-1043 (from Miracle) and November 16, 2006 for Job No. 2006-1112, Job No. 2006-1261 and Job No. 2006-1055.  These contracts were awarded to companies with which Lawson had no connection. Rummage claims he also obtained estimates for Job No. 2006-3406 which was bid on June 23, 2006, and Job No. 2007-1056 which was bid on September 7, 2007.  Lawson-related company bids were over the engineer estimates as follows: Job No. 2006-3406 - 5.38%; Job No. 2006-1038 - 3.20%; Job No. 2006-2247 - 8.47%; Job No. 2006-2276 - 5.79%; Job No. 2006-2282 - 7.19%; Job No. 2007-2163 - 5.58%; Job No. 2007-1022 - 7.92%; and Job No. 2007-1056 - 3.34%.  Rummage testified that he provided an estimate on the Rock Crusher Curve Project in Carter County which was awarded to a Lawson-related company although no entry appears on Griffith's calendar for showing that he requested the estimate.  Lawson won this contract with a bid 20% over the engineer's estimate.  (DE 480 at 63, DE 484 at 11).  Lawson-related companies won other contracts during this time period for which Rummage did not request estimates.  (DE 487, 6-7).

5

Rummage testified that he began to get nervous about the conspiracy in August 2006, so he created a story about an anonymous note that was left on his computer about the estimates. He went into Nighbert's office on August 28, 2006, and told Nighbert about the fictional note and recorded their conversation with his own recording device. (Government Ex. 18B).

In late September 2006, Nighbert asked Rummage to join him in his office. While walking into Nighbert's office, Rummage began taping the conversation with his own recording device. (Government Ex. 19A). Rummage testified that Lawson was also present in Nighbert's office but did not address him. (DE 483 at 33). Rummage testified that he believed this conversation solidified the cover story, which was to say that Nighbert needed the engineer's estimates for budgetary purposes and they were never given to Lawson. (DE 483 at 35).

On four occasions, Lawson gave Rummage $5000 in one hundred dollar bills secured by a rubber band. (R.37-39). The first was in June 2006 at Lawson's house, the second was in mid-December 2006, when Lawson told Rummage to "do something nice" for his family, the third time was in late-Spring 2007 and the last time was on August 31, 2007, the date that Rummage retired from the KTC. (DE 483 at 36-39). Lawson told Rummage not to say anything about the money, not even to his wife. Nighbert never asked Rummage about the money. (DE 483 at 41-42). To Rummage's knowledge, Billings was not aware that Lawson gave money to Rummage. At the hearing, to corroborate Rummage's testimony, the United States presented a summary of Rummage's ATM/Point of Sale transactions for the period of January 2005 to August 2008. (Government Ex. 15).

6

Between July 2006 through August 31, 2007, Rummage testified that Nighbert and Lawson made statements to Rummage that led him to believe that they were talking to one another about Rummage delivering various estimates.  (DE 483 at 40-41).

Prior to his retirement, Lawson and Nighbert each encouraged Rummage to postpone retirement.  Rummage received a raise shortly before he retired.  Rummage believed that these statements and the raise were to convince him to stay with the Cabinet so that he could continue to get estimates for Nighbert and Lawson.  (DE 483 at 42-44).

After his retirement, in mid-October 2007, Nighbert and Lawson each called Rummage to encourage him to apply for a Chief District Engineer for District 7.  (DE 483 at 45).  On November 1, 2007, Rummage accepted the job and started work.  (DE 483 at 46).  A District Engineer does not have access to the engineer's estimates.  In mid-November 2007, Lawson encouraged Rummage to apply for the position of State Highway Engineer.  (DE 483 at 46).  At the hearing, Rummage testified that Lawson threatened to have him fired from his Chief District Engineer position if he did not apply for the State Highway Engineer position. (DE 483 at 47).  Rummage applied for the position but was not hired.  Lawson met with Joe Prather, the incoming Secretary of Transportation, and told him that Rummage would be a great candidate for the State Highway Engineer position.

In mid-January 2008, law enforcement officials began to inquire about Rummage's requests for estimates.  Rummage contacted Nighbert and Lawson and they each said that he should stick to the cover story.  Lawson told him that he had not done anything wrong and could say that he just complied with the request of his supervisor, Nighbert, there were legitimate reasons for Nighbert to request the estimates and that he had never provided anything to Lawson.  (DE 483 at 50). Rummage claims that he stuck with the cover story at the OIG interview on January 25, 2008.

Rummage testified that he met with Nighbert twice in a Lexington Denny's parking lot in January, 2008. (DE 483 at 51-52). On both occasions, Nighbert told him to tell the same story that they agreed upon in the fall of 2006. (DE 483 at 51). On February 27, 2008, the FBI questioned Rummage and Rummage gave the cover story.

At some point after the February FBI interview, Rummage hired Mark Murphy to represent him, and on March 6, 2008, Rummage and Murphy called the FBI. Rummage testified that between the January OIG interview and the February FBI interview Billings contacted him and arranged a meeting with him in a parking lot of a Chinese restaurant in Mt. Sterling, Kentucky. At this meeting, Billings passed notes to Rummage about what he should say in the OIG investigation. (DE 483 at 56-57).

Billings and Lawson telephoned Rummage on March 6, 2008, but Rummage did not talk to them. The telephone records show that calls were made from Billings and Lawson's cell phones to Rummage's home phone on this date.

On March 7, 2008, Billings called Rummage to arrange a meeting. Billings spoke about work but passed notes about what Lawson wanted Rummage to do with regard to the investigation. (DE 483 at 61). The phone records show that a call was made from Billings' cell phone to Rummage's cell phone on this date. Also on March 7, 2008, Rummage telephoned Lawson from a pay phone in Frankfort and recorded the conversation with his own recording device. (Government Ex. 23B).

At the direction of the FBI, on March 12, 2008, at 3:15 p.m., Rummage telephoned Lawson about the FBI interview. (Government Ex. 24B). Lawson told Rummage that he needed a lawyer. Lawson told Rummage that he would have "Jon" call him. Soon after the call with Lawson, Jon

Woodall, an attorney in Lexington, telephoned Rummage and left a message on Rummage's cell phone. Rummage returned Woodall's call and Woodall recommended that Rummage contact David Guarnieri, an attorney in Frankfort. (DE 483 at 72). Later that evening, Lawson telephoned Rummage at home. The FBI recorded the conversation. (Government Ex. 25B). Telephone records show that on March 12, 2008, at 8:43 p.m. a call was placed from Lawson's home telephone in Florida to Billings' cell phone and that at 8:57 p.m. a call was placed from Billings' cell phone to Lawson's home telephone in Florida that lasted 38 minutes. The records also show that at 10:28 p.m., a call was placed from Lawson's home telephone in Florida to Nighbert's cell phone.

On March 18, 2008, Rummage telephoned Billings and recorded the conversation pursuant to the FBI's direction. (Government Ex. 90B). On March 19, 2008, Billings telephoned Rummage to arrange a meeting at McDonald's on Newtown Pike in Lexington at 11:30 a.m. They met later that day and Rummage recorded the conversation at the direction of the FBI. (Government Ex. 92B). While Billings talked about work-related topics, Rummage testified that he passed notes to Rummage about Lawson's interest in Rummage's attorney. (DE 480 at 8). Rummage met with Billings again on March 20, 2008, and recorded the conversation at the direction of the FBI. (Government Ex. 94). Rummage testified that Billings passed notes with messages to Rummage from Lawson while talking about work-related topics. (DE 480 at 11).

On March 24, 2008, Rummage called Billings to see if Billings had spoken to Lawson about paying for his attorney and agreed to meet him at McDonald's on Newtown Pike in Lexington. (Government Ex. 95B). The next day, Rummage met with Billings at the Holiday Inn parking lot on Newtown Pike in Lexington and videotaped the meeting at the direction of the FBI. (Government

Ex. 98B).  On March 26, 2008, at 9:25 a.m., Rummage telephoned Lawson about his meeting with Billings and recorded the conversation at the direction of the FBI.  (Government Ex. 96B).

Nighbert left the Transportation Cabinet in December 2007.  Prior to leaving the Cabinet, incoming Secretary Joe Prather asked for a meeting with Nighbert.  At that meeting, Nighbert told Prather "that to succeed in this job, you have got to get along well with Leonard Lawson" and that "Leonard Lawson had more employees in the Transportation Cabinet than he did."  (DE 485 at107).  On January 2, 2008, after Nighbert left the KTC, he applied to work in Frankfort for the Legislative Research Commission and began working in that capacity on January 4, 2008.

Lawson owns a majority interest in Utility Management Group, LLC ("UMG") which was formed in 2004 and contracts with local governments to manage their public utility services.  UMG contracted with Nighbert to perform "consulting services" for UMG in exchange for health insurance, a vehicle and $125,000 per year.  Nighbert was to begin working for UMG on January 1, 2008.  UMG wrote three checks payable to "Two Buck, LLC" in the amount of $10,000 each that were given to Nighbert.  None of the checks were cashed or deposited.  "Two Buck, LLC" is not a valid entity.  Nighbert, however, is a member (along with his brother) in a Kentucky company called "Double Buck, LLC."  (Defendants' Ex. 76).  On January 7, 2008, Nighbert received a check from UMG in the name of Two Bucks and deposited the check into his account to fund the purchase of a Toyota Avalon that he initially tried to register in the name of "Two Buck, LLC" but could not do so because it was a non-existing entity, so he registered the car in his own name.

As of the date of the Second Superseding Indictment, Lawson had not been paid on all of the contracts awarded to his companies by the KTC.

## II.     THE UNITED STATES' BURDEN WITH RESPECT TO THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS UNDER RULE 801(d)(2)(E)

Rule 801(d)(2)(E) provides that "a statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  The United States, as the proponent of the admissibility of the designated out-of-court statements, has the burden to prove each of the following foundational prerequisites: (1) that the alleged conspiracy existed; (2) that the defendant against whom the evidence is offered was a member of that alleged conspiracy; and (3) that the declarant's out-of-court statement was made during the course and in furtherance of that alleged conspiracy.  *United States v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007).  This three-part test is often referred to as an "Enright finding."  *See United States v. Enright*, 579 F.2d 980 (6th Cir. 1978).   Whether the United States has succeeded in making the required showing is a factual finding which the district court must make pursuant to Rule 104(a) of the Federal Rules of Evidence.  *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998).  The United States must establish these prerequisites by a preponderance of the evidence, and the Court's ruling is reviewed only for clear error.  *Id*. at 1007.

When determining whether the United States has met its burden of proof, the district court "exercise[s] judicial fact-finding responsibilities which . . . require [it] to evaluate both credibility and the weight of the evidence."  *James R. Snyder Co. v. Assoc. Gen. Contractors*, 677 F.2d 1111, 1116-17 (6th Cir. 1982)(quoting *Enright*, 579 F.2d at 985).  Additionally, the district court may not rely *only* on the contents of the out-of-court statements.  While "[t]he contents of the [out-of-court statement] shall be considered," they are not alone sufficient to establish the necessary foundation facts.  Fed.R.Evid. 801(d)(2).  "Because hearsay is presumptively unreliable, sufficient independent

11

and corroborating evidence of [the alleged conspirator's] knowledge and participation in the conspiracy must be produced to rebut and overcome the presumed unreliability of the proffered out-of-court statement." *Conrad*, 507 F.3d at 429.

## III.    WHETHER THE ALLEGED CONSPIRACY EXISTED

Under this framework, the first step for the Court is to determine whether the United States has shown, by a preponderance of the evidence, the existence of the conspiracy charged in Count 1 of the Second Superseding Indictment.

The bulk of the United States' proof of the existence of a conspiracy rests on the testimony of Rummage. At the outset, the Court notes that Rummage's credibility is severely impaired. He has admitted to lying to the KTC's Office of Inspector General in January 2008 and to the FBI in February 2008. He lied to Ryan Griffith and the other estimators from whom he obtained the engineer estimates, and to the Internal Revenue Service by filing false tax returns. He also lied to various attorneys he consulted with prior to meeting with the OIG.

Rummage's credibility is further weakened by the fact that he has told a variety of different versions of his story and has come forward with important parts of his current story very late in the game. For example, even after giving multiple statements - to the OIG, the FBI, the Grand Jury, and potential counsel - many of his allegations were disclosed for the first time in the United States' pre-hearing Designation of Coconspirator Statements, just ten days before the *Enright* hearing. In that disclosure, Rummage recalls for the first time the meeting with Billings at a Chinese restaurant in Mt. Sterling in January 2008, and adds that he met with Nighbert not once, as previously disclosed, but twice in a Lexington Denny's parking lot also in January 2008. Then, during the *Enright* hearing, Rummage alleged for the first time that Lawson threatened to have him fired if he did not

apply to be State Highway Engineer.  As the defendants point out, these and other events belatedly remembered by Rummage directly coincide with the United States' newest allegations contained in the Second Superseding Indictment.

While Rummage did record various meetings and conversations he had with Lawson, Nighbert, and Billings, he failed to record the most critical events he described; namely, the taking of instructions to obtain engineer's estimates, the delivery of the estimates to Lawson and/or Nighbert, the receipt of currency, or many of the meetings he testified about with Lawson and Nighbert.  He also failed to keep any copies of the engineer's estimates he allegedly delivered.

The defendants contend that Rummage may also have a political and personal motive to lie. As a Democrat in a Republican administration, Rummage was on the "hit list," a list of state employees to be fired by the Fletcher administration that prompted a scandal in which Nighbert was indicted.  Additionally, the OIG's investigation of Rummage was assigned to Mike Duncan. Rummage knew Duncan had also been on the "hit list," and that Duncan, unlike Rummage, had been fired and sued Nighbert over his discharge.  The subsequent investigation of Rummage occurred only sixteen days after Duncan settled and dismissed his personal lawsuit against Nighbert.

Any personal motive to lie may arise from the fact that Rummage has not yet been charged with any state or federal crime even though he has admitted to his involvement in a bribery and obstruction conspiracy, tax evasion, and other crimes.  Moreover, he has not forfeited his public pension for the time period he has admitted to committing crimes.  He was never terminated by the Cabinet and continued to be paid by the Cabinet after he admitted to taking bribes while a Cabinet employee.  Although the United States has not promised Rummage immunity in exchange for his testimony, the fact remains that a person in his position may choose to lie in an effort to curry favor

13

with the United States.  For these non-exclusive reasons, the Court cannot find Rummage's testimony fully credible.

However, to the extent that Rummage's testimony is corroborated by other credible evidence, the United States may be able to establish the existence of a conspiracy.   Rummage's testimony about the existence of a conspiracy is corroborated to some extent by the recorded conversations he had with Nighbert in the fall of 2006.  Rummage claims that the August 28, 2006 recording, initiated and recorded by Rummage after he allegedly obtained and delivered engineer's estimates to Nighbert and Lawson and received his first $5,000 payment from Lawson, was a result of his concern about his role in the conspiracy and the continuing requests to provide Lawson with the engineer's estimates.  In this conversation, wherein Rummage fabricates the claims that he found a note on his computer that made reference to the fact that Rummage had been requesting engineer's estimates prior to letting, Nighbert did not deny that Rummage had obtained the engineer's estimates prior to letting at his request, but rather responded "[y]ou've not done anything . . . [t]hey're just checking on ya.  I mean, I wouldn't worry about it."

The next recorded conversation, in late September 2006, began after Nighbert requested that Rummage come to his office.  Rummage alleges that Lawson was present in the office, although he is not heard on the recording.  The United States contends that the conversation reveals an agreement between Rummage, Lawson and Nighbert that, if asked, they would all say that the engineer's estimates were obtained for funding purposes and that they never gave any of the estimates to Lawson.  The United States further contends that this recording reveals that Rummage, Lawson, and Nighbert agreed that they would stick to this cover story if ever asked.  While the conversation could

14

be construed otherwise, the Court finds that it does offer further corroboration of Rummage's testimony about the conspiracy and agreement on a cover story.

Rummage's testimony is further corroborated in part by the testimony of FBI Agent Clay Mason.   Agent Mason has investigated this case and testified regarding the results of his investigation.   Specifically, he testified about the personal calendar kept by Ryan Griffith which supports Rummage's claim that he requested the confidential engineer's estimates prior to letting. Griffith's calendar reveals that Rummage obtained the engineer's estimates for several contracts that were eventually awarded to Lawson-owned companies.   Moreover, while the percentage bid by Lawson's companies over the engineer's estimates in these contracts varies, this evidence supports the United States' allegation that Lawson sought the confidential engineer's estimates in order to obtain a larger profit on the contracts.

Rummage's testimony that he was compensated for his participation in the alleged conspiracy is corroborated by a review of his bank records.   According to Rummage, Lawson gave him $5,000 on four separate occasions between June 2006 and August 2007.   Agent Mason explained that Rummage's ATM/Point of Sale transactions reveal that Rummage indeed withdrew less money from ATMs using his debit card during that time frame than in other months, supporting his testimony that he received $20,000 in cash from Lawson thereby obviating his need to withdraw money from his own account.   The conversations between Rummage and Lawson, wherein Lawson offers explanations that Rummage could use to explain to the FBI where he obtained cash, also support Rummage's testimony regarding his compensation.

The number and duration of calls between phones owned by Lawson and Nighbert also lends credibility to Rummage's testimony about the conspiracy.   Agent Mason's testimony, based on his

15

review of the phone records, pointed out a spike in phone calls prior to key dates when Rummage claims that he provided estimates to Nighbert and Lawson, as well as other key points in the alleged conspiracy.

While Rummage was not aware of any compensation made to Nighbert for his participation in the alleged conspiracy, Agent Mason provided testimony supporting the United States' allegation that Nighbert was compensated for his role in the conspiracy by UMG, a Lawson-related entity. According to Agent Mason, while Nighbert was still Transportation Secretary, he entered into an informal agreement with UMG to provide undescribed consulting services to UMG.   As compensation, he was to receive a vehicle, health insurance, and $125,000 per year.  The contract was placed in the name of a non-existent corporation - "Two Bucks, LLC."  Nighbert was to begin working for UMG on January 1, 2008.

Nevertheless, on January 2, 2008, Nighbert applied to work in Frankfort for the Legislative Research Commission, and began work in that capacity on January 4, 2008.  On January 5, 2008, Nighbert purchased a Toyota Avalon.  He attempted to put the registration in the name "Two Bucks, LLC," but could not because it was a non-existing entity.  Nighbert, however, is a member (along with his brother) in a Kentucky company called "Double Buck, LLC."  On January 7, 2008, Nighbert received a check from UMG in the name Two Bucks and deposited the check into his account to fund the car purchase.  Over the next three months, Nighbert received monthly checks from UMG in excess of $10,000 in the name Two Bucks, but did not cash or deposit these checks.  The United States contends that his failure to cash or deposit the checks is a result of the intensifying criminal investigation, and this evidence supports their allegations of a conspiracy.

16

Rummage's testimony is also corroborated to some extent by the recordings of four conversations between Rummage and Lawson in March 2008. These conversations were recorded after Rummage hired his current attorney and agreed to cooperate with the FBI. A review of these conversations reveal Lawson's intent to encourage Rummage to stick to the previously agreed upon cover story. Moreover, the recordings reveal that Lawson advised Rummage to get an attorney "and it ain't going to cost ya nothing," suggesting, as argued by the United States, that Lawson intended to pay for Rummage's attorney. The recordings between Billings and Rummage, also during the March 2008 time frame, lend support to the United States' allegation that Lawson wanted control over the attorney hired by Rummage and the information Rummage would give to the authorities.

Based on Rummage's testimony, to the extent it is corroborated by other evidence, as well as the other testimony and evidence introduced at the *Enright* hearing by the United States, the Court finds, by a preponderance of the evidence, the existence of a conspiracy to accomplish the goals and objectives as set out in the Second Superseding Indictment. This finding is based not only on the out-of-court statements which the United States seeks to admit under Rule 801(d)(2)(E), but also the cumulative effect of the other testimony and evidence introduced by the United States at the *Enright* hearing. As the first component of the *Enright* test has been satisfied, the Court now must consider whether the United States has established, by a preponderance of the evidence, that Lawson, Nighbert, Billings, and Rummage were members of the conspiracy.

## IV.   MEMBERS OF THE CONSPIRACY

According to the Second Superseding Indictment, Lawson, Nighbert, Billings and Rummage are all alleged to be members of the conspiracy alleged in Count 1. In order to be found a member of a conspiracy, the alleged conspirator must have the "specific intent, actual or implied, to violate

17

federal law." *United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001). In other words, the alleged conspirator must have, at a minimum, knowledge of "the essential nature of the plan." *United States v. Blumenthal*, 332 U.S. 539, 557 (1947); *United States v. Franklin*, 608 F.2d 241, 246 (6th Cir. 1979). In particular, "one who has no knowledge of the object of the conspiracy cannot be a conspirator, for the intent to participate is lacking . . . Moreover, evidence of knowledge must be clear and not equivocal." *Stanley v. United States*, 245 F.2d 427, 430 (6th Cir. 1957)(citing *Direct Sales Co. v. United States*, 319 U.S. 703 (1943)). In this case, the United States has established that Lawson, Nighbert, and Rummage knew of the conspiracy and agreed to join the conspiracy. A preponderance of the evidence, based on all the evidence received during the *Enright* hearing, reveals that Lawson, Nighbert, and Rummage agreed that Rummage would, at the request of Lawson or Nighbert, obtain confidential engineer's estimates and give them to Lawson prior to letting. Moreover, there is sufficient evidence that Lawson, Nighbert, and Rummage agreed to various forms of compensation for their participation in the alleged conspiracy: Lawson - in the form of the ability to obtain contracts at a maximum price; Nighbert - in the form of delayed compensation through UMG; and Rummage - in four installments of $5,000 of cash. There is also sufficient evidence to show that Lawson and Nighbert agreed to groom Rummage and corruptly compromise Rummage as an inside source in the KTC to further their objectives. Finally, there is sufficient evidence also that Lawson, Nighbert, and Rummage agreed to conceal their efforts by offering a "cover story"- that Nighbert needed the engineer's estimates for budgetary purposes and that the estimates were not given to Lawson prior to letting, and they agreed to obstruct state and federal investigations of their unlawful conduct. Accordingly, the Court finds, by a preponderance of the evidence, that Lawson, Nighbert, and Rummage were members of the alleged conspiracy.

However, the evidence that Billings knew of the conspiracy and agreed to join the conspiracy is not so clear.  The United States has conceded that Billings had no part in any improper activity during the 2006-2007 time frame.  Rather, the United States argues that Billings was a "late entry" into the conspiracy when, at Lawson's direction, he met with Rummage in a parking lot at a Chinese restaurant in Mt. Sterling, Kentucky in an alleged attempt to thwart Rummage's cooperation with authorities.  Based on this limited role, the United States seeks to hold Billings liable for the actions of all the conspirators since the beginning of the conspiracy in June 2006.

Generally, a coconspirator can be held liable for "actions done in furtherance of a conspiracy before [the particular coconspirator] joined." *United States v. Gravier*, 706 F.2d 174, 177-78 (6th Cir. 1983).  However, to be labeled a member of a conspiracy, the defendant must know of the other significant phases of the conspiracy, agree to its objectives, and knowingly join in the overall scheme.  *United States v. Zimmerman*, 832 F.2d 454, 458 (8th Cir. 1987).  The United States has failed to come forward with sufficient evidence that Billings knew of the bribery/conversion component of the conspiracy or that he agreed to join in the overall scheme.  Instead, the United States' case against Billings rests entirely on inferences, suspicion, and speculation.  There is no evidence that Billings had any knowledge that any engineer's estimates were passed by Rummage to Lawson prior to letting.  Nor is there any evidence that Billings, or anyone else, ever used those estimates in preparing bids for Lawson.  There is no evidence that Billings was aware of any payments, or arrangement for payments, to Rummage or Nighbert.  In fact, the United States repeatedly informed the Court, prior to the filing of the Second Superseding Indictment, that Billings had no involvement in or knowledge of the alleged bribery/conversion events and Rummage has testified to that effect.

19

To put it simply, there is no evidence that Billings agreed to join the bribery/conversion component of the conspiracy. While the United States claims that "Billings joined the obstruction phase, after having acquired knowledge of the main objectives of the conspiracy," it is unable to offer any explanation or evidence that Billings ever acquired any knowledge of the "main objective" of the conspiracy. Without any knowledge of the alleged bribery/conversion scheme, Billings would not have known the "essential object of the conspiracy," *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986), or its "essential features and broad scope," *Blumenthal*, 332 U.S. at 558, and, consequently did not - and could not - have "knowingly joined in the overall scheme." *United States v. Virta*, 1994 WL 18023, *6 (6th Cir. January 21, 1994).

Nor is there sufficient evidence that Billings agreed to join the obstruction phase of the conspiracy. Much of the United States' evidence against Billings consists only of Rummage's uncorroborated, and belatedly-remembered, testimony. While the video recordings of the conversations and note-passing between Rummage and Billings are indeed fishy, the Court cannot find, by a preponderance of the evidence, that this evidence is sufficient to show an agreement to join any conspiracy. Additionally, Rummage's testimony that Billings' notes - advising that he "can start a legal defense fund," and suggesting a Frankfort attorney, "David Guarnieri" - do not amount to sufficient evidence to show any agreement to obstruct justice or join in the conspiracy. David Guarnieri testified that he was never contacted by anyone associated with the defendants to represent Rummage or any unnamed person for whom someone else would be paying the fee. Moreover, advice to start a legal defense fund does not amount to obstruction of justice or witness tampering.

"[C]harges of conspiracy are not to be made out by piling inference on inference. . ." *Direct Sales*, 319 U.S. at 711. Even evidence that "might well arouse suspici[on] and support a speculative

20

conclusion of . . . guilt" is insufficient to prove knowledge of and participation in a conspiracy. *United States v. Barnes*, 383 F.2d 287, 293 (6th Cir. 1967)(quoting *United States v. Dunn*, 299 F.2d 548, 554-55 (6th Cir. 1962).   There is simply no clear, unequivocal evidence that Billings knew of any conspiracy and agreed to join in.  *See Direct Sales*, 319 U.S. at 711 (1943)(knowledge of a conspiracy and intent to join it must be shown by "clear, not equivocal" evidence).

The defendants effectively argue that the threadbare nature of the United States' case against Billings in this new conspiracy charge is a result of the fact that until ten days before the Second Superseding Indictment was returned, its theory of the case was that Billings had no involvement in the alleged bribery/conversion scheme.  They contend, and the United States essentially admits, that the United States' theory changed solely as a result of Judge Reeves' order denying its motion to reconsider his order severing the case into two trials.  While the United States' theory of the case may have changed, the facts have not.  After careful review of all the recordings involving Billings, and the other evidence offered by the United States at the *Enright* hearing, the Court cannot find any evidence that Billings agreed to join any conspiracy.

In conclusion, from the evidence outlined above, the Court finds that the United States has shown by a preponderance of the evidence that Lawson, Nighbert, and Rummage were members of the conspiracy.  However, with respect to Billings, the United States has not shown by a preponderance of the evidence that he had actual knowledge of and joined in the criminal enterprise as defined in Count 1 of the Second Superseding Indictment.  For this reason, and for the reasons set out in the Court's Opinion & Order entered this same date granting the defendants' joint motion to sever, the trial of Billings will be severed from the trial of Lawson and Nighbert.

**V.     WHETHER THE STATEMENTS WERE MADE DURING THE COURSE OF AND IN FURTHERANCE OF THE CONSPIRACY**

The Court has already determined the existence of a conspiracy between Lawson, Nighbert and Rummage beginning in the summer of 2006.  To determine whether the statements designated by the United States were "during the course of and in furtherance of the conspiracy," the duration of the conspiracy must first be determined.  The indictment alleges that the conspiracy began in June 2006 and continued until the return of the original indictment in September 2008.

The evidence at the hearing revealed that although Rummage was asked to obtain two engineer's estimates in June and July of 2006, it was not until the third request in late summer 2006, when he was asked to "take this to our friend in Lexington," that he realized the engineer's estimates were obtained for improper purposes.  At this point, Rummage joined the conspiracy.  However, there is  evidence that the conspiracy began prior to this time.  While the United States argues that the conspiracy began in June 2006, the only evidence in support of this date is Rummage's testimony.  With respect to Nighbert's second request in July 2006, however, Ryan Griffith's calendar confirms Rummage's testimony.  Accordingly, the Court finds, by a preponderance of the evidence, that the conspiracy began in July 2006 when Nighbert requested that Rummage obtain an engineer's estimate.

While the bribery component of the conspiracy ended when the coconspirators became aware of the OIG investigation, the United States contends that the conspiracy continued because the coconspirators had already agreed upon a cover story to conceal their conduct and because Lawson and Nighbert had not received all of the economic gain expected from their conduct.  Generally, subsequent acts of concealment are a continuation of the conspiracy if this was a part of the original

22

understanding and agreement. *Grunewald v. United States*, 353 U.S. 391, 399-405 (1957)(part of conspiracy to defraud government inextricably contained the acts of concealment). Additionally, if the concealment occurs prior to the receipt of the economic gain contemplated by the members of the conspiracy, the conspiracy is deemed ongoing and the concealment acts are in furtherance of the conspiracy. *United States v. Howard*, 770 F.2d 57 (6th Cir. 1985); *United States v. Dynaelectric Co.*, 859 F.2d 1559, 1563-64 (11th Cir. 1988); *United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984).

The United States has established, by a preponderance of the evidence, that Lawson, Nighbert and Rummage agreed to conceal their conduct with a cover story; i.e., that if asked, they would say that Nighbert needed the engineer's estimates for budgetary purposes and they were never given to Lawson. Moreover, until the return of the indictment, Nighbert was still under contract with UMG to receive more than $10,000 per month for all of 2008. Even though Nighbert did not cash the first three checks tendered to him, and UMG ultimately discontinued issuing them apparently in a reaction to the increasingly focused criminal investigation, he has not been fully compensated for his involvement in the alleged conspiracy. *See United States v. Helmich*, 704 F.2d 547 (11th Cir. 1983)(conspiracy to commit espionage continued long after secret material given over to Soviets because the defendant did not receive his payment until many years later). Additionally, at the time of the indictment, Lawson's companies were still not fully paid on all of the road contracts at issue. *See United States v. Walker*, 653 F.2d 1343, 1347 (9th Cir. 1981)(bid rigging conspiracy did not end with awarding of contract, because the scheme had the additional objective of obtaining money from the contracts and dividing it among conspirators). Thus the Court finds, by a preponderance of the

evidence, that the conspiracy began in July 2006 and continued until the return of the indictment in September 2008.

However, on March 6, 2008, Rummage hired his current attorney and offered to provide testimony to the FBI about his agreement with Lawson and Nighbert to unlawfully provide engineer's estimates to Lawson prior to letting. This confession to law enforcement authorities amounts to his withdrawal from the conspiracy. *See United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004); *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987)("[A] full confession to authorities or a communication by the accused to his coconspirators that he has abandoned the enterprise and its goals" is sufficient evidence of withdrawal). Thus, as of March 6, 2008, Rummage is no longer a member of the conspiracy and any statement made by him after that date cannot be admissible as a coconspirator statement under Rule 801(d)(2)(E).

Now that the duration of the conspiracy is established, the Court must examine the statements designated by the United States to determine whether they were made in furtherance of the conspiracy. Generally, "[a] statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." Maliszewski, 161 F.3d at 1008 (citing United *States v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)). According to the Sixth Circuit in *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988), this requirement can be met in a number of ways including when the statements are made to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears. *See also United States v. Shrout*, 2008 WL 4679543, *4 (6th Cir. October 22, 2008). "Statements that prompt a coconspirator to act in a matter that facilitates the carrying out of the conspiracy, or that serves as

24

a necessary part of the conspiracy by concealing or impeding the investigation, are also made in furtherance of the conspiracy. *United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005).

The United States has designated twenty-three general statements by Lawson, Nighbert, and Rummage, from June 2006 until January 2008, which it seeks to admit under Rule 801(d)(2)(E).[2] The Court has reviewed each of these statements, either the recordings themselves, the United States' description in its designation, and/or the testimony at the *Enright* hearing. With the exception of four statements, the Court finds that the statements were made during and in furtherance of the conspiracy and thus admissible as coconspirator statements under Rule 801(d)(2)(E) against Lawson and Nighbert.

The four statements in this group not admissible under Rule 801(d)(2)(E) are Statements 1, 11, 13 and 14 in the United States' Designation of Coconspirator Statements. Based on the Court's finding that the conspiracy began in July 2006, Statement 1, made in June 2006, cannot meet the "during" requirement contained in Rule 801(d)(2)(E). Statements 11, 13, and 14 do not satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). Statement 11 relates to Lawson's "numerous comments about Nighbert having been over to his house." Statement 13 relates to Rummage's testimony that he overheard Lawson on the phone, then observed Lawson phone his home and tell someone that Nighbert's wife and kids were coming over to go swimming. Statement 14 relates to Rummage's testimony that Lawson told him that Nighbert flew to Lawson's house in Florida, and then they flew together on Lawson's plane to a conference (possibly in Mexico). It is unclear how any of these statements promote the objectives of the conspiracy. Although Rummage noted at the

---

[2]These statements are numbered 1 through 23 in the United States' Designation of Coconspirator Statements.

hearing that he was aware that Lawson and Nighbert were friends, he failed to offer any explanation as to how these statements promoted the objectives of the conspiracy. The Court cannot find that these statements were made in furtherance of conspiracy and therefore, they are not admissible under Rule 801(d)(2)(E).

The United States has designated four recorded conversations between Lawson and Rummage.[3] As the United States concedes, all of these conversations took place after March 6, 2008 - the date Rummage withdrew from the conspiracy. Consequently, Rummage's statements in these recorded conversations are not admissible as coconspirator statements. Lawson, however, remained a member of the conspiracy, and the conversations reveal his efforts to reassure Rummage and to further the objects of the conspiracy. Accordingly, Lawson's statements in these four conversations are admissible as coconspirator statements under Rule 801(d)(2)(E) against Nighbert. Because Rummage's statements provide context for Lawson's statements, they will be admitted as context only, not for the truth of the matter asserted, and the jury will be so instructed. *See United States v. Rogers*, 118 F.3d 466, 477 (6th Cir. 1997)(citing *Howard*, 770 F.2d at 61, fn 4).

The United States has also designated seven general statements by Rummage and Billings which took place between January and March 2008.[4] Because the Court has already determined that the United States failed to prove by a preponderance of the evidence that Billings was a conspirator, Billings' statements are not admissible under Rule 801(d)(2)(E). Only one statement - Statement 24 in the United States' Designation of Coconspirator Statements - was made before Rummage

---

[3]The United States has incorporated the recordings of these conversations in Statement 26 of its Designation of Coconspirator Statements.

[4]These statements are numbered 24-25 and 27-31 in the United States' Designation of Coconspirator Statements.

withdrew from the conspiracy. This statement involves the meeting between Rummage and Billings in a parking lot of a restaurant in Mt. Sterling when Billings allegedly passed Rummage pieces of paper requesting information about the OIG investigation and whether anyone else had contacted him. Based on a review of the United States' designation and the testimony at the *Enright* hearing, the Court is unable to find any statements by Rummage during this meeting that meet the "in furtherance" requirement of Rule 801(d)(2)(E). The remainder of the designated statements between Rummage and Billings occurred after March 6, 2008, and thus cannot be coconspirator statements and are not admissible under Rule 801(d)(2)(E) since neither Rummage nor Billings were members of the conspiracy at that point. *See Rogers*, 118 F.3d at 477.

The United States has designated nine out-of-court statements made by the defendants to various witnesses which it seeks to admit under Rule 801(d)(2)(E). However, with respect to the statements made by Nighbert to Tim Hill (Statement 7), there is no evidence that these statements were made during or in furtherance of the conspiracy. The eight remaining statements designated by the United States were made by a coconspirator during and in furtherance of the conspiracy because they directly relate to one of the objectives of the conspiracy; i.e., to illegally obtain engineer's estimates [Statements 3 (Donnie Miracle), 5 (Ryan Griffith), and 9 (Debra Rhody)], to ensure that Rummage remained an inside source for obtaining engineer's estimates [Statements 1 (Governor Steve Beshear), 4 (Vince Gabbard), and 8 (Joe Prather)], or to compensate Nighbert [Statement 2 (Brian Collins) and 6 (Becky Harrelson)]. Accordingly, these statements are admissible as coconspirator statements under Rule 801(d)(2)(E) against Lawson and Nighbert.

27

## VI.    CONCLUSION

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby

**ORDERS** as follows:

(1)    the defendants' motion for leave to file oversized post-*Enright* hearing response brief [DE 497] is **GRANTED**, and the Clerk is **DIRECTED** to **FILE** the tendered brief;

(2)    the United States' motion to strike the defendants' joint submission of proposed findings of fact and conclusions of law [DE 506] is **DENIED**;

(3)    the defendants' joint motion for extension of time to file all other evidentiary challenges [DE 492] is **GRANTED**, and the period for filing all other evidentiary challenges shall be extended by 14 days after entry of this Opinion & Order; and

(4)    The following statements contained in the United States' Designation of Coconspirator Statements are **ADMISSIBLE** pursuant to Rule 801(d)(2)(E): Statements 2 - 10; Statement 12; Statements 15- 23 and Statement 26 (Lawson's statements only); and the Other Statements by witnesses Governor Steven Beshear, Brian Collins, Donnie Miracle, Vince Gabbard, Ryan Griffith, Becky Harrelson, Joe Prather, and Debra Rhody (Statements 1-6 and 8-9).  The remainder of the Statements in the United States' Designation of Coconspirator Statements are not admissible under Rule 801(d)(2)(E).

This October 19, 2009.

**Signed By:**

*Karl S. Forester*

**United States Senior Judge**

28