UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

CRIMINAL NO.: 3:08-cr-21                                                     *Electronically Filed*

UNITED STATES OF AMERICA                                                              PLAINTIFF


**RESPONSE TO MOTION IN LIMINE REGARDING
ATTORNEY REPRESENTATION**
V.                                    **AND**
**UNITED STATES MOTION IN LIMINE TO INTRODUCE ADDITIONAL
EVIDENCE OF ATTORNEY REPRESENTATION AND FEES**


**LEONARD LAWSON,
CHARLES WILLIAM "BILL" NIGHBERT and                              DEFENDANTS
BRIAN BILLINGS**

\* \* \* \* \* \*

The Defendants' motion in limine should be overruled.  While the motion is limited to a discussion of just two instances of overlapping attorneys-----True's prior representation of Marc Williams and Wicker's dual representation of Nighbert and Billings------this is only a small part of an overarching entanglement of attorneys and attorney's fees that is probative of issues before the finder of fact.

Evidence of a concerted effort by the defendant Lawson to select and provide, at his expense, attorneys for co-defendants and witnesses is proper impeachment of the witnesses, is evidence of prior or present association, and is evidence of a consciousness of guilt.  Therefore, the Government will move in limine to be allowed to introduce

evidence that Lawson has selected or is funding multiple attorneys for both witnesses and defendants.

The United States has a good faith basis for asking various witnesses in this case if Leonard Lawson is providing them with an attorney, or if someone on Lawson's behalf steered them to a particular attorney. It is the government's theory that long before the indictment was returned, during the early stages of the investigation, Lawson and his closest attorneys systematically began providing attorneys for individuals in and around the critical facts. He did this both for purposes of informing himself and his attorneys of the developments in the investigation and in order to control the message from the defense side of the case. The Court will recall Lawson's words to Rummage in the recordings:

> Lawson: Now what you need to do is...is call Jon...Jon Woodall and, uh, tell him what's goin' on and ask...ask him what to do now. And, that ain't gonna cost ya nothin'.
> Government Exhibit 24 B at 3, 32-35.
>
> Lawson: . . . let Jon tell you what to do. I mean go in and do...is just take the fifth and, uh, Jim. . . . you'll wind up sayin' somethin' that you ought not say.
> Government Exhibit 24 B at 4, 9-12.
>
> Lawson: But, if you can stand pat on this, you won't have no problem.
> Government Exhibit 24 B at 4, 20.
>
> Lawson: Jon Woodall will call ya and have you come to his office and, uh, I think you'll feel a lot better about yourself.
> Government Exhibit 24 B at 15, 20-21.
>
> Lawson: . . . you oughta get that lawyer that those boys recommended and, uh, don't worry about, uh, don't worry about, uh, what you, you know,

it...you...you can afford that. I, but you can read what I'm, uh, sayin'.
Government Exhibit 25 B at 1, 18-21.

Lawson: But, uh, you know you've got to have ya; you need to get you a lawyer. . . . And don't worry about what's it gonna cost. You may have to dig in that hole and get you some more cash.
Government Exhibit 25 B at 3, 1-5.

Lawson: But, anyway...after you do that, let us know who your lawyer is and let our lawyers talk to each other.
Rummage: Alright.
Lawson: That's way's try to curb this thing.
Government Exhibit 25 B at 8, 4-7.

Lawson: Jim, I can't tell you what to do, but you need to take...you need to (clears throat) you need to take the attorney that...you know, it's, uh, it's against the...it's against the law for me to tell ya what to do after this has come up.
Government Exhibit 26 B at 2, 1-4.

Lawson: . . . they was tryin' to get you to get another...get somebody else to represent ya and they...we could be talkin' with 'em. The lawyer that you got I understand don't have a real good...he's not real stable, but, uh... . . . Well, this guy that's (cough) that you was give a nam...that, uh, was giv... you was given a name by...by Jon...Jon Woodall that day I told you to get you an attorney, knows how to handle this thing.
Government Exhibit 26 B at 5, 21-32

Lawson: Well, he may seem to be, but he's got a...he has a credibility problem, I've been told. I've been told by three law firms.
Rummage: Wh...
Lawson: He'll throw everybody in the country under the bus, but he'll sa... he'll try his best to save you.
Government Exhibit 26 B at 6, 5-9.

Lawson: And, that lawyer will tell ya anything to suck in money in Louisville. And, he...and that's...that's...that happens to be Steve Beshear's old law firm where he works. Now, you know, I can't talk to ya anymore later on if you use that attorney. . . . At...at much, you oughta go talk to that fella and swapping attorneys uh, you know, uh, that's your decision as a person.

>Government Exhibit 26 B at 7, 4-21.

>Lawson: This...this other attorney works straight with the agents. This guy that you got has no credibility with anybody. By law firm in Louisville or the one in Lexington or anywhere else. . . He'll...he'll do somethin' for you and throw everybody else under the bus or try to and then everybody goes to court and you be...you be splattered all over the world.
>Government Exhibit 26 B at 8, 22-29.

There can be little doubt that if Lawson was prepared to fund Rummage's defense, he would do the same for other subjects and targets. It is also plainly apparent that he was not simply interested in competent representation for a friend, but a type of representation that was more inclined to advance his best interest, not the friend's.

Any evidence that a witness has a relationship to a party that could influence his testimony is admissible impeachment.

>"Impeachment by showing the witness to be biased rests on two assumptions: (1) that certain relationships and circumstances impair the impartiality of a witness, and (2) that a witness who is not impartial may, consciously or otherwise, shade his or her testimony in favor of or against a party. Since bias of a witness is always significant in assessing credibility, the trier of fact must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness to determine whether a modification of testimony reasonably could be expected as a probable human reaction.
>*Behler v. Hanlon*, 199 F.R.D. 553, 557 (D.Md. 2001)

A defendant's funding of a witnesses' representation is proper impeachment. *United States v. Coviello*, 225 F.3d 54 (1st Cir. 2000)(evidence that defendant paid for witnesses' attorney's fees at grand jury and that witness had same attorney as defendant at grand jury is admissible to impeach defense witness). A witness whose lawyer was

selected and paid for by a defendant has a motive to slant his testimony in a manner favorable to the defendant. *See*, *United States v. Frazier*, 944 F.2d 820 (11th Cir. 1991)(evidence of payment of witnesses' attorney's fee by a corporate target is probative of motive to commit perjury in favor of that corporation and fact that witness had same attorney as corporation also probative of motive.)

The United States believes that Lawson provided attorneys at his expense to witnesses, Archie Marr, Greg May, Anthony Combs and Kellie Haney. While the evidence is more ambiguous, there is some reason to believe that witness Marc Williams was furnished counsel by Lawson. These witnesses were in a position to provide critical evidence in this case and all have, in the government's opinion, shaded their testimony to either favor Lawson's defense or damage his defense less, or have refused to cooperate.

The government also firmly believes that Lawson is funding the defense for Nighbert and Billings. Therefore, if any witness testifies who would have personal knowledge of this subject, the government intends to inquire about it. This evidence would be consistent with the government's theory that Lawson was attempting to thwart the investigation, and is probative of his attempts to control Rummage. The facts of the prior representation of Williams by True and the joint representation of Nighbert and Billings by Wicker, are inextricably bound up in this evidence.

According to Rummage, Marc Williams was in the first meeting in Nighbert's office wherein Rummage was asked, in Lawson's presence, to obtain the engineer's estimate on a particular project. The Court will recall that Rummage said this first

request was for the purported purpose of investigating a possible leak, not for the purpose of budgeting, as is the more recent excuse. During the investigation, Williams initially refused to submit to an interview by either the OIG or the FBI. When served with a grand jury subpoena, Williams, through his attorney, Guthrie True, who also represents Lawson, informed prosecutor Ken Taylor that Williams had no information pertinent to the investigation. Taylor advised True that evidence existed that placed Williams at a critical meeting wherein engineer estimates were discussed. After conferring with Williams, True advised Taylor that Williams, when asked about the meeting, did vaguely recall something along that line. Williams then agreed to an interview with True present. In that interview, Williams both corroborated and contradicted Rummage's account of the meeting. (He corroborates the existence of a meeting with Nighbert, Lawson and Rummage, but says it was about technical bidding issues. He denies hearing Nighbert direct Rummage to obtain the estimates. He does corroborate that Nighbert, at a later time, professed to be concerned that estimates were being compromised and wanted to obtain some of them for analysis.)

    The government is entitled to confront Marc Williams with any evidence going to his bias. If his attorney was provided by Leonard Lawson, or if he consulted with Lawson or Nighbert concerning his testimony, that is clearly admissible impeachment.

    The evidence that, during the investigation, Williams was represented by an attorney, True, is proper impeachment evidence to show bias, even if Lawson did not fund True's representation of Williams. It is human nature to desire to please one with

whom one has had a significant relationship. Any association with the attorney for a party is fair cross examination. If years ago in private practice prosecutor Taylor had handled a legal matter for Rummage, that would be a proper subject of inquiry by the defense.

Attorney True has a significant past association with Williams, even representing him on a matter unrelated to this case. Williams will have to admit that he has voluntarily waived any conflict of interest in the dual representation by True of Williams and Lawson. That itself reflects a desire to please True, at least, and possibly Lawson as well.

Kelley Haney was the secretary receptionist that Rummage described as having been present when he dropped engineer's estimates off at Lawson's office. When asked to submit to an interview in lieu of grand jury testimony, Haney agreed. She was represented in the interview by attorneys Kent Wicker and Steve Reed. Both Reed and Wicker now represent co-defendant Brian Billings, and Wicker now represents co-defendant Bill Nighbert. Haney both corroborated and contradicted aspects of Rummage's testimony.

The United States again is entitled to question Haney about the source of the funds to pay for her attorney, the manner in which her attorney was selected for her, and the fact of her prior association with an attorney for a party. This is classic bias impeachment.

Archie Marr was at the center of the whole UMG phase of the investigation. The Court will recall that Clay Mason testified that when he did a cold call interview with Marr about the UMG/Nighbert relationship, his answers were very vague and confusing.

When attempts were made for follow up interviews and grand jury testimony, Marr was represented by Attorney Dick Plymale. Marr provided no further voluntary cooperation in the investigation.

The United States believes Mr. Plymale was selected to represent Marr based on his prior association with Lawson's attorney and that the representation is being funded by Lawson. It is believed that the Marr defense is being carefully coordinated with the Lawson defense. When called to testify under a court compulsion order, it is expected that Marr will slant his testimony in favor of Lawson. It is absolutely imperative that the government be allowed to explore the interconnectedness of his defense with that of Lawson.

In this analysis, it again is helpful to imagine the shoe on the other foot. Suppose the government was funding Marc Murphy's representation of Jim Rummage, or had been involved in the selection of Murphy. The allegations and cross-examination from the defense would be intense, implying that Rummage was directed to Murphy so as to control him and conform his testimony and that the government was paying the bill in order to induce Rummage to slant his testimony. The same intense questioning would occur if the defense had reason to believe that Murphy's fee was being paid by someone with a business or legal interest adverse to Lawson, such as another highway contractor.

Suppose Marc Murphy had represented government witnesses Ryan Griffith or Steve Waddle, or perhaps had previously represented persons the defense will try to imply are behind this investigation, such as David Ray, Chuck Hines or Mike Duncan.

There would be much said about the overlapping representations as being probative of association and collusion. These flags of bias and collusion apply just as certainly to the defense as they do to the prosecution.

In addition to its value as impeachment evidence, this concerted effort to control potential defendants and witnesses is substantive evidence of Lawson's consciousness of guilt. It is entirely consistent with Lawson's attempts to fund Rummage's defense-----so long as he stayed on message. Any evidence that Lawson funded Nighbert's or Billings' defense is corroborative of the allegations that Lawson was attempting to obstruct justice by controlling or preventing the cooperation of others. In *re Shargel*, 742 F.3d 61 (C.A.N.Y. 1984)(evidence that a person pays the attorney's fees of another is probative of prior or present association); *United States v. Simmons*, 923 F.2d 934 (2nd Cir. 1991)(evidence of shared attorney probative of association where there is independent evidence of prior association.)

In their motion, the defendants mis-characterize the intended use by the government of the evidence of overlapping and multiple representations by defense attorneys. They argue that the government is attempting to have the jury infer that the attorneys representations of more than one defendant or witness is misconduct. The government does not know whether these multiple representations involve impermissible conflicts of interest. Clearly, there are substantial questions raised in this regard, but the government has no intention of making any argument to the jury about attorney misconduct. The entire focus of this evidence is on the culpability of Lawson and the

lack of candor of the witnesses.

For all of the above stated reasons, the Defendants' motion in limine should be denied and the Government's motion in limine should be granted.

Respectfully submitted,

JAMES A. ZERHUSEN
UNITED STATES ATTORNEY

By:   s/Kenneth R. Taylor
      Assistant United States Attorney
      260 W. Vine Street, Suite 300
      Lexington, Kentucky 40507-1612
      (859) 685-4874
      Fax (859) 233-2747
      Ken.Taylor@usdoj.gov

CERTIFICATE OF SERVICE

On January 4, 2010, I electronically filed this document through the ECF system, which will send the notice of electronic filing to:

    Larry Mackey
    *Counsel for Defendant Leonard Lawson*

    Howard Mann
    *Counsel for Defendant William Nighbert*

    Kent Wicker
    *Counsel for Defendant Brian Billings*

s/Kenneth R. Taylor<br>
Assistant United States Attorney